## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| **LUCINDA BYRON** and **LATOYA LEWIS** on behalf of themselves, those similarly situated, and the Proposed Rule 23 Class,<br><br>   **Plaintiffs,**<br><br>**v.**<br><br>**AVANT HEALTHCARE PROFESSIONALS, LLC,**<br><br>   **Defendant.** | **Case No.: 6:23-cv-1645**<br><br>**Collective Action**<br><br>**Demand for Jury Trial** |

## COMPLAINT

Plaintiffs Latoya Lewis and Lucinda Byron, by and through their attorneys and on behalf of themselves, the Class and Collective set forth below, and in the public interest, bring this Complaint against Avant Healthcare Professionals, LLC, seeking relief for Defendant's violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589 *et seq.* and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*

## INTRODUCTION

1. This case is about labor trafficking and its impact on an essential workforce, including failure to pay minimum wages, suppression of wages, and unfair competition.

2. Avant Healthcare Professionals, LLC ("Avant," "Defendant," or "the

company") is a recruitment and staffing company that hires healthcare workers from other countries to work at various healthcare facilities around the United States.

3. Plaintiffs Latoya Lewis and Lucinda Byron (collectively, "Plaintiffs") are two such healthcare workers.

4. Avant led Plaintiffs and its other foreign-recruited healthcare workers to believe that they would come to the United States to practice nursing in a safe environment with a good employer who would treat them fairly.

5. But working for Avant was nothing like that. Rather, Avant's "employment" is essentially indentured servitude.

6. Avant requires healthcare workers to pay an unspecified amount of so-called "damages"—which are generally in the tens of thousands of dollars—if they leave Avant within three years or more of starting to work for the company. And Avant has a practice of threatening workers who try to resign with immigration consequences, even though Avant nurses' immigration status is not tied to their employer.

7. Avant also imposes harsh restrictive covenants on its healthcare workers, making it hard for them to find well-paying jobs if they were to leave Avant.

8. This lawsuit seeks to end Avant's illegal practices and to compensate the healthcare workers through two categories of claims.

9. First, Plaintiffs assert forced labor claims under federal law. Employers are not permitted to use or to attempt to use the threat of substantial harm, including financial harm or immigration consequences, to keep people trapped in their jobs.

Avant's threats of extraordinary financial penalties and immigration consequences if they try to leave their jobs violate federal forced labor laws and contravene the spirit of a competitive labor market to the detriment of Avant's healthcare workers and its competitors who play by the rules.

10.    Second, Plaintiffs assert a claim under the FLSA for failure to pay wages "free and clear" because Avant's policy of charging workers so-called "damages" if they try to leave their jobs prevented their earned wages from being "paid finally and unconditionally."  And when Avant recovers so-called "damages" in its lawsuits or through payment of those sums, it receives a "kick-back" of wages that is impermissible under the FLSA. The kickbacks reduce workers' wages in their final workweek of employment to substantially less than the federal minimum wage— indeed, well into the negative numbers.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this matter arises under the laws of the United States—specifically, the TVPA and FLSA.

12.    This Court has personal jurisdiction over Defendant, and venue is proper in this Court, because Defendant's headquarters are within the Middle District of Florida.

## PARTIES

13.    Plaintiff Latoya Lewis is a registered nurse who was formerly employed by Defendant. She is a citizen of Jamaica and a legal permanent resident of the United

States. She lives in Georgia.

14.     Plaintiff Lucinda Byron is a registered nurse who was formerly employed by Defendant. She is a citizen of St. Vincent and the Grenadines and a legal permanent resident. She lives in Tallahassee, Florida.

15.     Defendant is a limited liability company organized in Florida and with its principal place of business in Casselberry, Florida.

## FACTS

## I.    DEFENDANT'S BUSINESS

16.     Avant recruits trained nurses, physical therapists, and occupational therapists (together, "healthcare workers") from over 60 countries, bringing them to the United States, and selling their labor to healthcare facilities. These healthcare facilities often lack sufficient staff to serve the healthcare needs of their communities, so they turn to Avant.

17.     Avant lures healthcare workers to it by promising them the "American Dream." In fact, Avant lists the various steps of the recruitment process on its website with the last step being the "American Dream."

18.     Avant profits off the labor of the healthcare workers it recruits. Specifically, Avant profits by charging its clients (i.e., the healthcare facilities) fees for its healthcare workers' labor. Therefore, the longer Avant can make healthcare workers continue to work for it, the more it can profit from their labor. The healthcare facilities benefit from the arrangement through, among other things, the labor of expert healthcare workers.

19.     The inability of Avant's healthcare workers to leave their jobs is one of the company's selling points. As Avant boasts on its website, "[o]ur nurses are on contracts of 6,240 hours to our client facilities before conversion with no upfront or conversion costs. This long-term solution provides your organization with greater continuity of care, consistent patient satisfaction, and helps drive retention."

20.     Avant makes the healthcare workers it employs sign form contracts, each with substantially the same terms.

21.     But what these contracts do not make clear is that Avant achieves its "long-term solution" for its clients by forcing healthcare workers to labor under threat of serious harm, including financial and immigration consequences, as well as threatened abuse of legal process.

22.     At present, Avant employs hundreds of healthcare workers who labor under this scheme but has employed thousands of such workers over the years. These numbers continue to grow, with Avant's clients' demand for nurses having increased more than 500% since the onset of the coronavirus pandemic.

## II.     DEFENDANT'S THREATENED FINANCIAL PENALTY

23.     To compel workers to keep working for Avant, its form contract threatens that workers who resign before their "Initial Employment Period" or "Revised Initial Employment Period" are up will owe Avant "damages."

24.     Specifically, the contract provides, in relevant part:

**Initial Employment Period.** The Initial Employment Period commences on the date Employee first starts working at an Assigned Client Facility. The Initial Employment Period continues until Employee works the

Hours Commitment defined on Schedule A . . . exclusive of on-call hours, vacation, sick leave, or other leave during which employee did not actually work . . . . The Initial Employment Period relates only to damages and does not create any limitations on Employee's employment with Avant beyond the Initial Employment Period….

**Revised Initial Employment Period.** If the Assigned Client Facility terminates Employee's assignment for Cause and Avant transfers Employee as set forth in Section III.C., the transfer will result in AVANT incurring additional costs and suffering a loss of revenue, which will require an increase in the hours necessary to complete the Initial Employment Period (or the fee payment equivalent) ("Revised Initial Employment Period"). Consequently, should AVANT, in its sole discretion, choose to re-assign Employee instead of terminating Employee for Cause, Employee agrees to accept work at new Assigned Client Facility and acknowledges the Revised Initial Employment Period. AVANT has full discretion to transfer Employee to any location and to change Employee's compensation for work performed for the new Assigned Client Facility upon transfer to any rate that is not less than the local prevailing wage as determined by the United States Department of Labor. Employee, thus, acknowledges that a transfer due to the Assigned Client Facility's termination for Cause will result in Employee having an Initial Employment Period that does not end after Employee's initial completion of the Hours Commitment . . . but rather ends after completion of the Revised Initial Employment Period at the new Assigned Client Facility. The Revised Employment Period relates only to damages and does not create any limitations on Employee's employment with Avant beyond the Revised Initial Employment Period.

25.     As set forth in the paragraph about the "Revised Initial Employment Period," the total number of hours a healthcare worker must work for Avant before they can resign without a penalty is entirely within Avant's discretion and unknown to healthcare workers.

26.     For Plaintiffs, the Schedule A set their hours requirement at 5,200 and 6,240 hours respectively, but all could be subject to an increased number given the "Revised Initial Employment Period" possibility, among other things.

27.     Moreover, healthcare workers' hours do not start counting towards their

"Employment Period" until after they have completed four to six weeks of training in Florida, moved to their actual job location, and started working for Avant's chosen healthcare facility.

28.     The form contract states that if healthcare workers fail to complete the clinical component of that training or, for the first 90 days, fail to work a minimum of 35 regular hours per work week if scheduled to 8, 10, or 12-hour shifts, they will also be liable for damages.

29.     Further, under the form contract, if any of the following occur, the healthcare worker will be liable for damages:

> Employee fails to take the National Licensure examination or fails to achieve a passing score on the National Licensure examination and a re-sponsor is not granted;

> Employee fails to achieve a passing score on the National Licensure examination and is required by AVANT to re-take the examination at employee's expense and Employee either fails to re-take the examination or again fails to achieve a passing score on the examination;

> If Employee fails to participate in the AVANT licensure review program and fails to adhere to all requirements in the agreed upon timeframes or fails to meet the passing standards for the review program;

> Employee makes any change in his/her Original Employment from the time of execution of the Agreement and prior to relocation to the United States without written authorization from AVANT; or

> Employee fails to relocate to the United States.

30.     Avant also maintains the sole discretion to terminate healthcare workers—and, thus, hold them liable for "damages"—for a "breach" of contract in a variety of circumstances, including but not limited to "failure to provide patient care

consistent with accepted guidelines" and "failure to accept a transfer to a new location or new Assigned Client Facility."

31.     In contrast, if healthcare workers believe Avant has breached the contract, their only recourse is to give Avant notice and abide by Avant's CEO's or designee's determination on whether Avant breached the contract or failed to timely cure such breach.

32.     Avant's form contract explains its "damages" without listing a dollar amount. Instead, the contract threatens a whole host of alleged costs, including the company's "lost profits." Specifically, the contract provides:

> Employee acknowledges and agrees that AVANT has incurred and will continue to incur a significant cost investment related to the training, credentialing, licensure, and placement of Employee with a Client in the United States based upon the expectation that Employee will continue to be employed with AVANT for at least the Initial Employment Period. Employee understands and acknowledges that if he or she terminates his or her employment with AVANT at any time after relocation to the United States, but prior to the completion of the Initial Employment Period for any reason other than a termination with Good Reason . . . or by written consent of AVANT, that AVANT will be damaged not only by loss of its investment in credentialing, licensing, training, and placement, but also will incur costs, expenses, and damages related to replacement of Employee's services to the Client or Clients, including, but not limited to, training, licensure, and relocation costs for the replacement employee and lost profits. Consequently, if Employee breaches this Agreement, Employee will be liable to AVANT for Damages which, to the extent permissible by applicable law, are defined as the greater of (1) actual damages, including but not limited to actual costs, both direct and indirect, incurred by Avant related to Employee (costs do not include any amounts specifically not recoverable from Employee under U.S. law such as 20 CFR 655.761.(c)(9)(iii)(C)) or (2) lost profits. Damages are in addition to any injunctive relief awarded to AVANT due to Employee's breach of [restrictive covenants in the contract].

8

33.     When healthcare workers inquire about how much they will owe Avant should they resign early, Avant's typical practice is to tell those workers that "damages" cannot be calculated until after they actually resign, thus increasing workers' fear of owing an unattainable amount and incurring crippling debt.

34.     Healthcare workers that actually resign early routinely receive an email from an Avant representative with a variation on the statement that "early termination of employment is a serious decision" and a request to discuss that decision further by phone.

35.     When healthcare workers speak with an Avant representative, that person routinely tells them that they owe tens of thousands of dollars, which must be paid within 30 days.

## III.  DEFENDANT'S RESTRICTIVE COVENANTS INCREASE WORKERS' FEAR OF LEAVING AVANT TO FIND ANOTHER JOB.

36.     Defendant's form contract further makes leaving Avant dangerous for healthcare workers because of the restrictions it imposes on their ability to earn a living.

37.     Specifically, absent Avant's prior written consent, healthcare workers may not work either full or part time for anyone other than Avant while they are employed by Avant.

38.     The form contract also contains an 18-month covenant not to compete absent Avant's CEO's prior written consent. The non-compete term, which Avant applies to workers in all states except California, prohibits healthcare workers from

providing services to any of Avant's clients unless Avant has assigned the worker to that client. The restricted period of 18 months is only reduced to six months after completion of the "Employment Period."

39.     The form contract also prohibits healthcare workers from, during their employment with Avant and for an entire year following, soliciting or recruiting Avant's employees for any other job or suggesting, advising, or encouraging other healthcare workers to breach their contract with Avant.

40.     In other words, Avant requires its healthcare workers to work exclusively for Avant, prevents them from working for the healthcare facilities they came to know while working for Avant, and prohibits them from helping other healthcare workers escape from Avant.

## IV.  DEFENDANT'S IMMIGRATION THREATS

41.     Avant's healthcare workers are in the United States on EB-3 visas. EB-3 visas are available for skilled or professional workers, including nurses, and are not tied to a specific employer. Holders of EB-3 visas receive green cards allowing them to legally live and work in the United States.

42.     When Avant healthcare workers give notice that they intend to leave their jobs before the expiration of their commitment period, Avant routinely tells them that Avant will be forced to report their resignation to the United States Customs and Immigration Services, leading workers to believe that their resignation will have negative consequences for their immigration status. This is not true, but is a powerful

tool for Avant in its efforts to prevent employees from making a free and informed decision to find new employment.

## V. DEFENDANT'S FAILURE TO PROVIDE SAFE AND DECENT WORK ENVIRONMENTS WITH FAIR CONDITIONS AND PAY

43.     Avant recruits nurses that already have significant experience in nursing. Avant nurses have often worked for many years in hospitals all over the world before coming to the United States to work for Avant.

44.     Despite this, Avant frequently places nurses in positions that are well below their level of experience or outside their area of expertise, and provides them with hourly pay that is much lower than the pay received by American nurses with comparable levels of experience.

45.     Avant nurses are generally ineligible for the bonuses and incentives that are paid to their colleagues at the hospitals where they work.

46.     Avant controls where nurses are placed. If the hospital they are placed at has difficult or dangerous working conditions, such as high patient-to-nurse ratios or other limited resources, nurses may find themselves unable to leave for a better job because of Avant's threats of financial harm and immigration consequences.

47.     Pursuant to Avant's contracts, employees are eligible to accrue PTO at a rate of between 0.03 and 0.034 hours per contract hour, which amounts to as little as four full days of PTO per year.

## VI. PLAINTIFF LUCINDA BYRON'S FORCED LABOR EXPERIENCE WITH AVANT

48.     Plaintiff Lucinda Byron is a registered nurse.

11

49.     Byron is from the St. Vincent and the Grenadines.

50.     She has worked as a nurse since graduating from nursing school in 2016.

51.     From 2016 to 2018, Byron worked as a nurse in St. Vincent. From 2018 until 2021, she worked as a nurse in St. Kitts and Nevis. From 2021 to 2022, she worked as a nurse in the United Kingdom.

52.     Byron first heard about the opportunity to work as a nurse in the United States through Avant while she was in nursing school in St. Vincent. One of her instructors referred her to the program after immigrating to the United States with Avant herself.

53.     Byron wanted to work in the United States because she viewed it as a land of opportunity. Avant's marketing materials sold her on the idea of pursuing the American Dream through the company.

54.     Byron applied to Avant in 2016, but was told she needed post-graduate nursing experience. After working for three years in the Caribbean, Byron applied to Avant again in 2019.

55.     On or around January 2019, Byron signed Avant's form contract for the first time. **(Exhibit A, Byron Contract).**

56.     Byron came to the United States in 2019 to take her National Council Licensure Examination ("NCLEX"), which is required to be a licensed nurse in the United States and Canada. She passed the exam on the first try. When she was in the United States to take the NCLEX, she was even more motivated to pursue the

opportunity Avant purported to provide. She was amazed by the variety and affordability of food and other essentials.

57.     After she completed the NCLEX, Avant informed Byron that she would need to take an English language test to be eligible to immigrate.

58.     Taking this test required her to pay out of pocket to travel back to the United States, which Byron found frustrating. If Avant had informed her of the requirement earlier, she could have taken the English language test at the same time as her NCLEX test, but it did not.

59.     The COVID-19 pandemic further delayed the English language test. It was not until immediately before Byron moved to the United Kingdom in March 2021 to work as a registered nurse there that she was able to complete the test, which was the final step to become eligible to file for a green card to work in the United States through Avant.

60.     In March 2022, Byron received her immigration approval to begin working in the United States.

61.     When Byron initially signed up to work for Avant, the company said it would help both her and her daughter, who is now 11 years old, immigrate to the United States. However, Avant did not properly submit Byron's daughter's paperwork.

62.     Byron contacted Avant to fix the problem. An Avant representative said she would get back to Byron, but never did. As a result, Byron's daughter could not move to the United States, and had to stay in the Caribbean.

63.    Prior to departing for the United States, Byron interviewed with Monument Health Rapid City, in South Dakota. Byron passed that interview and therefore knew that her first work assignment would be at Monument Health.

64.    On April 22, 2022, Byron came to the United States to begin working for Avant.

65.    Byron's work began with training in Florida.

66.    On the first day of orientation, Byron signed Avant's form contract again. Avant required that she sign the contract on the spot, without reviewing it. An Avant representative subsequently took the contract back from her, meaning that she did not have any opportunity to review its terms either before or after signing.

67.    Avant paid Byron $10 per hour during training.

68.    The training lasted six weeks, and included things such as drug testing, life support certification, and lessons in the basics of life in the United States, such as how to get a drivers' license, how to open a bank account, and how to find an apartment.

69.    In addition, training included an introduction to Avant policies. One of the policies that Avant emphasized was that Avant employees should never to talk about their salary with anyone except Avant. Avant also told the workers at the training that they would be forced to pay a penalty if they tried to leave Avant before their contract was up.

70.    After training, Byron had one week of unpaid time before she started work, which she spent in Florida.

14

71.    Byron started working at Monument Health in Rapid City, South Dakota in June 2022.

72.    Throughout her work at Monument Health, there were issues with Byron's pay. For example, Byron was supposed to receive incentive pay for working certain shifts. But Avant repeatedly failed to pay the proper incentive pay rate.

73.    Avant referred Byron quickly found that she was underpaid relative to her American counterparts. Although Bryon has 7 years of experience as a nurse, Avant initially determined her pay rate at only $27 an hour, which was less than the hospital paid new graduate nurses.

74.    Byron had to reach out to Avant and have the pay rate adjusted to $30 an hour, which was still lower than the American nurses she worked with who had comparable experience.

75.    Not only that, but Avant consistently paid Byron less than it owed her. For example, Avant failed to provide Byron with a pay increase she was owed until she called Avant's payroll department to complain. Avant also repeatedly failed to pay Byron an additional $100 per shift it owed her in incentive pay for working certain shifts.

76.    Avant had told Byron that she was not allowed to discuss pay with her coworkers or the hospital where she worked. Despite this, Avant refused responsibility for addressing Byron's pay issues, referring her instead to the hospital to discuss pay issues.

77.     Because Avant told her it was unable to help with her pay issues, Byron discussed these issues with a representative in the Monument Health timekeeping department, who tried to assist her. However, she ultimately told Byron that Avant needed to resolve these issues.

78.     Between her low salary, Avant's consistent underpayment, and the need to send money back to the Caribbean to support her daughter, Byron quickly found herself struggling financially. Budgeting was particularly difficult because Avant's payroll errors made it difficult to predict how much pay she would actually receive.

79.     As a result, Bryon had to drop out of a masters' program she had enrolled in, because she could not afford the monthly payments.

80.     In addition to the low pay, Byron found that she accrued Paid Time Off ("PTO") much slower than the American nurses she worked with, and that she had to work at least 1,300 hours before she could take PTO at all.

81.     According to her contract, Byron's PTO would accrue at a rate of 0.03 hours per contract hour if she worked a 36-hour a week schedule and 0.034 hours per contract hour if she worked a 40-hour a week schedule. This amounts to as little as four full days of PTO per year.

82.     But Byron wanted to visit her daughter in the Caribbean in January 2023 because she had not seen her daughter for over a year, due to Avant's failure to secure her immigration status. As a result, Byron worked long hours just to accrue more PTO.

83.     Byron applied for PTO with Monument Health in October 2022. Monument Health approved the PTO.

84.    Byron applied for PTO with Avant at the same time.

85.    Avant, however, ignored Byron's requests for PTO. Byron therefore planned her trip to visit her daughter without knowing whether the PTO would be approved.

86.    Avant only approved Byron's PTO request shortly before she had planned to leave on her trip, and then only because Byron expressed that she was so frustrated with the constant battles over pay and PTO that she planned to quit.

87.    Byron gave her two weeks' notice in January of 2023, prior to departing on her trip to visit her daughter.

88.    The timing of the notice was such that she would work one final shift after her trip.

89.    Avant, through its HR department, then called Byron and threatened to report her to ICE. They told her to rescind her resignation in order to prevent them from calling ICE and to avoid paying Avant a financial penalty.

90.    Avant also said she would lose her PTO if she resigned, and that her insurance would lapse.

91.    When Byron asked what the financial penalty for resigning would be, Avant told her that they could not tell her or even calculate the amount until her resignation was final, but that whatever the amount ended up being, she would only have 30 days to pay it.

92.    During this conversation, Byron asked for a copy of the most recent contract she signed with Avant, which Avant refused to provide.

17

93.     Based on information Byron had received from other Avant nurses who had resigned, she believed the penalty was likely to be between $26,000 and $30,000.

94.     Byron knew of at least two colleagues at Monument Health who had left Avant before she did. One of the colleagues told Byron that Avant had told her she would have to pay more than $20,000 for leaving, and that Avant would retain her unused PTO.

95.     Byron returned to the United States after her trip to visit her daughter and worked her final week.

96.     After her final shift, Avant, through its HR department, called Byron to ask whether she wanted to go through with her resignation. Byron confirmed that she did. Avant's Human Resources representative told Byron that someone from the company would be in touch with her.

97.     Byron then retained counsel, which informed Avant that Byron was represented and that any communications should be sent through counsel. Avant did not respond.

98.     This process was terrifying for Byron. She still had bills to pay, was worried about incurring a massive debt, and felt that through the resignation process Avant had made her feel like a criminal, including telling her that her resignation could create issues if she applied for citizenship.

99.     Avant imposes a restrictive covenant that prevents Byron from working at Monument Health for 18 months after her departure. Because Monument Health is

the major health facility in Rapid City, Byron had to move to North Dakota to find a new job.

100. Byron did not hear from Avant again until July 18, 2023, when she received an email from an Avant representative named Anna Slodkowski, who is the Director of Field HR for Avant. That email read as follows:

> We received your notice to terminate your employment on December 23, 2022, effective January 26, 2023. As you are aware, prior to Avant providing you extensive services that facilitated your obtaining the necessary certifications to live and work in the United States as a registered nurse, you signed an Employment Agreement agreeing in return for these services to provide healthcare services for Avant's clients in the U.S.

> Avant upheld its obligations by providing to you what it promised in the Employment Agreement. Avant spent over 3 years and 3 months assisting you prior to your first day of employment assigned to a U.S. healthcare facility. Yet you decided not to honor your commitment to Avant because you decided to terminate your assignment with Monument Health Rapid City Hospital and your employment with Avant after only 7 months. Avant asked why you wanted to leave your current assignment and you said it was for personal issues. Avant offered to transfer you to another facility, and you refused.

> It is disappointing that you decided not to fulfill your Employment Agreement. As a reminder of the terms, you agreed to in the Employment Agreement, we are including a copy of your executed Employment Agreement including section IV.F Damages and Section VI Restrictive Covenant with this letter. Avant has been damaged by your breach of the Employment Agreement due to the costs it incurred for your benefit prior to your assignment. Please know that Avant has the right to enforce the terms of the Employment Agreement. If you would like to consider a settlement of Avant's potential breach of contract claims against you, please let me know.

> Should you have any questions regarding this letter or attachments, please contact me.

101.   Despite Byron's request to Avant that all future communications be sent to her counsel, Byron's counsel was not included on this email.

## VII.   LATOYA LEWIS'S FORCED LABOR EXPERIENCE WITH AVANT

102.   Plaintiff Latoya Lewis is a registered nurse.

103.   Lewis is a citizen of Jamaica.

104.   By the time Lewis began working for Avant, she had been a nurse for approximately 14 years. During that time she worked in Jamaica, the Cayman Islands, and Tortola in the British Virgin Islands.

105.   In approximately 2019, Lewis learned from friends who had used Avant to find jobs in the United States of an opportunity to move to the United States and practice nursing.

106.   Avant's marketing materials sold Lewis the idea of living the American Dream, and she decided to apply to Avant in order to seek out a better life for herself and her loved ones. She wanted the opportunity to move from a third-world country to a first-world country, and was drawn in by the belief that in America it doesn't matter who you are or where you come from if you come with the intention to work hard and lift up your life.

107.   On or around September 2019, Lewis signed Avant's form contract while she was working in the British Virgin Islands. **(Exhibit B, Lewis Contract).**

108.   At the time Lewis signed the contract, she was excited about the opportunity. Although she read the contract, she did not fully understand the implications of its terms, including the damages provision or the non-compete.

109.   Lewis arrived in the United States on or around October 2021. She was assigned to work at Piedmont Rockdale Hospital in Conyers, Georgia.

110.   After Lewis's arrival, she was provided the contract again. When she re-read it, she was unsettled by some of its terms, but by that point, it was too late to back out.

111.   From approximately October 11 until November 15, 2021, Lewis participated in Avant's cultural and clinical transitions program, which provided her with an orientation in the culture of the United States and American hospitals, including drug testing, life support certification, and lessons in the basics of life in the United States, such as how to get a drivers' license, how to open a bank account, and how to find an apartment.

112.   In addition, training included information about Avant policies. One of the policies that Avant emphasized was that nurses should never to talk about their salary with anyone except Avant. Avant also told nurses at the training that they would be forced to pay a penalty if they tried to leave Avant before their contract was up.

113.    During this orientation, which took place in Florida, Lewis was paid the minimum wage of approximately $10 per hour.

114.   On November 15, 2021, Lewis moved to Georgia, where she had been placed for a nursing job. She did not start work until November 29. During those two weeks of waiting, Lewis did not receive any pay.

115.   When Lewis began working, she quickly found that the job was physically demanding and far below her skill level. This was partly because

international nurses were required to do more menial labor than American nurses, including housekeeping work like cleaning beds after patients had left them. Lewis had never had to do work like this before in her decade-and-a-half of nursing, and found it to be demeaning.

116.    In addition, Lewis was assigned to a night shift, which was exhausting and difficult to sustain.

117.    Despite working twice as hard as her American counterparts, Lewis soon found that she was earning half of what they made, or potentially less. Although Lewis made approximately $30 an hour, other nurses she worked with made as much as $100 an hour. Full-time staff made up to $55.

118.    On top of that, Lewis's colleagues received a Christmas bonus, while she got nothing.

119.    According to her contract, Lewis's PTO would accrue at a rate of 0.03 hours per contract hour if she worked a 36-hour a week schedule and 0.034 hours per contract hour if she worked a 40-hour a week schedule. This amounts to as little as four full days of PTO per year.

120.    As of February 2023, Lewis had accrued only six days of PTO. When her aunt in Jamaica, with whom she was very close, died suddenly, Lewis was denied compassionate leave and had to use some of this PTO to travel back to Jamaica for her funeral. As a result of her very limited leave, she could only spend two days mourning with the rest of her family before she had to return to work in Georgia.

121.    Lewis quickly found that her salary was not enough to cover her cost of living in the United States. When she was working in Jamaica, the Cayman Islands, and the British Virgin Islands, she had earned enough to live comfortably and save on top of that. But in the United States, she was unable to save, and struggled to see her way out of debt.

122.    In addition to being a registered nurse, Lewis is a certified nephrology nurse, and considered working part-time for a dialysis unit in order to earn additional money. However, Avant's contract contained a provision preventing her from working for anyone other than Avant, which meant that she was unable to do this extra work in her free time.

123.    Because her difficult working conditions and low pay were becoming unbearable, Lewis approached Avant to discuss leaving to find another job. In a conversation that included Lewis's previous nurse manager, her new nurse manager, and an Avant Client Services Representative, the Client Services Representative told Lewis that the company had paid a lot of money for her to come to the United States, and that if she broke the contract with them, she would face penalties. However, the Client Services Representative declined to tell her how much those penalties would be.

124.    Lewis was scared by these threats and afraid of the consequences of leaving her job.

125.    As a result, Lewis retained counsel to negotiate her departure from Avant.

126.    On Friday, March 10, 2023, Lewis e-mailed Avant's Field HR notice of her intent to resign from Avant effective March 31, 2023. In her resignation letter, Lewis requested that Avant direct any future correspondence about her resignation to counsel.

127.    On Monday, March 13, 2023, Lewis received an email from Tabatha Akers at Avant that said:

> I understand that you have decided to terminate your employment with Avant. An early termination of employment is a serious decision, which I would like to discuss with you further by phone. I have important information that you need to know prior to your last day with Avant.  Please let me know your availaiblity [sic].

128.    On March 15, 2023, Lewis spoke with a representative from Avant HR named Tabatha Akers. Akers told Lewis that she would be receiving a bill from Avant in the amount she purportedly owed via mail in approximately one month, and that she would have 30 days to pay that amount. Akers also told Lewis that she could not work for any facilities that where Avant placed nurses for a year and a half.

129.    Leaving Avant was very scary for Lewis. She was worried about being pursued for the debt Avant claimed she owed, which she was unable to afford, and feared being sued. She was also worried that Avant would call USCIS and tell them that she had illegally left her job with Avant.

## CLASS ACTION ALLEGATIONS

130.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

131.    Plaintiffs assert claims on behalf of and seek to represent a Class of all healthcare workers who entered the United States to perform work for Defendant and Defendant's clients within the statute of limitations and are subject to Avant's Employment Agreement requiring the payment of liquidated damages for failure to meet a specified hours commitment.

132.    Plaintiffs reserve the right to amend and refine the class definitions above or add classes and/or subclasses as litigation progresses.

133.    Numerosity: The Classes are so numerous that joinder of all class members is impracticable. Although the precise number of putative Class members is currently unknown, Plaintiffs believe that the Class includes well over forty members. These members can be identified based on Defendant's records, which would include information on the employees' placement, length of employment and commitment period, whether and how much they were paid, and whether and how much they paid Defendant, among other things.

134.    Commonality: Common questions of law and fact exist as to all members of all Classes and predominate over any questions solely affecting individual members, including but not limited to:

a) Whether Defendant obtains the labor of foreign healthcare workers by using serious harm or threats of serious harm in violation of the TVPA;

b) Whether Defendant's uniform practices surrounding the commitment period, monetary penalty, immigration threats, and conditions of work constitute attempted labor trafficking in violation of the TVPA;

25

c) Whether Defendant knowingly recruits healthcare workers and knowingly benefits by its violations of the TVPA;

d) The proper measure of damages; and

e) The proper measure of punitive damages.

135.   These common questions arise, in part, because of the uniform circumstances under which Plaintiffs and the Class worked. These include the form contracts and workplace policies that resulted in a standard environment and set of employer-mandated conditions that employees were forced to abide by under the same threat of being sued, suffering adverse immigration consequences, and facing financial harm.

136.   Typicality: Plaintiffs' claims are typical of the members of the Class for precisely the reasons set forth above. Among other things, Defendant uses a uniform contract, and the contracts between Defendant and Plaintiffs are typical of Defendant's form contracts. Further, Defendant treated Plaintiffs consistently with other class members, in accordance with its standard policies and practices.

137.   Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are committed to the prosecution of this action and have retained counsel that numerous courts have found sufficiently experienced in class actions to be appointed as class counsel. There are no conflicts between Plaintiffs and the Class they seek to represent.

138.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions

affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant uses a uniform contract and uniform policies and practices, resulting in common violations of law. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not likely present any difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum. Plaintiffs are not aware of any existing related litigation.

139.    Common questions of law and fact also predominate as to Plaintiffs' claim that Defendant attempted to obtain forced labor in violation of law. Defendant attempted to keep every healthcare worker in its employ through the threats of severe penalties and immigration consequences, as well as through conditions of employment. That attempt—regardless of whether an employee could eventually pay the severe monetary penalty or the degree to which they were misled and forced to work against their will—was the same and uniformly made as to each and every employee.

140.    Plaintiffs intend to send notice to all members of the Classes to the extent required by Fed. R. Civ. P. 23(c)(2). The names and addresses of the class members are available from Defendant's records.

## COLLECTIVE ACTION ALLEGATIONS

141.    Pursuant to the FLSA's collective action provision, 29 U.S.C. § 216(b), Plaintiffs seek to represent an FLSA Collective consisting of all healthcare workers employed by Defendant who entered the United States to perform work for Defendant and Defendant's clients within the statute of limitations, are subject to Avant's Employment Agreement requiring the payment of liquidated damages for failure to meet a specified hours commitment, and who file a consent form to join this action.

142.    The proposed FLSA Collective members are similarly situated in that they have been subject to uniform practices by Defendant which violated the FLSA, including Defendant's mandatory damages contract provision, which operates as an unlawful kickback by requiring, or threatening to require, that employees pay back costs associated with the costs of Defendant's regular business expenses to the extent the payment reduces wages below the statutory minimum wage as set for in the FLSA. They have also uniformly been subject to Defendant's failure to pay wages "free and clear."

## COUNT I

**Violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1589(a)**
*on behalf of* Plaintiffs and the Class

143.    Plaintiffs incorporate the above allegations by this reference.

144.    It is a violation of the TVPA to "knowingly provide[] or obtain[] the labor or services of a person . . . (2) by means of serious harm or threats of serious harm . . . ; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means

28

of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm . . . ." 18 U.S.C. § 1589(a).

145.    The TVPA defines "serious harm" to include nonphysical harm, "including psychological, financial, or reputational harm, that is sufficiently serious . . . to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services to avoid incurring that harm." *Id.* § 1589(c)(2).

146.    Defendant obtained the labor of Plaintiffs and the Class members through threats of serious harm, through a scheme to make Plaintiffs and members of the Class believe they would suffer serious harm, and through threatened abuse of legal process, including immigration processes and through the terms and administration of its contract with employees.

147.    Defendant kept Plaintiffs and the Class working for it against their will with the contract's term of indentured servitude, with contractual provisions that led employees to fear financial ruin, with threats of immigration consequences, and with other isolating and draconian employment terms, as described herein.

148.    Defendant's use of such means to obtain the labor of Plaintiffs and the Class was knowing and intentional.

149.    Plaintiffs and the Class suffered damages because of Defendant's conduct. Those damages include the penalty some members of the Class paid to Defendant, as well as emotional distress and other damages.

29

150.    Plaintiffs and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT II

**Violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1589(b)**
*on behalf of* Plaintiffs and the Class

151.    Plaintiffs incorporate the above allegations by this reference.

152.    It is a violation of the TVPA to "knowingly benefit" from participation in a venture which obtains labor in violation of the TVPA, while "knowing or in reckless disregard of the fact" that the venture has obtained labor through such means. 18 U.S.C. § 1589(b).

153.    Defendant has knowingly benefited from its participation in the forced labor venture described herein by earning substantial profits from the venture.

154.    Defendant knew or recklessly disregarded the fact that the venture described herein engaged in obtaining forced labor.

155.    Plaintiffs and the Class suffered damages as a result of Defendant's conduct. Those damages include the penalty some members of the Class paid to Defendant, as well as emotional distress and other damages.

156.    Plaintiffs and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT III

**Violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1590(a)**
*on behalf of* Plaintiffs and the Class

157.    Plaintiffs incorporate the above allegations by this reference.

158.    It is a violation of the TVPA to "knowingly recruit[], . . . or obtain[] by any means, any person for labor or services in violation of" the TVPA.

159.    Defendant knowingly and purposefully recruited Plaintiffs and Class members, as described herein, in violation of the TVPA.

160.    Plaintiffs and the Class suffered damages as a result of Defendant's conduct. Those damages include the penalty Plaintiffs and the Class paid to Defendant, as well as emotional distress and other damages.

161.    Plaintiffs and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT IV

**Violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1594(a)**
*on behalf of* Plaintiffs and the Class

162.    Plaintiffs incorporate the above allegations by this reference.

163.    Attempts to violate the TVPA are themselves violations of the TVPA. 18 U.S.C. § 1594(a).

164.    Defendant attempted to violate 18 U.S.C. §§ 1589 and 1590, as described herein.

165.    Plaintiffs and the Class suffered damages as a result of Defendant's conduct. Those damages include any penalty Plaintiffs and the Class paid to Defendant, as well as emotional distress and other damages. The penalty amount is determinable from Defendant's records.

166.    Plaintiffs and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT V

**Violations of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (Illegal Kickback)**
*on behalf of* Plaintiffs and the Collective

167.    Plaintiffs incorporate the above allegations by this reference.

168.    Pursuant to 29 U.S.C. § 216(b), Plaintiffs have consented in writing to be join this Fair Labor Standards Act action as a plaintiff. Their written consent is attached to this complaint as **Exhibits C and D**.

169.    During the relevant period, Defendant was Plaintiffs' employer pursuant to the Fair Labor Standards Act.

170.    During the relevant period, Plaintiffs were employees pursuant to the Fair Labor Standards Act.

171.    Repayment of "damages" as defined by the contract between Defendant and Plaintiffs and other similarly situated upon termination is an illegal kickback of wages to Defendant because the purported damages are expenses incurred primarily for Defendant's benefit.

172.    Kicking back these expenses to Defendant takes employees' wages below the applicable minimum wage during the last work week employed by Defendant.

173.    Plaintiffs and others similarly situated were not paid at least minimum wage for all hours worked in their final week of work because they were required to kick back their wages to Defendant.

174.    Defendant's payment demands to Plaintiffs and others similarly situated were willful violations of the FLSA within the meaning of 29 U.S.C. § 255(a).

175.    Plaintiffs and others similarly situated are entitled to recover their unpaid wages plus an additional equal amount in liquidated damages, costs of suit, declaratory relief, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

## COUNT VI

**Violations of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (Failure to Pay Wages Free and Clear)**
*on behalf of* Plaintiffs and the Class

176.    Plaintiffs incorporate the above allegations by reference.

177.    During the relevant period, Defendant was Plaintiffs' employer pursuant to the Fair Labor Standards Act.

178.    During the relevant period, Plaintiffs were employees pursuant to the Fair Labor Standards Act.

179.    Defendant violated 29 U.S.C. § 206 by unlawfully requiring Plaintiff and others similarly situated to repay so-called "damages" that amount to tens of thousands of dollars of their earned and taxed wages to Defendants once their employment with Defendants ended.

180.     Rather than paying Plaintiffs and other similarly situated employees their wages "free and clear," Defendant maintained and enforced a policy under which the wages paid to employees during every pay period were paid conditionally, subject to the requirement that they not leave their jobs. If they did leave their jobs, they would have to repay all of the wages earned during the pending pay period, plus tens of thousands of additional dollars.

181.     By requiring Plaintiffs and other similarly situated employees to return their wages to Defendant, Defendant failed to pay wages "finally and unconditionally," as required by the FLSA.

182.     Because Defendant failed to pay wages "finally and unconditionally," Defendant cannot be deemed to have met the wage requirements of the FLSA, which includes the requirement to pay no less than the federal minimum wage for each hour worked.

183.     Defendant's actions constitute willful violations of the FLSA within the meaning of 29 U.S.C. § 255(a).

184.     Plaintiffs and others similarly situated are entitled to recover all unpaid minimum wages plus an additional equal amount in liquidated damages, costs of suit, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

## COUNT VII

**Unlawful Contract in Restraint of Trade, Fla. Stat. § 542.18**
*on behalf of* Plaintiffs and the Class

185.     Plaintiffs incorporate the above allegations by reference.

186.   Fla. Stat. § 542.18 states that "[e]very contract, combination, or conspiracy in restraint of trade or commerce in this state is unlawful."

187.   The clear purpose and effect of the financial penalty for departing workers is to limit nurse mobility and thereby restrain trade. It explicitly punishes nurses who attempt to work for an employer other than Defendant with a severe economic penalty.

188.   Contracts in restraint of trade of commerce are void and unenforceable, unless they are reasonable in time, area, and line of business, and support one of the following "legitimate business interest[s]":

- Trade secrets;

- Valuable confidential business or professional information that otherwise does not qualify as trade secrets;

- Substantial relationships with specific prospective or existing customers, patients, or clients;

- Customer, patient, or client goodwill; or

- Extraordinary or specialized training.

Fla. Stat. § 542.335.

189.   Defendant's penalty is not reasonable in time, area, and line of business. It restricts workers' ability to compete regardless of whether or not they leave Defendant to go work for a competitor.

190.   Defendant's penalty does not support a legitimate business interest.

191.   Defendant's penalty does not provide extraordinary or specialized training. In fact, most of the nurses who work for Defendant have years or even decades of nursing experience.

192.   The severe economic penalty Defendant imposes on departing employees does not protect any legitimate competitive interest. It injures workers by subjecting them to substantial debts and injures the public by limiting the choice and mobility of skilled nurses.

193.   Defendant's penalty does not fall within the "legitimate business exception" of Fla. Stat. § 542.335. It is a blatant restraint of trade, not subject to any statutory exceptions, and it is therefore unlawful under Fla. Stat. § 542.18.

194.   Plaintiffs and the Class seek a declaration under Fla. Stat. § 542.18 that the penalty is an unlawful restraint under Florida law.

195.   Plaintiffs and the Class seek an injunction under Fla. Stat. § 542.23: (a) prohibiting Defendants from taking any further actions to collect on or enforce its agreement; (b) prohibiting Defendants from referring any cases to a collections agency; (c) prohibiting Defendant from reporting this invalid debt to any collections agencies; and (d) requiring Defendant to take appropriate steps to repair any damage done to the credit ratings of the Class members, such as a goodwill deletion agreement.

196.   In addition, Plaintiffs and the Class seek to recover threefold actual damages sustained (including, but not limited to, the monies that they have paid to Defendants, or to any collections agency on Defendant's behalf), interest on actual

damages for the period beginning on the date of service of this Complaint and ending on the date of judgment, the cost of suit, and reasonable attorney's fees.

## **PRAYER FOR RELIEF**

197.    Plaintiff respectfully requests that the Court:

a. Certify the case as a class action on behalf of the proposed class;

b. Designate Plaintiff as a class representative;

c. Designate Plaintiff's counsel of record as class counsel;

d. Certify the case as a collective action on behalf of the proposed collective;

e. Declare that Defendant's conduct is illegal under the various statutes cited here;

f. Preliminarily and permanently enjoin Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them from engaging in the unlawful practices set forth in this Complaint;

g. Award Plaintiff damages, including treble damages, and equitable relief, including restitution and disgorgement, in an amount subject to proof at trial;

h. Award Plaintiffs' counsel costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

i. Grant leave to amend to add claims under the Florida Minimum Wage Act; and

j. Order pre-judgment and post-judgment interest as provided by law; and

k. Provide such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:      August 28, 2023            **VARNELL & WARWICK, P.A.**

*/s/ Janet R. Varnell*
Janet R. Varnell; FBN: 0071072
Brian W. Warwick; FBN: 0605573
Pamela G. Levinson; FBN: 0538345
Jeffrey Newsome; FBN: 1018667
400 N Ashley Drive, Suite 1900
Tampa, FL  33602
(352) 753-8600
jvarnell@vandwlaw.com

**TOWARDS JUSTICE**

Juno Turner (*pro hac vice* motion
forthcoming)
David H. Seligman (*pro hac vice*
motion forthcoming)
Rachel W. Dempsey (*pro hac vice*
motion forthcoming)
P.O. Box 371689, PMB 44465
Denver, CO 80237-5680
(720) 441-2236
juno@towardsjustice.org
david@towardsjustice.org
rachel@towardsjustice.org

**NICHOLS KASTER, PLLP**

Anna P. Prakash, MN Bar No.
0351362 (*pro hac vice* motion
forthcoming)
4700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 215-6870
aprakash@nka.com

*Attorneys for Plaintiffs*

38