**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| LUCINDA BYRON and LATOYA LEWIS on behalf of themselves, those similarly situated, and the Proposed Rule 23 Class, | Case No.: 6:23-cv-1645-WWB-LHP |
| Plaintiffs, | |
| v. | CLASS AND COLLECTIVE ACTION |
| AVANT HEALTHCARE PROFESSIONALS, LLC, | |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS SECOND AMENDED COMPLAINT**

**INTRODUCTION**[1]

Plaintiffs Lucinda Byron and Latoya Lewis are healthcare workers formerly employed by Defendant Avant Healthcare Professionals LLC ("Avant"). They allege Avant used improper threats of serious financial harm and immigration consequences to restrain Plaintiffs from leaving their jobs. They also allege that Avant used fraud against them and the federal government relating to Plaintiffs' recruitment to work in the U.S. on green card visas. Plaintiffs allege claims under the Fair Labor Standards Act ("FLSA"), Trafficking Victims Protection Act ("TVPA"), Racketeer Influenced Corrupt Organizations Act ("RICO"), and Florida Restraint of Trade law.[2]

---

[1] Plaintiffs join Defendant's request for oral argument. (ECF No. 48.)
[2] Plaintiffs agree to voluntary dismissal of their Florida Minimum Wage Act claims.

## SUMMARY OF FACTUAL ALLEGATIONS

Avant is a recruiting and staffing company that sells the labor of experienced foreign healthcare workers to medical facilities throughout the United States. Second Amend. Compl. ("SAC") ¶¶ 1, 14, 16 45, ECF No. 44. Plaintiffs were employed by Avant as nurses, staffed to Avant clients. *Id.* ¶¶ 2, 11-12, 50-57, 67, 107-112. Plaintiffs allege that Avant makes its employees sign form contracts that require workers who leave their employment before the end of a specified employment period to pay Avant the greater of Avant's "lost profits" or "actual damages . . . both direct and indirect, incurred by Avant related to Employee". *Id.* ¶ 30. This employment period begins after initial training and is generally longer than three years. *Id.* ¶¶ 4, 18, 21-25, 30; SAC Ex. A at 9-10, ECF No. 44-1; SAC Ex. B at 9-10, ECF No. 44-2. The damages Avant claims a right to recover are broad, including employee training, placement, and costs to find a replacement employee, which results in purported damages as high as $26,000 or more. *Id.* ¶¶ 30, 98. Because the threat of this kickback hangs constantly over employees, Avant never pays their wages "free and clear," as required by the FLSA. Instead, Avant nurses work under threat that Avant will seek a kickback of their wages unless they work for the time period Avant dictates. Avant gives workers 30 days after their last day to pay this kickback, and threatens those who do not pay. *Id.* ¶¶ 105; *see id.* ¶¶ 30, 129, 137. It also tells workers that leaving early might negatively impact their immigration status. *Id.* ¶¶ 42-43, 58, 94, 103, 114, 129 143-45. Avant's threats of debt, litigation, and potential immigration consequences caused Plaintiffs and others to suffer from wage suppression and forced them to keep working against their will. *See, e.g.*, *id.* ¶¶ 32-34, 91, 130-33.

To obtain visas for its workers, Avant attests that its employment conditions do not

violate federal, state, or local law, and that Avant intends to pay the prevailing wage. *Id.* ¶ 139. But these statements are untrue because Avant's damages provision unlawfully requires nurses to pay its costs of doing business in violation of the FLSA and constitutes an unlawful restraint of trade. These violations bring nurses' wages well below the prevailing wage. *Id.* ¶ 74, 120; *see also id.* ¶¶ 25, 79. Also, despite knowing their green cards are not tied to a specific employer or employment period, Avant falsely tells workers they will face immigration consequences for leaving their jobs early. *Id.* ¶¶ 41-44.

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, a complaint must state a plausible claim for relief on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] court must accept the well pleaded facts as true and resolve them in the light most favorable to the plaintiff." *Beck v. Deloitte & Touche, et al.,* 144 F.3d 732, 735 (11th Cir. 1998) (internal quotation and citation omitted). A "facial attack" on subject matter jurisdiction looks to whether the allegations in the complaint, taken as true, are sufficient to demonstrate a basis for jurisdiction. *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232-33 (11th Cir. 2008) (internal citations omitted).

## ARGUMENT

**I.    Plaintiffs Plausibly Allege Concrete and Redressable FLSA Violations.**

**A. The FLSA Provides a Right to Receive the Minimum Wage Free and Clear.**

An employer does not satisfy the minimum wage requirements of the FLSA merely by giving its workers paychecks that purport to pay at least minimum wage for every hour worked. The FLSA also requires that minimum wages be paid "finally and unconditionally or 'free and clear.'" 29 C.F.R. § 531.35. Accordingly, "the wage requirements of the Act will not be met where the employee 'kicks-back' directly or indirectly to the employer . . .

for the employer's benefit the whole or part of the wage delivered to the employee." *Id.*; *see also Ramos-Barrientos v. Bland*, 661 F.3d 587, 594 (11th Cir. 2011); *Arriaga v. Fla. Pac. Farms, LLC*, 305 F.3d 1228, 1235-36 (11th Cir. 2002). Such kickbacks violate the FLSA's "free and clear" requirement whether they are actual (*i.e.*, taken directly out of a paycheck) or "de facto" (*i.e.*, the employee is required to pay an expense legally the employer's to bear). *Arriaga*, 305 F.3d at, 1235-36. Any purportedly "valid debt" owed to an employer is a de facto deduction if it "tend[s] to shift part of the employer's business expense to the employees." *Mayhue's Super Liquor Stores, Inc. v. Hodgson*, 464 F.2d 1196, 1199 (5th Cir. 1972).[3]

Here, Plaintiffs allege that Avant seeks to recoup tens of thousands of dollars in "damages" from them in their last pay period, bringing their effective wage rate below $0.00 per hour. SAC ¶¶ 33-34, 72, 94, 96, 98-99, 105, 118, 129-130, 136. These "damages" were for expenses that primarily benefited Avant—namely, the greater of "lost profits" or "costs related to Employee," such as training, placement, and "replacement of Employee's services to the Client." *Id.* ¶ 30. These are not costs for the employees' benefit, like a bonus or air travel to the United States. Rather, they are business expenses that every employer incurs when an employee leaves. If employers can recover thousands of dollars for the "lost profits" caused by employees' departure or the costs of hiring a replacement, wage laws will be turned on their head.

The United States Department of Labor recently filed a case against another

---

[3] Avant relies on an out-of-circuit district court case to argue that only an actual paycheck deduction can form the basis for an FLSA claim. *See* ECF No. 47 at 9 (citing *Park v. FDM Grp. (Holdings) PLC*, No. 16 CV 1520-LTS, 2017 WL 946298, at *4 (S.D.N.Y. Mar. 9, 2017), *order vacated in part*, 2018 WL 4100524 (S.D.N.Y. Aug. 28, 2018)). *Park* is not the law in this Circuit. *Mayhue's*, 464 F.2d at 1199.

staffing company alleging that its practice of requiring foreign nurses to pay back a portion of their wages as "lost profits" because they left before working a contracted period of time violates the minimum wage requirements of the FLSA. *See generally Su v. Advanced Care Staffing, LLC*, No. 23 Civ. 2119-NRM (S.D.N.Y. 2023). Avant's reference to out-of-context cases that do not involve claims that employers failed to pay the minimum wage free and clear do not suggest otherwise. Thus, Plaintiffs' FLSA claim is valid.

### B. Plaintiffs' FLSA Claims Are Ripe.

Avant's arguments that Plaintiffs' claims are not ripe also fail. Ripeness asks whether (1) an issue is fit for judicial review, and (2) "withholding court consideration" presents "hardship to the parties." *Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005). Although Avant (correctly) does not challenge Plaintiffs' Article III standing, the ripeness inquiry overlaps with Article III standing, as both look to "whether the claim presented is 'of sufficient concreteness to evidence a ripeness for review.'" *Id.*

Avant's position hinges on the theory that the debt it alleges Plaintiffs owe contractually does not cause harm unless Avant sues to enforce it. This is wrong. The Eleventh Circuit has recognized that a wrongful debt can cause concrete harm even in the absence of a lawsuit. *See, e.g.*, *Toste v. Beach Club at Fontainebleau Park Condo. Ass'n, Inc.*, No. 21-14348, 2022 WL 4091738, at *3 (11th Cir. Sept. 7, 2022). In *Toste*, the court held that the plaintiff had pleaded concrete injuries arising from an allegedly wrongful debt, including, "emotional damages"; "wasted time"; "an inaccurate claim of lien" against the plaintiff's property; and "confusion over the amount [the plaintiff] owed, resulting in his being unable to pay what he owed and resolve the matter without legal assistance." *Id.* at *2. Concrete harm can be a mere "trifle," *see Salcedo v. Hanna*, 936

F.3d at 1167, such as the time it took the *Toste* plaintiff to go to the debt-holder's office "to try to discover the basis" for his purported debt. 2022 WL 4091738, at *4; *see also Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1252 (11th Cir. 2015) (tying up a fax machine for a minute is a concrete harm).

Here, Plaintiffs allege concrete injuries from Avant's violation of the FLSA. The threat of owing Avant a debt due to an allegedly unlawful kickback on wages caused Plaintiffs "confusion" and "wasted time," caused Plaintiffs to delay quitting their jobs, caused both Plaintiffs to retain a lawyer to negotiate their departure, and suppressed their wages. *See, e.g.*, SAC ¶¶ 32-34, 91, 130-33. These harms are not "conjectural," "speculative," or "hypothetical." The Complaint pleads that they already happened.

Moreover, as stated above, the FLSA provides a right to receive the minimum wage "free and clear." In determining whether a statutory injury creates a concrete harm, the operative question is "whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). The common law has long recognized that an encumbrance on property such as a purported debt is an injury ripe for adjudication. *See, e.g.*, *Kahama VII, LLC v. KTLC Riverboat, LLC*, No. 2:15-CV-14363, 2016 WL 1375590, at *3 (S.D. Fla. Apr. 7, 2016) (describing the common law roots of quiet title actions to clear an "alleged cloud or defect" on the title of real property).

Plaintiffs need not address whether the threat of a future lawsuit alone is sufficient to show a substantial likelihood of future injury, but it would be. Avant told Plaintiffs that their debt was due upon termination, and although it stopped contacting Lewis after she retained a lawyer, it made numerous attempts to collect from Byron. SAC ¶¶ 94, 96, 105,

129, 136. Both Plaintiffs know other nurses from whom Avant has collected. *Id.* ¶¶ 98-99, 130. The court in *Ketner v. Branch Banking & Tr. Co.* held that similar allegations supported standing. 143 F. Supp. 3d 370, 382-83 (M.D.N.C. 2015) (finding standing due to "an objective and reasonable apprehension of future litigation" where defendant demanded payment, threatened legal action, and enforced contract against other graduates). In contrast, in *Bland v. Edward D. Jones & Co., L.P*, which Avant cites, there was no evidence that the defendant had "ever actually collected money" from anyone, rendering the threat of litigation remote. 375 F. Supp. 3d 962, 974 (N.D. Ill. 2019).

Avant's argument that Plaintiffs' claims are not ripe because the "damages" Avant seeks to recover are permissible under the FLSA raises merits questions that are properly resolved at summary judgment or trial. The contract defines "damages" as the greater of "lost profits" or "actual costs related to Employee," which includes costs that are primarily for the benefit of the employer like employee training, placement, and hiring and training a replacement. SAC ¶ 30.[4] These are factual disputes that should not be decided on a motion to dismiss. *See, e.g., McClain v. Cape Air,* No. 22-CV-10649-DJC, 2023 WL 3587284, at *6-7 (D. Mass. May 22, 2023). Additionally, the Complaint pleads that Avant seeks to recover as much as $12,000- $26,000, which would bring employees' last paychecks well below minimum wage. SAC ¶¶ 98-99, 130.[5] The savings clause within Avant's contract preventing the collection of illegal damages does not change these well-

---

[4] Although, as Avant notes, the contract states that Avant would incur damages in the case of breach "due to the costs it incurred for [the employee's] benefit," *see* ECF No. 47 at 7 (citing SAC ¶ 105), it then defines the damages Avant actually has the right to seek to include "indirect" costs and other costs that are primarily for Avant's benefit.

[5] Avant's argument that this case is not like cases involving "$20,000 or higher repayment obligation[s]" flatly disregards Plaintiffs' allegations. *See* ECF No. 47 at 10.

pleaded facts. The fact that Avant would likely be unable to get a court order enforcing the contract does not mean that the imposition of the debt or the potential for litigation does not cause concrete harm.[6]

## II.    Plaintiffs Plausibly Allege Violations of the TVPA.

The Court should deny Avant's motion to dismiss Plaintiffs' TVPA claims. Congress intended the TVPA to address "a broad range of conduct" beyond just that prohibited by the Thirteenth Amendment. *See Burrell v. Staff*, 60 F.4d 25, 37 (3d Cir.), *cert. denied sub nom. Lackawanna Recycling Ctr., Inc. v. Burrell*, 143 S. Ct. 2662 (2023). Such conduct includes "increasingly subtle" methods of forced labor such as "nonviolent coercion." *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (citing H.R. Rep. No. 106–939, at 101, 2000 U.S.C.C.A.N. 1380, 1392–93 (2000) (Conf. Rep.), 2000 WL 1479163, at *91). As a result of these amendments, the TVPA prohibits extracting labor not only by physical force "but also more subtle psychological methods of coercion." *See United States v. Bradley*, 390 F.3d 145, 150, 156 (1st Cir. 2004), *rev'd on other grounds.*

Because the TVPA requires a court to consider "all the surrounding circumstances" in deciding whether a threat constitutes a threat of "serious harm" or "abuse of legal process," cases like this one are generally inappropriate for decision on the pleadings. *See, e.g., Camayo v. John Peroulis & Sons Sheep, Inc.*, No. 10-CV-00772-MSK-MJW, 2012 WL 4359086, at *5 (D. Colo. Sept. 24, 2012) (assessing a TVPA violation "is particularly difficult on the sparse record of a motion to dismiss"); *Elmy v. W. Express, Inc.*, No. 3:17-cv-01199, 2020 WL 1820100, at *7 (M.D. Tenn. Apr. 10, 2020) ("A factual

---

[6] Plaintiffs do not address Avant's arguments about *Stein v. HHGREGG, Inc.*, 873 F.3d 523 (6th Cir. 2017), as they are not relevant. Plaintiffs do not rely on that case.

determination of whether an objectively reasonable person . . . would have felt compelled to . . . labor would be premature at this stage . . .").

### A. Plaintiffs Sufficiently Allege Serious Harm in Violation of the TVPA.

Here, Plaintiffs allege that Avant obtained (or, at minimum, attempted to obtain) their continued labor through threats of serious harm and abuse of legal process in violation of the TVPA. The TVPA prohibits a person from knowingly obtaining labor using:

> **serious harm** or **threats of serious harm**; . . . the **abuse or threatened abuse of law or legal process**; or . . . any scheme, plan, or pattern **intended to cause** the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm[.]

18 U.S.C. § 1589(a)(2)-(4) (emphases added). "Serious harm" may include "any harm, whether physical or nonphysical, including psychological, **financial**, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." *Id.* § 1589(c)(2) (emphasis added). The TVPA does not require that a defendant actually inflict serious harm; even a "plan . . . intended to cause [the laborer] to believe" she would suffer serious harm can suffice. *Id.* § 1589(a)(4). And a defendant need not successfully obtain coerced labor to commit *attempted* forced labor under the TVPA. *Id.* § 1594.

When Plaintiffs attempted to quit, Avant staff threatened them with unspecified "damages." SAC ¶ 27-35; 72-73; 94-99; 105; 118; 129-30; 136; 172-74, 177. Based on conversations with colleagues who had paid, Plaintiffs believed that debt would be in the tens of thousands of dollars. *Id.* ¶¶ 98-99, 130) Courts around the country have found such allegations sufficient to state a claim under the TVPA. *See, e.g.*, *Salcedo v. RN Staff*

*Inc.*, No. 121CV01161SEBDLP, 2023 WL 2403832, at *11 (S.D. Ind. Mar. 8, 2023) ($20,000 liquidated damages provision sufficient to plead serious harm); *Vidal v. Advanced Care Staffing, LLC*, No. 122CV05535NRMMMH, 2023 WL 2783251, at *14 (E.D.N.Y. Apr. 4, 2023) (unspecified damages including "lost profits" and "expenses" were sufficient to plead serious harm); *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 438 (E.D.N.Y. 2017) (threats of payment of $25,000 are "more than enough to rise to the level of harm necessary to state a TVPA claim").

It does not help Avant that Plaintiffs willingly entered into their jobs, or that they ultimately quit them. "[A]n employment contract, even if voluntarily entered, can at times result in illegally compelled labor." *Carmen v. Health Carousel, LLC*, No. 1:20-CV-313, 2021 WL 2476882, at *4, 5-9 (S.D. Ohio June 17, 2021); *see also Elat v. Ngoubene*, 993 F. Supp. 2d 497, 533 n.19 (D.Md. 2014) ("Even if Plaintiff originally travelled to the United States willingly, Defendants still could be liable if their later actions prevented her from leaving when she no longer wanted to remain." (citing *United States v. Marcus*, 628 F.3d 36, 45 (2d Cir. 2010)); *Paguirigan*, 286 F. Supp. 3d at 439 ("That plaintiff was physically able to leave her employment and eventually did so is not determinative in light of the termination fee, threat of suit, and eventual lawsuit that she alleges were intended to coerce her to stay.").

Plaintiff Byron pled that she wanted to quit Avant as early as orientation, but did not because she was afraid of the consequences set forth in the contract. SAC ¶¶ 69, 72-73, 91. Plaintiff Lewis pled that she delayed her departure after Avant told her that she would face penalties for violating the contract. *Id.* ¶ 129. Further, Plaintiffs would still have a valid TVPA claim based on attempted forced labor. *See* 18 U.S.C. § 1594(a).

Avant is also wrong that Plaintiffs did not plead they were coerced or deceived into entering their contracts. Plaintiff Byron alleged she did not have any opportunity to review the Contract's terms before or after signing. SAC ¶ 69. Plaintiff Lewis alleged she did not fully understand the implications of the damages provision or the non-compete. *Id.* ¶ 113. And both alleged that while Avant sold them the American Dream, they learned after they arrived in the U.S. that their jobs were below their level of experience, paid less than their American counterparts, accrued less than standard paid time off, and denied them bonuses paid to their co-workers. *Id.* ¶¶ 46-49, 76-79, 84-85, 121-25. This bait-and-switch violates the TVPA. *See Carmen*, 2021 WL 2476882, at *7-9.

Finally, Avant suggests that its attempts to coerce workers to stay trapped in grueling jobs were merely "warnings of adverse but legitimate consequences" flowing from the terms of their contracts. *See* Br. at 13. But as set forth above, it is widely accepted that Avant "cannot escape TVPA liability merely because [Plaintiffs] 'agreed' to the term in their employment contract. Rather, the Court must evaluate the effect of the damages provision [and Avant's other conduct] in the context of 'all the surrounding circumstances,' as applied to a reasonable person in the plaintiff's position." *Carmen*, 2021 WL 2476882, at *9 (quoting 18 U.S.C. § 1589); *see also Baldia v. RN Express Staffing Registry LLC*, 633 F. Supp. 3d 693, 707 (S.D.N.Y. 2022) (refusing to dismiss TVPA claim because the "enforceability of the . . . damages provision depends on the facts and circumstances surrounding the contract"). Although Avant suggests that its damages provision is not coercive because it purportedly is tied to actual expenses, it is still illegal for employers to collect the types of expenses that Avant seeks to recoup. Both of the cases Avant relies upon to argue that its damages provision is lawful clarify that an attempt to collect

"improper or illicit" damages that are specified by contract may run afoul of the TVPA. *Panwar v. Access Therapies, Inc.*, No. 1:12-CV-00619-TWP, 2015 WL 1396599, at *4 (S.D. Ind. Mar. 25, 2015); *see also Carter v. Paschall Truck Lines, Inc.*, No. 5:18-CV-41-BJB, 2023 WL 359559, at *11 (W.D. Ky. Jan. 23, 2023).[7]

### B. Plaintiffs Sufficiently Allege Abuse of Legal Process.

Plaintiffs have additionally alleged that Avant obtained their labor through Avant's threats to report them to immigration authorities if they failed to complete their contract terms. These threats were not neutral factual statements or "free speech"; rather, Avant deliberately caused Plaintiffs to believe their immigration status was dependent on fulfilling their entire contract terms. SAC ¶¶ 43-44, 94, 114, 129, 144, 172-74. Employers are not "forced" to report departing green card workers to the government, *id.* ¶¶ 40-45, and nothing requires green card workers to remain employed by the employer that initially sponsored their visa. *Id.* ¶ 143. These facts on their own—even without additional threats of financial harm—state a claim for forced labor or attempted forced labor under the TVPA. *See, e.g.*, *Estavilla*, 2022 WL 539192, at *13 (collecting cases); *Magtoles v. United Staffing Registry, Inc.*, 21-cv-1850-KAM-PK, 2021 WL 6197063, at *8 (E.D.N.Y. Dec. 30, 2021) (considering circumstances, including a liquidated damages provision and non-compete, in concluding nurse-plaintiffs could have plausibly regarded an immigration notification provision as a threat of deportation).

Moreover, threats of immigration consequences need not be direct or explicit—

---

[7] *Estavilla v. Goodman Grp., LLC*, No. CV 21-68-M-KLD, 2022 WL 539192, at *13 (D. Mont. Feb. 23, 2022) is distinguishable because the contract damages had already been deemed enforceable in a separate litigation. The *Estavilla* court distinguished that situation from *Paguirigan*, 286 F. Supp. 3d at 438, where, like here, the plaintiffs had alleged that the basis for the contract damages was improper. *Id.*

they can be implied.  For example, in *Dinsay v. RN Staff Inc.*, 1:19-cv-00907-TWP-DML, 2021 WL 2042097, at *5 (S.D. Ind. May 21, 2021), the court held that an employer's response to an employee asking about her immigration consequences that she had "better be a good employee and just work her hours. . . could be viewed as a subtle psychological method of coercion to retain [plaintiff's] labor rather than simply a factual statement. . ." And even if Plaintiffs had not pled that Avant's statements about the immigration consequences of quitting were false, a factual statement can be an abuse of legal process under the TVPA if that statement is "directed to an end different from those envisioned by the law." *United States v. Calimlim*, 538 F.3d 706, 713 (7th Cir. 2008).

### C. Plaintiffs Plausibly Allege Causation under the TVPA.

Both Plaintiffs plausibly allege that Avant's threats of monetary penalties and immigration consequences kept them from resigning earlier.  For example, Byron alleged that she did not quit despite the "draining" struggles she experienced with her work because she feared the severe "financial, legal, or immigration consequences" of doing so. SAC ¶¶ 73, 91. Lewis alleges that after she "approached Avant to discuss leaving," several Avant employees told her that "if she broke the contract with [Avant], she would face penalties." *Id.* ¶ 129. After those conversations, Lewis continued working "to minimize the penalty she would face for leaving." *Id.* ¶ 131. Although she decided to leave before meeting that goal, she still delayed her departure for some time because of Avant's threatened consequences. *Id.* ¶ 132-33.

Calling these allegations vague and conclusory does not make them so, and the cases on which Avant relies do not change that.  In *Headley v. Church of Scientology*, the court affirmed summary judgment for defendant where the plaintiffs failed, after discovery,

to adduce any evidence that the defendant obtained their labor through prohibited means. 687 F.3d 1173 1179-80 (9th Cir. 2012). And in *Roman v. Tyco Simplex Grinnell*, the plaintiff failed to allege any harm "more serious than the financial harm any employee encounters when faced with termination." 731 F. App'x 813, 817 (11th Cir. 2018). [8]

## III.    Plaintiffs Plausibly Allege RICO Violations.

To state a claim under RICO, Plaintiffs must show that (1) the defendant committed a pattern of RICO predicate acts, (2) the plaintiff suffered injury to business or property, and (3) the defendant's racketeering activity proximately caused the injury. *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 705 (11th Cir. 2014). To show a pattern of predicate acts, a plaintiff must plead that the defendant participates in an enterprise of two or more acts of racketeering activity affecting interstate or foreign commerce. *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1225 (11th Cir. 2002) (quoting 18 U.S.C. §§ 1962(a)–(c)). Courts often refer to the second and third elements of a RICO claim as establishing "statutory standing."

Plaintiffs allege a RICO claim based on a pattern of predicate acts involving fraud directed towards the United States Customs and Immigration Service ("USCIS"), and towards Plaintiffs themselves. Plaintiffs allege Avant falsely represented to USCIS in Plaintiffs' I-140 Immigrant Petitions for Alien Workers that it complied with employment statutes and paid its employees a prevailing wage, when all wages were subject to a threatened kickback designed to keep employees trapped in their jobs. SAC ¶¶ 139-40, 227. Plaintiffs also allege Avant falsely represented to Plaintiffs during the pre-

---

[8] Moreover, even if Plaintiffs did not plausibly allege that Avant's threats caused them to continue working, they still plausibly allege attempted forced labor under 18 U.S.C. § 1594(a).

employment immigration process that their green cards required them to work for Avant for a specified period of time, when nothing about their green cards would prevent them from working elsewhere. *Id.* ¶¶ 143-44; 228. This racketeering conduct caused injury to business or property "in the form of unpaid wages, reduced and suppressed wages, payment of expenses related to coming to the United States, and the payment of penalties to Defendant." *Id.* ¶ 233; *see also id.* ¶¶ 141, 146.

Although Avant states that Plaintiffs "fail to plead any of the elements of a RICO claim with the particularity required by Fed R. Civ. P. 9(b)," it only seriously challenges Plaintiffs' statutory standing, to which Rule 9(b) does not apply. *See, e.g.*, *Magnifico v. Villanueva*, 783 F. Supp. 2d 1217, 1222 (S.D. Fla. 2011) (the requirement to plead fraud with particularity "applies only to the fraud-related predicate acts").[9] Thus, Plaintiffs have alleged injuries sufficient for standing under RICO.

## A. The Imposition of an Unlawful Debt Supports Statutory Standing.

Plaintiffs allege that Avant has already unlawfully imposed a debt upon them for "damages" because they left their jobs before the end of the required work period. These

---

[9] Avant includes one sentence, without citation or legal authority, in its Motion to Dismiss stating that "Plaintiffs don't plead the who, what, when, or where of any misrepresentations that allegedly give rise to Plaintiffs' claims." ECF No. 47 at 20. "[C]onclusory statements are not sufficient to support a Motion to Dismiss." *Cifuentes v. Sec'y, Dep't of Homeland Sec.*, No. 6:21-CV-770-WWB-EJK, 2022 WL 1238612, at *3 (M.D. Fla. Feb. 2, 2022), *report and recommendation adopted*, No. 6:21-CV-770-WWB-EJK, 2022 WL 4285898 (M.D. Fla. Sept. 16, 2022) (citation omitted). Even if Avant had provided some support for its argument, it would fail. Plaintiffs allege Avant made misrepresentations to the government when it submitted Plaintiffs' I-140 Immigrant Petitions for Alien Workers attesting their employment would comply with all applicable laws and pay the prevailing wage. SAC ¶¶ 139-40, 227. Plaintiffs also plead U.S.-based Avant immigration specialists made misrepresentations to Plaintiffs over the telephone during the pre-employment immigration process designed to make them feel they would be trapped in their jobs as a condition of their visas. SAC ¶¶ 143-44; 228. These allegations set forth the "who, what, when, and where" of the alleged fraud.

purported "damages" violate the FLSA because they are an illegal kickback on wages, which is also what makes Avant's representations to USCIS that it complies with relevant minimum wage laws and pays its workers the prevailing wage fraudulent.[10] "[T]he imposition of a wrongful debt constitutes an injury to one's business or property" under RICO. *Chevron Corp. v. Donziger*, 833 F.3d 74, 135 (2d Cir. 2016). In *Chevron*, the court held that a judgment debt that the plaintiffs alleged had been attained in violation of RICO was sufficiently non-speculative and established standing. *Id.*

In contrast, the cases that Avant cites involve a *possible future debt* that could be created by the outcome of a lawsuit, not a *current* debt that has not yet been the subject of a judicial enforcement order. For example, in *Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 847 (1st Cir. 1990), the plaintiff claimed that the defendant was hiding assets that could be used to satisfy a judgment debt if the plaintiff prevailed in a separate pending lawsuit. The court held that there was no RICO standing because the debt would never even exist unless the plaintiff both won the separate pending lawsuit and could not collect on any resulting judgment. *Id.*[11] Here, there is no doubt that the debt exists under the contract and Avant has tried to collect it. Avant's argument fails.

### B. Avant's Racketeering Conduct is the Proximate Cause of Harm to Business or Property in the form of Plaintiffs' Relocation Expenses.

Avant argues Plaintiffs did not plead that Avant's misrepresentations to them about their visa restrictions were the proximate cause of their relocation expenses. But it is

---

[10] Plaintiffs do not argue that the debt resulted from the fraudulent statements Avant made to *Plaintiffs* about the conditions of their visa.

[11] Similarly, in *Arabian Am. Oil Co. v. Scarfone*, 713 F. Supp. 1420, 1421 (M.D. Fla. 1989), the plaintiff alleged that the payment of costs borne by a non-party to the lawsuit constituted a RICO injury. The court held that the mere possibility that the non-party could seek to recover these costs in the future was not sufficient to confer standing under RICO. *Id.*; *see also Ello v. Singh*, 531 F. Supp. 2d 552, 574 (S.D.N.Y. 2007) (same).

Avant's misrepresentations to the *USCIS* regarding Plaintiffs' visas that are the proximate cause of Plaintiffs' payment of relocation expenses. SAC ¶¶ 139-40, 227. If Avant had disclosed that it was violating the law and taking kickbacks on wages, Plaintiffs' visas would not have been approved. Avant does not appear to dispute this.

### C. Plaintiffs Plausibly Allege Wage Suppression as an Additional Loss to Business or Property.

Wage suppression—which causes harm to employees' business relationships—is a cognizable harm to business or property under RICO. *See, e.g.*, *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 709 (11th Cir. 2014) (citation omitted). Here, Plaintiffs plausibly plead that they suffered this harm due to Avant's misrepresentations to the USCIS and to Plaintiffs, which "were designed to make [Plaintiffs] feel trapped in their jobs." SAC ¶¶ 143, 145. If Plaintiffs knew their visas allowed them to work elsewhere for better wages and working conditions, Avant would be forced to compete with other employers (such as the hospitals where Plaintiffs worked for Avant) by paying more. As evidence that the misrepresentations have the intended effect of suppressing wages, the Complaint alleges that other nurses that Plaintiffs worked alongside earned potentially as much as two- or three-times Plaintiffs' rates. SAC ¶¶ 77-78, 123. Moreover, Plaintiffs received fewer benefits than their non-Avant counterparts, including less paid time off and fewer bonuses. *Id.* ¶¶ 84, 124. The wages earned by both Plaintiffs increased since they stopped working for Avant. *Id.* ¶ 146.

There are several ways to show wage suppression, but none more direct than what Plaintiffs have done here. The Complaint pleads that other nurses doing the same job as Plaintiffs at the same hospital for a different employer earn higher pay. Avant contends that because Plaintiffs' direct employer was Avant and not the hospitals themselves, there

is an "obvious alternative explanation" for the pay disparity.[12] But there is no "obvious" reason that this would result in full-time Avant-employed nurses getting paid up to $25 an hour less than other full-time hospital-employed nurses. In fact, the complaint pleads that other nurses working at the same hospital as Plaintiff Byron were making as much as $100 an hour. SAC ¶¶ 77-78.[13] All Plaintiffs must do at this stage is plausibly plead that Avant's racketeering conduct caused wage suppression. They easily satisfy that burden.

## IV. Plaintiffs Plausibly Allege Unlawful Restraint of Trade.

Plaintiffs plausibly allege that the use of debt alongside the restrictive covenant in Avant's contracts amounts to a "contract. . . in restraint of trade." Fla. Stat. § 542.18. The labor market depends on workers being able to move freely between jobs in order to create upward pressure on wages to the benefit of all workers. By using the threat of debt, unlawful immigration consequences, and an illegal restrictive covenant—which prohibits Avant's nurses from going to work for *any* of Avant's clients, whether or not the nurse has been staffed to that client—Avant traps its nurses in their jobs. *See, e.g.*, SAC ¶¶ 36-40.

---

[12] The cases that Avant cites for support of its "obvious alternative explanation" argument are inapposite. *Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 728 (11th Cir. 2020) is an antitrust case where plaintiffs sought to rely on loss of business as evidence of a steering conspiracy, not a RICO case where the plaintiffs used lower wages in a narrowly-defined market as evidence of wage suppression. And while *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010) is a RICO case, it too applies the "obvious alternative explanation" analysis in the context of whether the plaintiffs pleaded a plausible inference of conspiracy. Here, Avant does not contest Plaintiffs' allegations of conspiracy, and as set forth above, there is nothing "obvious" about Avant's proposed explanation for its workers' decreased wages.

[13] This allegation is consistent with data that the national average pay for travel nurses—who are employed by "middlemen" and not directly by hospitals—was $150/hour in early 2022. *See, e.g.*, Bertha Coombs, "With travel nurses making $150 an hour, hospital systems are forced to innovate," CNBC.com (Mar. 28, 2023) *available at* https://www.cnbc.com/2023/03/28/with-travel-nurses-making-150-an-hour-hospital-systems-innovate.html.

As Plaintiffs allege, this harms Avant's nurses; gives Avant an unfair advantage over its competitors, *id.* ¶¶ 7, 236, 238; and deprives consumers of highly skilled nurses. *Id.*¶ 241.

Avant also argues that Plaintiffs' allegations regarding its restrictive covenant are conclusory. Untrue. Plaintiffs allege the covenant exists only to punish workers who leave their jobs early and to prohibit other workers from leaving Avant, *i.e.*, to "restrict or prohibit competition" without a legitimate business interest. *See* SAC ¶¶ 36-40; *supra* § III.C (regarding wage suppression). That is a prohibited restraint of trade. *See* Fla. Stat. § 542.335(1); *Blue-Grace Logistics LLC v. Fahey*, 653 F. Supp. 3d 1172, 1178 (M.D. Fla. 2023). Plaintiffs also plead the covenant is not properly limited as to time, area, and line of business because it prohibits employees from working for *anyone* other than Avant while employed there and disallows employees from providing healthcare services in *any capacity* to any of Avant's clients for 18 months after departure, which is reduced to 6 months if the employee completes the initial employment period. *See* SAC ¶¶ 36-37; SAC Ex. A at 10-11; SAC Ex. B at 10-11. These limitations apply regardless of another employer's location, field of operations, or whether it competes with Avant. *See id.* ¶¶ 38, 40; *cf. Temporarily Yours-Temp. Help Servs., Inc. v. Manpower, Inc.*, 377 So. 2d 825, 827 (Fla. Dist. Ct. App. 1979) (covenant limited to 200-mile radius of city was reasonable). Such restrictions are unlawful.

Plaintiffs also allege that the penalty restricts workers' mobility without a legitimate business interest, SAC ¶¶ 238-242, and that Avant's actual interest is to "subject[] [workers] to substantial debts and injures the public by limiting the choice and mobility of skilled nurses." *Id.* ¶ 241. A debt imposed on a worker for leaving a job can function as

an illegal restraint of trade where it is unreasonable.[14] *See Matthews v. City of Gulfport*, 72 F. Supp. 2d 1328, 1341 (M.D. Fla. 1999). And "whether a business has a legitimate business interest justifying restrictions, and whether the restrictions are reasonable in time, area, and line of business are questions of fact, and not of law." *LT's Benjamin Records, Inc. v. Machete Music*, No. 09-23770-CIV, 2010 WL 2573961, at *5 (S.D. Fla. June 24, 2010). They ought not be decided on the pleadings.

Plaintiffs respectfully request the Court deny Avant's Motion to Dismiss.

DATED: January 17, 2024

**VARNELL & WARWICK, P.A.**

*/s/ Janet R. Varnell*
Janet R. Varnell
FBN: 0071072
Brian W. Warwick
FBN: 0605573
Pamela G. Levinson
FBN: 0538345
Jeffrey Newsome
FBN: 1018667
400 N Ashley Dr.,
Suite 1900
Tampa, FL  33602
(352) 753-8600
jvarnell@vandwlaw.com

**NICHOLS KASTER, PLLP**

Anna P. Prakash
(*pro hac vice*)
Voreese T. Hoggans
(*pro hac vice*)
4700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel.: (612) 256-3200
Facsimile: (612) 215-6870
aprakash@nka.com

**TOWARDS JUSTICE**

Juno Turner
(*pro hac vice*)
David H. Seligman
(*pro hac vice*)
Rachel W. Dempsey
(*pro hac vice*)
P.O. Box 371689,
PMB 44465
Denver, CO 80237-5680
(720) 441-2236
juno@towardsjustice.org
david@towardsjustice.org
rachel@towardsjustice.org

***Attorneys for Plaintiffs and the Putative Class and Collective***

---

[14] Allowing employers to characterize such restraints as a "financial disincentive" to avoid liability would render protections against unlawful restraints of trade meaningless. For similar reasons, in its recent proposed non-compete rule, promulgated under its "unfair methods of competition" authority, the FTC explains that requiring a worker to pay an employer for leaving a job may constitute an unlawful non-compete agreement and an unfair method of competition. FTC, 88 FR 3482-01 at 3484 (Jan. 19, 2023).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 17, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Janet R. Varnell
Janet R. Varnell