# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

LUCINDA BYRON and LATOYA
LEWIS,

               Plaintiffs,

v.                                          Case No:   6:23-cv-1645-JSS-LHP

AVANT HEALTHCARE
PROFESSIONALS, LLC,

               Defendant

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the following

motion filed herein:

| |
|---|
| **MOTION:**  **DEFENDANT'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT (Doc. No. 47)** |
| **FILED:**  **December 20, 2023** |
| |
| **THEREON** it is **RECOMMENDED** that the motion be **GRANTED IN PART AND DENIED IN PART**. |

## I.       BACKGROUND.

On August 28, 2023, Plaintiffs Lucinda Byron and Latoya Lewis, on behalf of

themselves and those similarly situated, instituted this putative class and collective

action against Defendant Avant Healthcare Professionals, LLC.   Doc. No. 1.   Their

operative pleading is now the second amended complaint, filed on December 7,

2023.   Doc. No. 44.[1]   In the second amended complaint, Plaintiffs bring claims for

violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589(a)–

(b), 1590(a), 1594(a) (Counts 1 through 4), violations of the Fair Labor Standards Act

("FLSA") for "illegal kickback" and failure to pay wages "free and clear" (Counts 5

and 6), violations of the Florida Minimum Wage Act ("FMWA") (Counts 7 and 8),

violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

U.S.C. § 1962 (Count 9), and Unlawful Contract in Restraint of Trade, Fla. Stat. §

542.18 (Count 10), on behalf of themselves as well as a putative class of all healthcare

workers who entered the United States to perform work for Defendant and are

subject to a standard employment agreement requiring payment of a penalty for

early termination of employment.   *Id.* ¶ 158; *see also id.* at 38–57.

Defendant has filed a motion to dismiss the second amended complaint in its

---

[1] After Plaintiffs filed their initial complaint, Defendant filed a motion to dismiss.
Doc. No. 27.   In response, Plaintiffs filed their first amended complaint.   Doc. No. 35.
Thereafter, the Court *sua sponte* dismissed the first amended complaint without prejudice
as a shotgun pleading.   Doc. No. 41.   Accordingly, the substantive merits of Plaintiffs'
pleadings have not yet been addressed by the Court.

entirety, for the reasons discussed below.   Doc. No. 47.   Plaintiffs oppose.   Doc.

No. 54.   The matter was referred to the undersigned for issuance of a Report and

Recommendation.   Both parties requested oral argument, and the undersigned

held oral argument on February 29, 2024.   Doc. Nos. 48, 54, 57, 70–71.[2]   Upon

consideration, this Report and Recommendation follows.

For the reasons discussed herein, the undersigned will respectfully

recommend that Defendant's motion to dismiss (Doc. No. 47) be granted in part and

denied in part, and that the FLSA claims (Counts 5 & 6), FMWA claims (Counts 7 &

8), and unlawful restraint of trade claim (Count 10) be dismissed.   The undersigned

will further recommend that the motion be denied with respect to the TVPA claims

(Counts 1 through 4) and the RICO claim (Count 9).

## II.   ALLEGATIONS OF THE SECOND AMENDED COMPLAINT.[3]

Defendant, a staffing company, hires foreign healthcare workers to work in

the United States.   Doc. No. 44 ¶ 1.   Defendant's healthcare workers are in the

United States on EB-3 visas, which visas are available for skilled or professional

workers, including nurses, and are not tied to a specific employer.   *Id.*  ¶ 41.

Holders of EB-3 visas receive green cards allowing them to legally live and work in

---

[2] During oral argument, the issues were well-argued by able counsel, who greatly assisted the undersigned in analyzing the myriad of complex issues present in this case.

[3] At the motion to dismiss stage, courts must assume "that all the [factual] allegations in the complaint are true (even if doubtful in fact)."   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).

the United States.   *Id.*   Although EB-3 visa holders can change employers, they must have sponsorship from the employer for which they move to the United States to work.   *Id.* ¶ 42.

Plaintiffs allege that several of Defendant's employment practices are illegal, including: (1) requiring employees to pay unspecified contractual damages upon early termination of employment; (2) threatening foreign workers who try to resign with immigration consequences, even though their immigration status is not tied to the employer; (3) imposing harsh restrictive covenants; and (4) making false representations in immigration applications about complying with the law and paying prevailing wages.   *Id.* ¶¶ 4–5, 139–46.

The employment contracts provide that Defendant's employees will work a certain number of hours for Defendant, and upon early termination of employment or other contingencies, the employee will owe Defendant unspecified "damages," including Defendant's lost profits.   *Id.* ¶¶ 22, 26–28, 30.   The precise number of hours are unknown to employees given the terms of the contracts, and do not include completion of training.   *Id.* ¶¶ 23–25.   If employees inquire about how much they will owe Defendant if they resign early, Defendant will not provide a calculation until the employee actually resigns.   *Id.* ¶¶ 31–32.

The employment contract also provides that during their employment, employees may not be otherwise employed either full or part time.   *Id.* ¶ 36.   The

contract further contains an 18-month non-compete provision, prohibiting workers from providing any services to Defendant's clients if they leave employment early (the term is reduced to 6 months after completion of the employment period), or from soliciting/recruiting other employees for a 12-month period.   *Id.* ¶¶ 37, 39.

Plaintiffs allege that Defendant's immigration representatives imply to healthcare workers that the EB-3 visa requires the employee to work for Defendant for the entire contract term.   *Id.* ¶ 42.   When employees give notice that they intend to leave Defendant's employ, Defendant routinely tells employees that it will be required to report the resignation to United States Citizenship and Immigration Services ("USCIS"), which leads workers to believe that leaving will have a negative impact on their immigration status.   *Id.* ¶¶ 43–44.

The second amended complaint alleges that Defendant places nurses in positions well below their level of experience, provides hourly pay that is much lower than wages received by American counterparts, Defendant's nurses are generally ineligible for bonuses and incentives, Defendant controls where nurses are placed, and the employees receive insignificant paid time off.   *Id.* ¶¶ 45–49. And Plaintiffs allege that Defendant makes false representations in visa applications, including that (1) the terms and conditions of employment do not violate federal, state, or local law (which is false based on the penalty in the employment contract) and (2) Defendant intended to pay the prevailing wage listed

in each of those visa petitions (which is false based on how much American-nurse-counterparts made). *Id.* ¶¶ 139–42.   Plaintiffs further allege that Defendant made misrepresentations to them during the pre-employment process, including that a requirement of their visas/green card was to work for Defendant during the entire contract period for employment. *Id.* ¶¶ 143–46.

Plaintiffs are both foreign registered nurses. *Id.* ¶¶ 11–12, 50–51, 107–08. Plaintiff Byron, who is from the St. Vincent and the Grenadines, signed the form contract with Defendant in January 2019, and again on the first day of orientation. *Id.* ¶¶ 12, 51, 57, 69.   Upon initial signing, Defendant told Byron that she would be required to work for Defendant for the entire contract term as a condition of receiving a green card. *Id.* ¶ 58.   Defendant also said it would help both Byron and her daughter immigrate to the United States, but Defendant did not. *Id.* ¶¶ 64–65, 86.   Byron considered quitting during training, but she did not, given the worry regarding financial, legal, and/or immigration consequences. *Id.* ¶ 73.

Byron was placed at a health facility in South Dakota in June 2022, but during her employment, Defendant failed to properly pay incentive pay, Byron was underpaid relative to her American counterparts, Defendant paid Byron less than it owed her, and Byron accrued time off much slower than her American nurse counterparts. *Id.* ¶¶ 75–82, 84–85.   Defendant also told Byron that she was not allowed to discuss pay with her coworkers at the hospital where she worked. *Id.*

¶ 80; *see also id.* ¶ 72.   Byron gave a two-week resignation notice in January 2023. *Id.* ¶ 92.   But for the fear of financial, legal, or immigration consequences, Byron would have quit long before she gave notice.   *Id.* ¶ 91.

Upon receipt of the resignation notice, Defendant threatened to report Byron to United States Immigration and Customs Enforcement ("ICE") unless she rescinded her resignation, and told her that she should rescind in order to avoid a financial penalty.   *Id.* ¶ 94.   Byron asked what the financial penalty would be, but Defendant would not provide it until her resignation was final, and said she would have thirty days to pay it.   *Id.* ¶ 96.   Based on information received from other nurses who had resigned, Byron thought the penalty would be between $26,000–$30,000.   *Id.* ¶¶ 98–99.   When she quit, HR told her "that someone from the company would be in touch with her."   *Id.* ¶ 101.   Because Byron feared the consequences of her resignation, she retained counsel.   *Id.* ¶ 102.   She received an email (personally, not through counsel) from Defendant stating that Defendant had "the right to enforce the terms of the Employment Agreement."   *Id.* ¶ 105. Because of the restrictive covenant, Byron had to move to North Dakota to find a new job.   *Id.* ¶ 104.

Plaintiff Lewis, a citizen of Jamaica, signed the form contract with Defendant in September 2019, although she did not fully understand the contract terms (she read it though).   *Id.* ¶¶ 108, 112–13.   Lewis believed, based on Defendant's

representations, that failing to fulfill the contract terms would have a negative impact on her immigration status; during training, Defendant also said that she would be forced to pay a penalty if she left employment early.  *Id.*¶¶ 114, 118. Lewis was assigned to a healthcare facility in Georgia in November 2021; the job was physically demanding and below her skill level; she was assigned to the night shift; although she worked twice as hard, she earned only half as much as her American counterparts (approximately $30/hour); she did not receive a Christmas bonus although the American nurses did; and she accrued an insignificant amount of paid time off.  *Id.* ¶¶ 121–26.  Lewis's salary was not enough to cover cost of living in the United States, but she could not work elsewhere part time due to the terms of the contract with Defendant.  *Id.* ¶¶ 127–28.

Lewis approached Defendant to discuss leaving employment, but Defendant told her that she would face penalties if she did so, which Lewis interpreted as immigration consequences and financial penalties.  *Id.* ¶ 129.  Lewis was scared by these threats as she knew another employee who faced penalties for quitting early.  *Id.* ¶ 130.  Lewis ultimately retained counsel to negotiate her departure from Defendant's employ, and on March 10, 2023, emailed her intent to resign.  *Id.* ¶¶ 133–34.  Despite asking that communications be with counsel, Lewis received an email from and spoke with a representative of Defendant, and was informed she would receive a bill via mail regarding the amounts owed under the contract, that

she would have thirty days to pay that amount, and that she could not work for any facilities where Defendant placed employees for 18 months.   *Id.* ¶¶ 135–36.   Lewis feared being sued, financial penalties, and immigration consequences.   *Id.* ¶ 137.

A copy of Plaintiff Byron's employment agreement is attached as Exhibit A to the complaint (Doc. No. 44-1), and a copy of Plaintiff Lewis's employment agreement is attached as Exhibit B (Doc. No. 44-2).

## III.    LEGAL STANDARDS.

Defendant moves to dismiss the second amended complaint for failure to allege standing as to some of the claims and otherwise for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).   Doc. No. 47.

Generally speaking, "[t]o establish standing, a plaintiff must allege: (1) injury-in-fact; (2) a causal connection between the injury and the conduct complained of; and (3) that it is likely the injury will be redressed by a favorable ruling."   *Disability Rights Fla., Inc. v. Jacbos*, 476 F. Supp. 3d 1238, 1242 (M.D. Fla. 2019) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).   "To meet Article III's standing requirement, a plaintiff must allege and be able to demonstrate that he personally suffered injury.   This requirement is not met by alleging that an injury has been suffered by other individuals of the class to which the plaintiff contends he belongs and which he purports to represent."   *Bilal v. Kaupasta*, No. 2:19-cv-73-FtM-60MRM, 2019 WL 4118765, at *2 (M.D. Fla. Aug. 29, 2019) (citations omitted).

Under Rule 12(b)(6), "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   While this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quoting *Twombly*, 550 U.S. at 555).   A pleading must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.   "A court's review on a motion to dismiss is limited to the four corners of the complaint.   A court may consider only the complaint itself and any documents referred to in the complaint which are central to the claims."  *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) (internal quotation marks omitted) (first citing *St. George v. Pinellas Cty.*, 285 F.3d 1334, 1337 (11th Cir.2002), then citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997)).

## IV.    ANALYSIS.

As an initial matter, in response to Defendant's motion, Plaintiffs "agree to voluntarily dismiss their Florida Minimum Wage Act Claims."   Doc. No. 54, at 1 n.2; *see also* Doc. No. 71, at 5–6.   Therefore, the motion to dismiss (Doc. No. 47) is due to be granted on Counts 7 and 8.   The remaining claims addressed in this Report are:   violations of the TVPA (Counts 1 through 4), violations of the FLSA

(Counts 5 and 6), violations of RICO (Count 9), and unlawful restraint of trade (Count 10).   In line with the parties' briefing (Doc. Nos. 47, 54), the undersigned addresses the FLSA claims first, followed by the remainder.

A.   <u>Violations of the FLSA.</u>

Plaintiffs' two FLSA claims (Counts 5 and 6) are premised on Defendant's alleged use of "kickbacks" and failure to pay wages "free and clear."   Doc. No. 44, at 42–45.[4]   Both claims are premised on the same thing—repayment of "damages" pursuant to the employment contract upon early termination of employment.   *Id.* According to Plaintiffs, this penalty provision "takes employees' wages or threatens

---

[4]      Pursuant to FLSA regulations,

> Whether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear."   The wage requirements of the Act will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee.   This is true whether the "kick-back" is made in cash or in other than cash.   For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act. See also in this connection, § 531.32(c).

29 C.F.R. § 531.35.   "This rule prohibits any arrangement that 'tend[s] to shift part of the employer's business expense to the employees . . . to the extent that it reduce[s] an employee's wage below the statutory minimum.'"   *Ramos-Barrientos v. Bland*, 661 F.3d 587, 594 (11th Cir. 2011) (citing *Mayhue's Super Liquor Stores, Inc. v. Hodgson*, 464 F.2d 1196, 1199 (5th Cir. 1972)).

to take employees' wages below the applicable minimum wage."   *See id.* ¶ 196; *see also id.* ¶ 205.

There is no dispute that *no money* was withheld from either Plaintiff's paycheck for these alleged contract damages/penalties, that Plaintiffs *have not paid* any monies to Defendant pursuant to the contract provision, or that Defendant has *not instituted any lawsuit to collect*.   Doc. Nos. 44, 47, 54; *see also* Doc. No. 71, at 15–16, 33 (both sides confirming at oral argument no dispute on these issues).   Instead, Plaintiffs rely on the existence of the penalty provisions of the employment contract and the following allegations of the second amended complaint to allege injury in fact:

<u>Plaintiff Byron</u>

- "Avant, through its HR department, then called Byron and threatened to report her to ICE.   They told her to rescind her resignation in order to prevent them from calling ICE and to avoid paying Avant a financial penalty, and told her that she didn't have to make a final decision on resignation until she had thought more about it."   Doc. No. 44 ¶ 94.

- "When Byron asked what the financial penalty for resigning would be, Avant told her that they could not tell her or even calculate the amount until her resignation was final, but that whatever the amount ended up being, she would only have 30 days to pay it."   Doc. No. 44 ¶ 96.

- "Based on information Byron had received from other Avant nurses who had resigned, she believed the penalty was likely to be between $26,000 and $30,000."   Doc. No. 44 ¶ 98.

- "Byron knew of at least two colleagues at Monument Health who had left Avant before she did.   One of the colleagues told Byron that Avant had told her she would have to pay more than $20,000 for leaving, and that Avant would retain her unused PTO."   Doc. No. 44 ¶ 99.

- "Byron did not hear from Avant again until July 18, 2023, when she received an email from an Avant representative named Anna Slodkowski, who is the Director of Field HR for Avant [stating, among other things] . . . 'Avant has been damaged by your breach of the Employment Agreement due to the costs it incurred for your benefit prior to your assignment.   Please know that Avant has the right to enforce the terms of the Employment Agreement.   If you would like to consider a settlement of Avant's potential breach of contract claims against you, please let me know.'"   Doc. No. 44 ¶ 105.

Plaintiff Lewis

- "Lewis approached Avant to discuss leaving to find another job. . . . [T]he Client Services Representative told Lewis that the company had paid a lot of money for her to come to the United States, and that if she broke the contract with them, she would face penalties.   Lewis interpreted this statement to mean that she would face immigration consequences and financial penalties if she left her job.   However, the Client Services Representative declined to tell her how much those penalties would be."   Doc. No. 44 ¶ 129.

- "Lewis was scared by these threats and afraid of the consequences of leaving her job.   She was aware of at least one other nurse that Avant had collected money from after that nurse had left before she fulfilled her contract.  . . .   The nurse told Lewis that in addition to the referral bonus the company had refused to give her, she paid Avant monthly under a payment plan.   The company claimed that the nurse still owed $12,000." Doc. No. 44 ¶ 130.

- "On Monday, March 13, 2023, Lewis received an email from Tabatha Akers at Avant that said:

> I understand that you have decided to terminate your employment with Avant. An early termination of employment is a serious decision, which I would like to discuss with you further by phone. I have important information that you need to know prior to your last day with Avant. Please let me know your availability [sic].

- On March 15, 2023, Lewis spoke with a representative from Avant HR named Tabatha Akers. Akers told Lewis that she would be receiving a bill from Avant in the amount she purportedly owed via mail in approximately one month, and that she would have 30 days to pay that amount. Akers also told Lewis that she could not work for any facilities that where Avant placed nurses for a year and a half." Doc. No. 44 ¶¶ 135–36.

*See also* Doc. No. 71, at 17–20, 28, 30, 33–35. Plaintiffs claim that their pay was not "free and clear" or "unconditional" because of the requirement that they complete a certain term of employment or face a financial penalty. *Id.* at 35–36.

Defendant raises three arguments regarding Plaintiffs' FLSA claims: (1) failure to plead statutory standing; (2) the FLSA claims are not ripe; and (3) failure to state a claim for an "illegal kickback" and for failure to pay wages "free and clear" under the FLSA. Doc. No. 47, at 4–10. Upon consideration of the parties' respective arguments, the undersigned agrees with Defendant that Plaintiffs do not plead standing or establish that their claims are ripe.

Specifically, Defendant argues that the second amended complaint fails to allege standing because Plaintiffs have not alleged that they were in fact paid below

the minimum wage, and relief is not available to remedy future FLSA minimum wage violations.   Doc. No. 47, at 4.   In sum, Defendant argues that Plaintiffs' minimum wage claims are wholly speculative and not based on an actual violation of the FLSA—*i.e.*, future events *might* cause them to be paid less than minimum wage.   *Id.* at 5.

Plaintiffs respond that any purported "valid debt" owed to an employer is a de facto deduction of wages under the law of this Circuit.   Doc. No. 54, at 4 (citing *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1237 (11th Cir. 2002) (de facto deductions can also constitute illegal kickbacks under the FLSA); *Mayhue's Super Liquor Stores, Inc. v. Hodgson*, 464 F.2d 1196, 1199 (5th Cir. 1972) (agreement that employee would repay employer shortages when it drove wages below minimum wage was illegal kickback)).   So, because Defendant may seek to recover "tens of thousands of dollars in 'damages,'" Plaintiffs say the wages during their last pay period would be below $0.00 per hour.   *Id.*[5]

---

[5] Plaintiffs note that the U.S. Department of Labor ("DOL") recently filed suit against another staffing company alleging the same claims.   Doc. No. 54, at 4–5.   *See Su v. Advanced Care Staffing, LLC*, No. 1:23-cv-2119, Doc. No. 1 (E.D.N.Y. March 20, 2023). There is a motion to dismiss pending in that case raising similar arguments to those raised here (Doc. No. 28), and the court set the matter for oral argument on March 21, 2024. However, that matter is distinguishable on one primary basis, as the DOL may properly seek injunctive relief.   There is no dispute here that Plaintiffs lack standing to seek injunctive relief.   *See Powell v. State of Fla.*, 132 F.3d 677, 678 (11th Cir. 1998) ("[T]he right to bring an action for injunctive relief under the Fair Labor Standards Act rests exclusively with the United States Secretary of Labor." (citations omitted)); *Cunningham v. Fulton Cty., Ga.*, 785 F. App'x 798, 802 n.3 (11th Cir. 2019) (same).

Upon review, the issue is whether Plaintiffs have adequately alleged an injury in fact for purposes of the standing inquiry.[6]   As it relates to this issue, the parties cite two cases in their briefing decided in similar contexts, with those cases reaching conflicting conclusions on the standing issue.

The first case is *Ketner v. Branch Banking & Tr. Co.*, 143 F. Supp. 3d 370 (M.D.N.C. 2015).   There, the employees had to participate in mandatory training and execute a training cost agreement, and they were required to repay the training costs if they resigned/were terminated within five years of employment.   143 F. Supp. 3d at 375.   After the employees resigned, the employer told them it intended to enforce the agreement, retained a law firm, and would file suit; the employer also sent demand letters.   *Id.* at 376.   Although plaintiffs did not repay any portion of the costs, at least two other persons had.   *Id.*   So, the plaintiffs filed suit, and included a claim for failure to pay minimum wages and declaratory relief that

---

[6] Defendant's motion raises the issue as lack of "statutory standing" under the FLSA for failure to plead each of the elements of the claim, *i.e.*, failure to allege actual failure to pay minimum wages given that Plaintiffs have paid nothing under the employment contract in this case nor has Defendant instituted proceedings to collect. Doc. No. 47, at 4–5.   Generally speaking, Defendant is correct that this is an element of an FLSA minimum wage claim.   *See Clay v. Showntail Legend LLC*, No. 5:20CV124-MW/MJF, 2020 WL 10728117, at *2 (N.D. Fla. Dec. 17, 2020) ("If Plaintiffs wish to state a claim for FLSA violations due to Defendant not having paid the required minimum wage and overtime wages, they will need to plead more than 'Defendant did not pay the required minimum wage and overtime wages.'"); *see also Baldia v. RN Express Staffing Registry LLC*, 633 F. Supp. 3d 693, 712 (S.D.N.Y. 2022) (failure to allege in complaint that wages were ever below the minimum requires dismissal of FLSA minimum wage claim).   However, the issue here, at bottom, is whether the claim of kickbacks or failure to pay wages "free and clear" sufficiently clears the pleading hurdle regarding standing under Article III.

enforcement of the agreement constituted an illegal kickback in violation of the minimum wage requirements of the FLSA.  *Id.*  The court concluded that the applicable plaintiff had standing and there was an actual controversy, given the defendant's collection threats/efforts and enforcement of the agreement against other persons, and thus there was apprehension of future litigation sufficient to confer standing.  *Id.* at 382–83.

In *Bland v. Edward D. Jones & Co., L.P.*, 375 F. Supp. 3d 962 (N.D. Ill. 2019) ("*Bland I*"); *see also Bland v. Edward D. Jones & Co., L.P.*, No. 18-CV-1832, 2020 WL 1503574 (N.D. Ill. Mar. 30, 2020) (on reconsideration, "*Bland II*"), the court reached the opposite conclusion.  *Bland* also addressed a contractual training repayment provision, where the employees were required to reimburse the employer $75,000.00 on early termination.   The plaintiffs alleged constructive discharge/that they were forced to leave.  *Bland I*, 375 F. Supp. 3d at 970–71.   Although the plaintiffs alleged that the defendants had sent communication demanding payment of the $75,000.00, in contrast to *Ketner*, there were no allegations that the defendants (1) took any steps to bring litigation; (2) actually collected money from other individuals based on the contract; or (3) expressly threatened to file suit.   *Id.* at 974.  Because the allegations amounted to "little more than an avowal of their fear of litigation," the court found that the plaintiffs failed to establish concrete harm, and thus, standing.  *Id.*  On reconsideration, the court also noted that the plaintiffs'

allegations that the defendants collected fees from some employees (four over fifteen years), suggesting that the defendant *sometimes* initiated adversarial proceedings, were insufficient to show that litigation was anything more than speculative.  *Bland II*, 2020 WL 1503574, at *5.[7]

Upon consideration, the undersigned finds *Bland* more persuasive, and closer to the facts presented here.[8]   In this case, there is no allegation that Plaintiffs have

---

[7] The undersigned notes that, in most of the cases addressing the issue of illegal kickbacks similar to the case at bar, there had already been a payment by the plaintiff(s) to the defendant(s), and thus the issue of standing was not explicitly discussed.  *See, e.g.*, *Gordon v. City of Oakland*, 627 F.3d 1092, 1094 (9th Cir. 2010) ("Gordon paid the City the $5,268.03 it claimed was due . . . for 'training reimbursement' and 'collection costs.'"); *Heder v. City of Two Rivers, Wisconsin*, 295 F.3d 777, 778 (7th Cir. 2002) ("Two Rivers withheld all of Heder's pay from his last two pay periods."); *Milford v. Roehl Transp., Inc*, No. 22-CV-0879-BHL, 2023 WL 2503495, at *4 (E.D. Wis. Mar. 14, 2023) ("Milford 'ultimately paid around $1,800 or $1,900 to resolve Defendant's claim that he owed the company for failing to drive the minimum number of miles.'"); *Park v. FDM Grp. (Holdings) PLC*, No. 16 CV 1520-LTS, 2017 WL 946298, at *2 (S.D.N.Y. Mar. 9, 2017), *order vacated in part on other grounds*, 2018 WL 4100524 (S.D.N.Y. Aug. 28, 2018) ("Plaintiff resigned from her FDM Consultant position . . . and paid a Termination Fee of $ 20,000 . . . .").  *Ketner* and *Bland* are the only cases discussed in the parties' briefing that address standing under circumstances similar to here.

[8] At oral argument, Plaintiffs relied solely on *Ketner* for the proposition that there is standing even if no alleged kickback has yet occurred.  Doc. No. 71, at 39–40.  But the undersigned finds *Ketner* factually distinguishable because in that case, there were more concrete enforcement actions taken, such that the defendant hired a law firm that sent the plaintiff collection letters, demanding payment under the agreement and threatening legal action if payment was not made, as well as allegations that the defendant had enforced the agreement against other graduates and recovered money.  *Ketner*, 143 F. Supp. 3d at 383.  Moreover, in concluding there was injury in fact, the *Ketner* court relied on a Fourth Circuit case finding that "the threat of litigation can satisfy the standing requirement."  *Id.* at 382-83 (citing *Volvo Constr. Equip. N. Am., Inc., v. CLM Equip. Co.*, 386 F.3d 581, 593–94 (4th Cir. 2004)); *see also id.* at 385 (" In determining whether to entertain a request for declaratory relief, the Fourth Circuit has instructed district courts to consider whether such a request "'will serve a useful purpose in clarifying and settling the legal relations in issue,' and 'will

paid anything to Defendant, that Plaintiffs wages have in fact fallen below minimum wage, or that Defendant has taken action to collect the alleged amounts due (outside of the statements to Plaintiffs via email and/or phone call as alleged in the second amended complaint (Doc. No. 44 ¶¶ 94, 105, 129, 135–36)).   *See also* Doc. No. 71, at 27–28.   Moreover, the second amended complaint alleges no concrete enforcement action against other employees, as it alleges only that a colleague told Byron that Defendant "told her she would have to pay more than $20,000 for leaving," and that Lewis knew that Defendant had "collected money from" another nurse through a monthly payment plan and by withholding a referral bonus.   Doc. No. 44 ¶¶ 99, 130.

Based on the allegations of the second amended complaint, the undersigned finds that Plaintiffs have failed to demonstrate how they have standing for claims

---

terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" (citing *Volvo*, 386 F.3d at 594)).   In this Circuit, however, a "perhaps" or "maybe" chance that an agreement will be enforced in the future "is not enough to give them standing to challenge its enforceability."   *See Bowen v. First Fam. Fin. Servs., Inc.*, 233 F.3d 1331, 1340 (11th Cir. 2000).

However, the undersigned notes that at oral argument, counsel for Defendant attempted to distinguish the authority cited by Plaintiff, specifically *Toste* (discussed below) and *Ketner*, for failure to demonstrate that there was an attorney involved in any collection efforts or litigation threats in this case.   Doc. No. 71, at 16–22.   Given that defense counsel had no authority for this proposition, the undersigned finds the issue of attorney involvement alone does not provide a meaningful distinction with regard to the standing/injury in fact analysis.   Rather, it is the totality of the circumstances, including allegations of concrete actions taken to seek collection, and/or actual payments, that trigger standing, and on that point, the cases Plaintiffs cite are distinguishable on the other bases discussed herein.

for FLSA kickbacks or failure to pay wages "free and clear."   *Cf. Cudnik v. W.L. York, Inc.*, No. CV H-20-2998, 2021 WL 3674972, at *2 (S.D. Tex. Feb. 5, 2021) ("Kickbacks are not *per se* illegal, but only when such deductions deprive an employee of the federally mandated minimum wage or overtime pay." (citing 29 C.F.R. § 531.35)).   As demonstrated by the allegations of the second amended complaint, even assuming the scheme could result in a "kickback," no such kickback has yet occurred, nor do the allegations of the second amended complaint sufficiently allege that they will.   In sum, "there are no indications of a substantial likelihood the agreement will be enforced against the plaintiffs."   *See Bowen v. First Fam. Fin. Servs., Inc.*, 233 F.3d 1331, 1340 (11th Cir. 2000) ("Allegations of possible future injury do not satisfy the requirements of Art. III.   A threatened injury must be 'certainly impending' to constitute injury in fact. . . ."(citations omitted));[9] *Bland I*, 375 F. Supp. 3d 962 (demand for payment under employment agreement without additional steps to bring litigation or actual collection of money, or express threat to file suit, suggested lack of concrete harm).   This also ties into the ripeness argument, next addressed.[10]

---

[9] At oral argument, counsel for Plaintiffs argued that *Bowen* actually supports that they have standing because they have alleged "threats to enforce."   Doc. No. 71, at 26. As discussed above, the undersigned does not find the allegations of the second amended complaint sufficient to satisfy the standards set forth in *Bowen*, however.

[10] In the parties' briefing, the issues of standing, injury in fact, and ripeness are discussed in an intermixed fashion, but for the sake of clarity, the undersigned addresses

The doctrine of ripeness "originate[s] from the Constitution's Article III requirement that the jurisdiction of the federal courts be limited to actual cases and controversies." *Elend v. Basham*, 471 F.3d 1199, 1204–05 (11th Cir. 2006). "For a court to have jurisdiction, the claim must be 'sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decisionmaking by the court.'" *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009) (quoting *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995)). "The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation and internal quotation marks omitted).

Defendant argues that the FLSA claims are not ripe because they are based

_____

the issues separately. To be sure, the "two justiciability doctrines [of standing and ripeness] present similar inquiries," but "[w]hat distinguishes the two is that the ripeness doctrine seeks to separate matters that are premature for review because the injury is speculative and may never occur, whereas standing focuses on whether the type of injury alleged is qualitatively sufficient to fulfill the requirements of Article III and whether the plaintiff personally suffered that harm." *See Abusaid v. Hillsborough Cty. Bd. of Cnty. Comm'rs*, 637 F. Supp. 2d 1002, 1014–15 (M.D. Fla. 2007); *see also Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 149 n.19 (2d Cir. 2021) ("[T]he doctrines of standing and ripeness serve separate and distinct purposes. . . . [However] where . . . the justiciability inquiry focuses on whether an alleged injury is 'imminent rather than conjectural or hypothetical,' the two doctrines 'overlap.'" (citations omitted)).

on speculative conjectural events—that Defendant will sue for breach of contract and recover actual damages that would in fact drive Plaintiffs' wages below minimum wage—and the type of relief Defendant may seek against Plaintiffs is purely speculative.    Doc. No. 47, at 6–7.    Defendant also argues that the amount of any contract claim Defendant has against Plaintiffs is unknown—even assuming the recovery on such a claim would be a kickback, Plaintiffs speculate a future repayment will drive their wages below minimum wage, despite language in the employment agreement prohibiting such result.   *Id.* at 7.[11]    Defendant further argues that Plaintiffs will suffer no hardship in waiting for their claims to become ripe.   *Id.*

Plaintiffs argue the FLSA claims are ripe, relying on their argument that a wrongful debt can constitute concrete harm even in the absence of a lawsuit. Plaintiffs rely mostly on *Toste v. Beach Club at Fontainebleau Park Condo. Ass'n, Inc.*, No. 21-14348, 2022 WL 4091738 (11th Cir. Sept. 7, 2022), discussed in detail below.

---

[11] Here, Defendant points out that the employment agreement limits any damages "to the extent permissible by applicable law."    Doc. No. 47, at 7.   *See, e.g.*, Doc. No. 44-1, at 11 ¶ IV(F) ("[I]f Employee breaches this Agreement, Employee will be liable to AVANT for Damages which, *to the extent permissible by applicable law*, are defined as the greater of (1) actual damages, including but not limited to actual costs, both direct and indirect, incurred by Avant related to Employee (costs do not include any amounts specifically not recoverable from Employee under U.S. law such as 20 CFR 655.761.(c)(9)(iii)(C)) or (2) lost profits." (emphasis added)).    Plaintiffs dispute that the language of the contract is relevant to the standing inquiry, Doc. No. 54, at 8, and also argue that its language is ambiguous, Doc. No. 71, at 49.   The Court need not reach the issue, however, which really goes to the merits of the kickback/"free and clear" claims.

Doc. No. 54, at 5.[12]   Specifically, Plaintiffs contend that Defendant's actions caused them to delay quitting their jobs, retain a lawyer, and caused suppressed wages—constituting concrete harm.   *Id.* at 6.   Plaintiffs further rely on *Ketner* and attempt to distinguish *Bland*.   *Id.* at 7.[13]   Plaintiffs contend that the question of whether the kickback/contract damages are actually permissible is not an issue resolvable by motion to dismiss.   *Id.* (citing *McClain v. Cape Air*, No. 22-CV-10649-DJC, 2023 WL 3587284, at *7 (D. Mass. May 22, 2023) (concluding that the issue is best resolved with the benefit of discovery)).

As it relates to Plaintiffs' reliance on *Toste*, *Toste* addressed the injury-in-fact requirement for standing.   2022 WL 4091738, at *3.   In *Toste*, the plaintiff failed to pay condominium dues, the association referred the matter to a law firm, and the law firm attempted to collect the debt (by threatening to file a claim of lien and then actually filing a claim a lien and threatening to foreclose if payment of past due

---

[12] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants."   *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007).

[13] Plaintiffs distinguish *Bland I* on the basis that the defendant had never "actually collected money" from anyone.   Doc. No. 54, at 7.   However, as previously discussed, in *Bland II*, on reconsideration, the court noted that the plaintiffs' allegations that the defendants collected fees from some employees (four over fifteen years), which suggested that the defendant only *sometimes* initiated adversarial proceedings, were insufficient to show that litigation was anything more than speculative in *Bland*.   *Bland II*, 2020 WL 1503574, at *5.   Here, as discussed above, Plaintiffs' allegations as to collection efforts against other employees are even more sparse than noted in *Bland II*.   *See* Doc. No. 44 ¶¶ 99, 130.

amounts was not made).   *Id.* at *1.   The plaintiff disputed the amount of the debt, had to retain a lawyer, and ultimately filed a lawsuit for violation of the Fair Debt Collection Practices Act.   *Id.*   The plaintiff alleged the following injuries:   (1) the claim of lien reflecting an inaccurate debt; (2) significant time wasted determining whether the amounts were correct; (3) contesting the defendant's communications; (4) taking time away from work/personal life; (5) confusion; and (6) emotional distress resulting in loss of sleep, extreme stress, frustration, anger, agitation, and anxiety.   *Id.* at *3.   The court determined that the plaintiff suffered concrete harm in the form of wasted time and emotional distress, and in any event the plaintiff suffered concrete harm in the form of the claim of lien, which by itself was sufficient to confer standing.   *Id.* at *4.

The undersigned finds Plaintiffs' statement that *Toste* stands for the proposition that "a wrongful debt can cause concrete harm even in the absence of a lawsuit" unavailing, given the claim of lien and threats of foreclosure at issue in *Toste*.   Plaintiffs also attempt to argue that they allege similar injuries here such as "confusion," "wasted time," "delay quitting their jobs," retaining a lawyer, and suppressed wages.   Doc. No. 54, at 6.   But, unlike in *Toste*, here, there was no actual enforcement action taken by Defendant that Plaintiffs allege, outside of a phone call and email to Plaintiff Byron, one phone call to Plaintiff Lewis, and vague allegations about what other employees might have paid to Defendant.   Doc. No.

44 ¶¶ 94, 98–99, 105, 129–30, 135–36.   And otherwise Plaintiffs merely point to general allegations of what occurs when employees quit/attempt to quit when working for Defendant (Doc. No. 44 ¶¶ 32–34), that Plaintiff Byron would have quit earlier but for her fear that should would face financial/immigration consequences (Doc. No. 44 ¶ 91), and that Plaintiff Lewis was scared to quit in light of potential consequences (Doc. No. 44 ¶¶ 130–33).   But Plaintiffs have not demonstrated that any of these, standing alone or in combination, are concrete injuries presenting a controversy ripe for review.   There is simply no allegation that Defendant took any enforcement action here with regard to Plaintiffs, that Defendant intends to, that Plaintiffs have paid anything under the employment contracts, or that there were other collection efforts against other employees sufficient to support Plaintiffs' claims.[14]   Thus, it appears to the undersigned that Plaintiffs' FLSA claims are not ripe for view.   *See Bowen*, 233 F.3d at 1340-41 (finding both lack of standing and lack of ripeness where there was only a "perhaps" or "maybe" chance that a party

---

[14] Plaintiffs also point to *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1237 (11th Cir. 2002) (de facto deductions can also constitute illegal kickbacks under the FLSA), and *Mayhue's Super Liquor Stores, Inc. v. Hodgson*, 464 F.2d 1196, 1199 (5th Cir. 1972) (agreement that employee would repay employer shortages when it drove wages below minimum wage was illegal kickback).   Doc. No. 54, at 3–4.   However, neither of those cases addresses the standing inquiry, and both cases really go to the merits of Plaintiffs' kickback and "free and clear" claims.

Plaintiffs also argue that their "free and clear" claim demonstrates concrete harm based on Defendant's collection efforts, in reliance on *Ketner*.   Doc. No. 54, at 6–7. However, the undersigned declines to rely on *Ketner*, for the reasons set forth above.

would seek to enforce an arbitration agreement against the plaintiffs in the future; if and when the party seeks to enforce the arbitration agreement, then the plaintiffs may challenge its enforceability).

As a final matter, at oral argument, counsel for Plaintiffs argued that Plaintiffs would also have standing to seek declaratory relief on their FLSA claims.   Doc. No. 71, at 40–41, 44–48.   However, upon consideration, there is no claim for declaratory relief in the second amended complaint, and the only mention of declaratory relief appears as a conclusory reference in the paragraph setting forth the relief sought. *See* Doc. No. 44 ¶ 199.   Thus, it is not clear whether Plaintiffs have sufficiently raised the issue.   *See id.; see also Toussaint v. Cty. of Westchester*, 615 F. Supp. 3d 215, 223 (S.D.N.Y. 2022) ("[I]solated references in the wherefore clause are entirely insufficient to state claims for relief for a declaratory judgment . . . .").

Moreover, even assuming the second amended complaint adequately alleges declaratory relief, for the same reasons set forth above, Plaintiffs have not demonstrated that they have standing to pursue such claim at this time.   *See Malowney v. Fed. Collection Deposit Group*, 193 F.3d 1342, 1346 (11th Cir. 1999) ("In order to demonstrate that a case or controversy exists to meet the Article III standing requirement when a plaintiff is seeking injunctive or declaratory relief, a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." (citations omitted)); *see also Elend*, 471 F.3d at 1207 ("The

binding precedent in this circuit is clear that for an injury to suffice for prospective relief, it must be imminent.").[15]

Accordingly, for the reasons set forth above, the undersigned will respectfully recommend that the motion to dismiss be granted on the FLSA claims, and that Counts 5 and 6 of the second amended complaint be dismissed without prejudice. *See Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (explaining that a dismissal for lack of standing has the same effect as a dismissal for lack of subject matter jurisdiction, and therefore is entered without prejudice).[16]

---

[15] At oral argument, counsel for Plaintiffs also argued that if the employment agreement at issue were somehow declared null and void in a separate lawsuit or otherwise, the case could proceed solely as it relates to liquidated damages on the FLSA claims.   Doc. No. 71, at 37–38.   Plaintiffs do not cite, and the undersigned has located no authority, to stand for this proposition, however.   *See* Doc. Nos. 54, 71.

On March 26, 2024, Plaintiffs also filed a Notice of Supplemental Authority with a recent case decided in the Northern District of Texas: *Fredericks v. Ameriflight, LLC*, No. 3:23-CV-1757-X, 2024 WL 1183075 (N.D. Tex. Mar. 19, 2024).   Doc. No. 75.   Although it does not appear that Plaintiffs rely on *Fredericks* for the standing argument, the undersigned notes that *Fredericks* is distinguishable on this ground, as in that case the plaintiff had made repayments to the employer for the training program at issue after she resigned, unlike here.   2024 WL 1183075, at *1, 2.   Otherwise, Plaintiffs rely on *Fredericks* to support the merits of the FLSA claims, which, given Plaintiffs' lack of standing, the undersigned does not address in this Report.   *See infra*, n.16.

[16] Because Plaintiffs lack standing and the FLSA claims are not ripe for review, it is unnecessary for the Court to address whether the contract scheme actually is an "illegal kickback" and/or failure to pay wages "free and clear" at this time.   Should the Court disagree and find that Plaintiffs have standing and their FLSA claims are ripe for review, the undersigned alternatively recommends that the Court remand the matter of Counts 5 and 6 to the undersigned for consideration of the merits of Defendant's argument under Rule 12(b)(6) that the FLSA claims fail to state a claim.

B.      <u>Violations of the TVPA</u>.

Under the forced labor provision of the TVPA, "[w]hoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means," shall be guilty of a crime:

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or
>
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a).      Further,

> (b) Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).
>
> (c) In this section:
>
> (1) The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

(2) The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

Section 1589 was "passed to implement the Thirteenth Amendment against slavery or involuntary servitude." *United States v. Toviave*, 761 F.3d 623, 629 (6th Cir. 2014). "Congress intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion," as well as through "physical or legal coercion." *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (citation and internal quotation marks omitted); *see also United States v. Calimlim*, 538 F.3d 706, 714 (7th Cir. 2008) ("Section 1589 is not written in terms limited to overt physical coercion, and we know that when Congress amended the statute it expanded the definition of involuntary servitude to include nonphysical forms of coercion."). The TVPA is primarily a criminal statute, but "[a]n individual who is a victim of a [trafficking or involuntary servitude] violation may [also] bring a civil action against the perpetrator" for "damages and reasonable attorneys fees." 18 U.S.C. § 1595; *see also Treminio v. Crowley Mar. Corp.*, No. 3:22-cv-00174-CRK-PDB, 2024 WL 382400, at *1 n.1 (M.D. Fla. Feb. 1, 2024) ("In 2003, Congress reauthorized and amended the TVPA with the Trafficking Victims Protection Reauthorization Act of 2003, which refined the criminal provisions against trafficking and included

a civil remedy actionable by victims against their traffickers in federal court."
(citations omitted)).

Here, Plaintiffs bring four (4) claims under the TVPA: (1) Count 1 – based on
threat of serious harm through threatened abuse of legal process, including the
immigration process and through terms of the employment contracts (18 U.S.C. §
1589(a)); (2) Count 2 – Defendant knowingly benefitted from its forced labor
scheme, including the resultant suppressed wages of its employees (18 U.S.C. §
1589(b)); (3) Count 3 – Defendant knowingly and purposefully recruited Plaintiffs
in violation of the TVPA (18 U.S.C. § 1590); and (4) Count 4 – Defendant attempted
to violate §§ 1589 and 1590 by using threats of serious harm and abuse of legal
process to coerce Plaintiffs to continue working for Defendant (18 U.S.C. § 1594(a)).
Doc. No. 44, at 38–44.

In the motion to dismiss, Defendant addresses the four TVPA claims
collectively because although Count 1 is the "forced labor" claim, Counts 2 and 3
are premised on the alleged forced labor violations and Count 4 is based on the
same underlying conduct.   Doc. No. 47, at 12 & n.3; *see also id.* at 19 n.6 (stating that
failure to allege forced labor results in dismissal of derivative claims in Counts 2
and 3, and for similar reasons the attempt claim in Count 4).   Defendant contends
that the forced labor claim fails because there is no "threat of serious harm" or
"threatened abuse of legal process."   *Id.* at 12.   Defendant argues no "serious

harm" for several reasons: (1) Plaintiffs in fact resigned and were not compelled to remain employed; (2) the "threats" at issue were not improper or illegal – *i.e.,* the report to immigration was permissible because the report to ICE would be truthful as an immigration sponsor; (3) the actual damages stemming from the contract are not coercive/"serious harm" because they are limited "to the extent allowed by applicable law" under the contract, tied to Defendant's actual expenses, and permissible under state law; (4) the restrictive covenant in the contract is "exceedingly narrow"; and (5) Plaintiffs allege no coercion, fraud, or deception in execution of the employment contracts. *Id.* at 12–17. Defendant argues that the abuse of process claim fails for the same reasons because any threatened processes were lawful. *Id.* at 17. And even if there is "serious harm" or "threatened abuse of legal process," Defendant also disputes causation, arguing that the threats did not occur during Plaintiffs' employment, Plaintiffs actually resigned, and Plaintiffs' allegations are otherwise conclusory. *Id.* at 17–19.

Plaintiffs contend that these arguments are not properly addressed at the motion to dismiss stage. Doc. No. 54, at 8–9. Plaintiffs also argue they have adequately alleged serious harm because even attempted coerced labor is actionable; Plaintiffs rely on Defendant's threat of damages, citing cases where other courts have denied motions to dismiss TVPA claims on similar facts (cases discussed below). *See id.* at 9–10. Plaintiffs say that even though they willingly

entered into their jobs, and ultimately quit, it does not change this result. *Id.* at 10. Plaintiffs further argue that the allegations of the second amended complaint adequately allege that they did not quit their jobs when they wanted to in fear of the consequences for doing so, and that they were coerced or deceived into entering the contracts. *Id.* at 10, 11. Plaintiffs also contest Defendant's argument that warning of legitimate consequences is not coercion, arguing that this is a fact specific inquiry, Plaintiffs' agreement to the contract terms is not dispositive, and the damages Defendant seeks to recoup are illegal (*i.e.*, kickbacks under the FLSA). *Id.*[17]

Plaintiffs also address abuse of legal process, arguing that the threat of immigration consequences existed because Defendant misled them to believe that immigration status was dependent on Plaintiffs fulfilling the entire contract terms. *Id.* at 12. Finally, as to causation, Plaintiffs argue that the threats of immigration consequences and monetary penalties kept them from resigning earlier. *Id.* at 13–14. Plaintiffs also argue that in the event they do not properly plead causation with regard to continuation of work, it is of no moment because they adequately allege causation with respect to attempted forced labor. *Id.* at 14 n.8.

Upon review, the case law supports Plaintiffs here, the TVPA inquiry is fact

---

[17] At oral argument, Plaintiffs' counsel further noted that the second amended complaint alleges a requirement imposed on workers during their training that they may not speak to each other about wages. Doc. No. 71, at 80 (referencing Doc. No. 44 ¶ 72).

specific, and most courts have allowed similar TVPA claims to survive a motion to dismiss. *See, e.g.*, *Dale Carmen v. Health Carousel, LLC*, No. 1:20-CV-313, 2021 WL 2476882, at *9 (S.D. Ohio June 17, 2021) (denying motion to dismiss after determining that "discovery is necessary" to assess enforceability of liquidated damages provision, which could impact the TVPA analysis); *Elmy v. W. Express, Inc.*, No. 3:17-CV-01199, 2020 WL 1820100, at *7 (M.D. Tenn. Apr. 10, 2020) ("A factual determination of whether an objectively reasonable person with the same background as Plaintiff and under his same circumstances would have felt compelled to continue performing labor would be premature at this stage of the litigation."); *Camayo v. John Peroulis & Sons Sheep, Inc.*, No. 10-CV-00772-MSK-MJW, 2012 WL 4359086, at *5 n.6 (D. Colo. Sept. 24, 2012) ("[R]esolution of whether a certain statement amounts to an abuse of the legal process is one that is particularly difficult on the sparse record of a motion to dismiss.").

As but one example, *Magtoles v. United Staffing Registry, Inc.*, No. 21-CV-1850 (KAM) (PK), 2021 WL 6197063 (E.D.N.Y. Dec. 30, 2021), is instructive. That case also concerned a staffing agency that employed health care professionals. The employees signed employment contracts, which included (1) a liquidated damages provision for leaving employment early; (2) a non-compete clause; (3) a statement that the salaries paid would be prevailing wages where the nurse worked; and (4) a provision stating that if the employee breached the agreement, the defendant

would report the change in employment status to authorities, which could affect green card status. *Id.* at \*1–2. The court denied the motion to dismiss on grounds that the plaintiffs had failed to adequately allege serious harm under the TVPA, finding that the claims regarding the liquidated damages provision, non-compete clause, and immigration notification provision in their contracts could threaten serious harm under the TVPA. *Id.* at \*3–8. The court similarly found that threats regarding visa cancelation could be threatened abuse of legal process, as well as a scheme, pattern, or plan under § 1589(a)(4). *Id.* at \*8–9.

Several other courts have also denied similar motions to dismiss where the TVPA claims are premised on a penalty/liquidated damages provision in an employment contract and/or threats of immigration consequences. *See Carmen v. Health Carousel, LLC*, No. 1:20-CV-313, 2023 WL 5104066, at \*7 (S.D. Ohio Aug. 9, 2023) ("Plaintiffs . . . have plausibly alleged their TVPA claims. They provide sufficient allegations that Health Carousel created a threat of 'serious harm' to compel their labor . . . including allegations that Health Carousel forced the Plaintiffs to work excessive overtime and that Health Carousel used liquidated damages as a 'penalty' to lock Plaintiffs in."); *McClain v. Cape Air*, No. 22-CV-10649-DJC, 2023 WL 3587284, at \*8 (D. Mass. May 22, 2023) ("Courts have ruled that threats to enforce unenforceable liquidated damages provisions are plausibly threats to use the legal system for a purpose for which it was not designed. . . . Plaintiffs

ultimately may need to show more than an attempt to enforce an unenforceable contract provision to prevail on their TVPA claims. . . .   At this stage of litigation, however, Plaintiffs have plausibly pled that Cape Air obtained their services by threatening an abuse of the legal process." (citations omitted)); *Baldia v. RN Express Staffing Registry LLC*, 633 F. Supp. 3d 693, 705 (S.D.N.Y. 2022) (denying motion to dismiss TVPA claim where the complaint contained allegations that foreign nursing worker's employment agreement with staffing agency included liquidated damages provision); *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 438 (E.D.N.Y. 2017) ("Here, plaintiff alleges that she was not only threatened with the prospect of paying a $25,000 contract termination fee . . . she also was actually sued for recovery of both the $25,000 fee and $250,000 in tort damages. Allegations of such a severe financial burden are more than enough to rise to the level of harm necessary to state a TVPA claim."); *Panwar v. Access Therapies, Inc.*, 975 F. Supp. 2d 948, 958 (S.D. Ind. 2013) ("[I]t was the threat of being in debt to the Defendants under the $20,000.00 Promissory Note and having his visa revoked that kept Mr. Panwar from voluntarily terminating his employment. . . .   The Court finds that Mr. Panwar has adequately stated a claim under the TVPA."); *see also Vidal v. Advanced Care Staffing, LLC*, No. 122CV05535NRMMMH, 2023 WL 2783251, at *14 (E.D.N.Y. Apr. 4, 2023) ("Courts around the country, including many in this Circuit, have held that contracts such as this—in which immigrant workers are

threatened with severe financial penalties if they leave their employment before the end of their contract term—can violate the TVPA."); *Salcedo v. RN Staff Inc.*, No. 121CV01161SEBDLP, 2023 WL 2403832, at *11 (S.D. Ind. Mar. 8, 2023) (allegations of immigration and financial harm sufficient to survive motion to dismiss TVPA claims).

Indeed, "[s]everal cases have found the 'abuse of the legal process' prong to be satisfied by conduct in which the employer threatens to involve law enforcement or immigration authorities in order to persuade the employee to remain faithful or continue working." *Camayo*, 2012 WL 4359086, at *4.   And despite Defendant's argument to the contrary, courts have found that a plaintiff's voluntary cessation of employment does not change the result.   *See, e.g.*, *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 533 n.19 (D. Md. 2014) ("Even if Plaintiff originally travelled to the United States willingly, Defendants still could be liable if their later actions prevented her from leaving when she no longer wanted to remain."); *Paguirigan*, 286 F. Supp. 3d at 439 ("That plaintiff was physically able to leave her employment and eventually did so is not determinative in light of the termination fee, threat of suit, and eventual lawsuit that she alleges were intended to coerce her to stay.").   Nor does Plaintiffs' consent to the employment agreement appear to bar their claims on a motion to dismiss.   *See, e.g.*, *Dale Carmen*, 2021 WL 2476882, at *9 ("[A]n employer cannot escape TVPA liability merely because the employee 'agreed' to the term in their

employment contract").

In its briefing and at oral argument, Defendant's "best case" decided in a similar procedural posture to support the argument that the TVPA claims cannot proceed is *Estavilla v. Goodman Group, LLC*, No. CV 21-68-M-KLD, 2022 WL 539192 (D. Mont. Feb. 23, 2022).   Doc. No. 47, at 13–15; Doc. No. 71, at 69.[18]   In *Estavilla*,

_____

[18] In its motion, Defendant also cites *Roman v. Tyco Simplex Grinnell*, 732 F. App'x 813, 817 (11th Cir. 2018) for the proposition that Plaintiffs have failed to adequately allege causation on the TVPA claims for failure to plead facts sufficient to demonstrate that any forced labor was caused by threatened serious harm or abuse.   Doc. No. 47, at 17–18; *see also* Doc. No. 71, at 70–71.   Notably, in *Roman*, the district court gave the *pro se* plaintiff four opportunities to amend prior to dismissing the case with prejudice.   And in *Roman*, there were no allegations regarding how threats of termination from employment for not performing a job about which the plaintiff alleged safety concerns led to his forced labor. *Roman*, 732 F. App'x at 817.   Here, in contrast, Plaintiffs allege that they were forced to remain in their jobs due to the threats of immigration consequences and the threat of the financial penalties they would face if they resigned early, factors which did not appear to be at play in *Roman*.   Accordingly, the undersigned does not find the analysis in *Roman* persuasive here.

At oral argument, Defendant also argued that *K. H. v. Riti, Inc.*, No. 23-11682, 2024 WL 505063 (11th Cir. Feb. 9, 2024) supports its motion to dismiss the TVPA claims.   Doc. No. 71, at 70–72.   *K.H.* is factually inapposite, however, as it was "not a claim against a perpetrator" and concerned "beneficiary claims" under the TVPA.   2024 WL 505063, at *2. Specifically, the case concerned whether there were sufficient allegations as to whether a hotel operator participated in a sex trafficking venture.   *Id.* at *3–4.   Thus, the undersigned does not find the analysis in *K.H.* applicable here.

The remainder of the cases addressing the TVPA cited by Defendant were decided in the context of summary judgment or after trial, and not on a motion to dismiss for failure to state a claim.   Doc. No. 47, at 11–19.   *See Martinez-Rodriguez v. Giles*, 31 F.4th 1139, 1143 (9th Cir. 2022) (summary judgment); *Muchira v. Al-Rawaf*, 850 F.3d 605, 608 (4th Cir. 2017), *as amended* (Mar. 3, 2017) (summary judgment); *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1179 (9th Cir. 2012) (summary judgment); *Dinsay v. RN Staff Inc.*, No. 1:19-cv-00907-TWP-DML, 2022 WL 581033, at *1 (S.D. Ind. Feb. 25, 2022), *appeal dismissed*, No. 22-1490, 2022 WL 19298459 (7th Cir. Nov. 1, 2022) (bench trial); *Panwar v. Access Therapies, Inc.*, No. 1:12-CV-00619-TWP, 2015 WL 1396599, at *1 (S.D. Ind. Mar. 25, 2015) (summary

the court noted the "well-settled [principle] that financial pressure, including the threat of financial harm, may constitute serious harm under the TVPA." 2022 WL 539192, at *13 (collecting cases). However, the court rejected the plaintiff's argument that a repayment provision (a specific amount based on the defendants' actual expenses) set forth in a signed employment offer letter and related promissory note constituted a "threat of serious harm" in that case. Specifically, in distinguishing *Paguirigan* and *Carmen*, cited above, the court noted that the plaintiff did not allege that the defendants engaged in coercive tactics outside of a non-compete clause and immigration provision in the offer letter, and the plaintiff did not allege that the defendants enforced or threatened to enforce those provisions against her. *Id.* at *14, 15. Moreover, in related state court litigation, a

---

judgment). Thus, to the extent that Defendant also relies on these cases to say that its conduct of reporting Plaintiffs to immigration authorities upon leaving employment cannot support a TVPA claim, *see* Doc. No. 47, at 14, the undersigned finds this contention unavailing at this stage of the proceedings. *See also Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 93 (2d Cir. 2019) (finding plausible claim of abuse of process/forced labor under TVPA where plaintiff alleged that the defendants "would withdraw their sponsorship of [his] visa if he stopped working for them or gave them any trouble," which plausibly "support[ed] an inference that [the plaintiff] was entitled to regard it as a threat to expose him to deportation.").

　　The final cases cited by Defendant do not address the TVPA, and are cited for general principles on contract damages elections, *see Del Monte Fresh Produce Co. v. Net Results, Inc.*, 77 So. 3d 667, 673 (Fla. Dist. Ct. App. 2011); *Physicians Reference Lab., Inc. v. Daniel Seckinger, M.D. & Assocs., P.A.*, 501 So. 2d 107, 108 (Fla. Dist. Ct. App. 1987), or regarding analysis on restrictive covenants, *see Lincare, Inc. v. Tinklenberg*, No. 8:20-cv-1002-T-02AAS, 2020 WL 10354020, at *4 (M.D. Fla. June 26, 2020); *Env't Servs., Inc. v. Carter*, 9 So. 3d 1258, 1264 (Fla. Dist. Ct. App. 2009).

court had determined that the repayment provision was valid and enforceable, a decision which the plaintiff did not appeal. *Id.* at *2, 14.   Based thereon, the court determined that the plaintiff did not state a TVPA claim. *Id.* at *15.

Upon consideration, *Estavilla* is factually distinguishable from the present case, and thus the undersigned finds Defendant's reliance on it unpersuasive.   In this case, there has been no determination as to whether the financial penalty provision set forth in the employment agreement is valid and/or enforceable, and in contrast to *Estavilla*, here, Plaintiffs allege threats by Defendant regarding immigration consequences as well as threats to enforce the financial penalty provision set forth in the employment agreement for early termination of employment. *See* Doc. No. 44, at 38–44.[19]

Based on the persuasive authority cited above demonstrating that the TVPA inquiry is fact-specific,[20] and given Plaintiffs' allegations in the second amended

---

[19] The undersigned further notes that *Estavilla* relied on a case decided in the context of summary judgment in determining that the complaint failed to state a claim. 2022 WL 539192, at *14–15 (discussing *Panwar v. Access Therapies, Inc.*, No. 1:12-CV-00619-TWP, 2015 WL 1396599 (S.D. Ind. Mar. 25, 2015), a case on which Defendant also relies). Notably, in *Panwar*, the court denied an earlier motion to dismiss the TVPA claims. *See Panwar*, 975 F. Supp. 2d 948.

To the extent that Defendant's counsel made a "slippery slope" argument at oral argument with regard to expansion of the TVPA to cover claims like those alleged here, Doc. No. 71, at 90, based on the case law cited above, and with the limitations of the TVPA as they have been defined, *see, e.g.*, *Roman*, 732 F. App'x 813; *K.H.*, 2024 WL 505063, the undersigned does not find this argument persuasive.

[20] Indeed, as Plaintiffs argue, "[t]he relevant analysis is whether a reasonable

complaint regarding the contract damages provision, contract terms regarding non-competes, threats of immigration consequences, and wage suppression, the undersigned finds that Plaintiffs have sufficiently stated TVPA claims for purposes of withstanding a Rule 12(b)(6) motion to dismiss.[21]   Accordingly, the undersigned will respectfully recommend that the Court deny the motion with respect to Counts 1 through 4 of the second amended complaint.

C.   Violations of RICO.

To state a claim under RICO, the plaintiff must establish "'three essential elements,': first, that the defendant committed a pattern of RICO predicate acts under 18 U.S.C. § 1962; second, that the plaintiff suffered injury to business or property; and, finally, that the defendant's racketeering activity proximately caused the injury." *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 705 (11th Cir. 2014). "In order to show a § 1962 violation, a plaintiff must satisfy four elements of proof: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.   To show 'conduct of an enterprise,' a plaintiff must show that an enterprise, which includes any individual, partnership, corporation, association, or other legal entity,

_____

person in [the plaintiff's] position would have found . . . threatened financial penalties serious enough to compel him or her into remaining on the job. . . ."   *Vidal*, 2023 WL 2783251, at *14.

[21] This is not to say, however, that some of Defendant's arguments may be well taken in the context of a motion for summary judgment after discovery.

and any union or group of individuals associated in fact although not a legal entity, had a common goal.   A RICO 'pattern' is two predicate acts of racketeering within a ten-year period, and 'racketeering activity' is any act which is indictable under the list of criminal offenses in 18 U.S.C. § 1961." *Rock v. BAE Sys., Inc.*, 556 F. App'x 869, 872 (11th Cir. 2014) (quotation marks and citations omitted).

"When a plaintiff asserts RICO and RICO conspiracy claims, the court must look at the underlying allegations of racketeering predicates to determine the nature of the alleged wrongdoing.   When the underlying allegations assert claims that are akin to fraud, the heightened pleading standards of Rule 9(b) apply to the RICO claims." *Miccosukee Tribe of Indians of Fla. v. Cypress*, 814 F.3d 1202, 1212 (11th Cir. 2015) (citation omitted).   "To satisfy the Rule 9(b) standard, RICO complaints must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements misled the Plaintiffs; and (4) what the Defendants gained by the alleged fraud." *Id.* (citation omitted).

The plaintiff must also demonstrate statutory standing under RICO, which requires the plaintiff to establish the injury and causation requirements of 18 U.S.C. § 1964(c).   *Regions Bank v. Kaplan*, No. 8:12-cv-1837-T-17MAP, 2014 WL 1292888, at *4 (M.D. Fla. Mar. 31, 2014), *on reconsideration in part*, 2015 WL 2347190 (M.D. Fla. May 14, 2015) (citing *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)).

"The Court reviews RICO statutory standing under Rule 12(b)(6)." *Truthinadvertisingenforcers.com v. Dish Network, LLC*, No. 8:16-cv-2366-T-33JSS, 2016 WL 7230955, at *5 (M.D. Fla. Dec. 14, 2016) (citing *Adell v. Macon Cty. Greyhound Park, Inc.*, 785 F. Supp. 2d 1226, 1237 (M.D. Ala. 2011)).

Here, in the second amended complaint, Plaintiffs allege a violation of RICO based on Defendant's alleged "multiple repeated violations of trafficking and attempted trafficking with respect to" involuntary servitude/forced labor under the TVPA.   Doc. No. 44 ¶ 225.   Alternatively, Plaintiffs allege a pattern of racketeering activity by Defendant's fraud in foreign labor contracting (18 U.S.C. § 1351), visa fraud (18 U.S.C. § 1546), unlawful conduct with respect to documents in furtherance of trafficking/forced labor/etc. (18 U.S.C. § 1592), or trafficking (18 U.S.C. § 1590). *Id.* ¶ 226.   Plaintiffs allege that Defendant, along with Arete Nurse Professionals LLC (Defendant's sister company), or alternatively, Jackson Healthcare (Defendant's parent company), constitute an "enterprise" for RICO purposes, and they share a common purpose of bringing foreign nurses into the United States, suppressing their wages, and keeping them trapped in their jobs.   *Id.* ¶¶ 147–53, 232.   Plaintiffs allege that Defendant has knowingly made misrepresentations to USCIS with respect to Plaintiffs' employment/recruitment, by misrepresenting that it pays prevailing wages and complies with the law because it seeks to recover the "kickbacks" including lost profits.   *Id.* ¶¶ 139–56, 227.   Defendant also allegedly

makes false representations to the healthcare workers regarding the nature of their green card. *Id.* ¶ 228. Plaintiffs allege injury in the form of "unpaid wages, reduced and suppressed wages, payments of expenses related to coming to the United States, and the payment of penalties to Defendant." *Id.* ¶ 233.

In the motion to dismiss, Defendant contends that Plaintiffs fail to comply with Federal Rule of Civil Procedure 9(b) on the RICO claim, by failing to plead the claim with particularity. Doc. No. 47, at 19. Defendant also argues that Plaintiffs do not plead statutory standing because Plaintiffs' alleged "injuries" ((1) possibility that Defendant might recover future damages, (2) expenses related to relocating to the United States, and (3) suppressed wages)) are (a) speculative, (b) Plaintiffs do not allege they would have forgone immigration expenses related to coming to the United States if they knew the true immigration consequences of their visa with Defendant; and (c) as to suppressed wages, Plaintiffs fail to provide sufficient detail on new employers that supposedly paid more, and Plaintiffs other "comparators" worked directly for the hospitals and not a staffing agency, and thus are not true comparators. *Id.* at 19–24.

Plaintiffs, on the other hand, claim they sufficiently allege a pattern of fraud on both USCIS and Plaintiffs themselves, in that (1) Defendant falsely represented to USCIS that it paid its employees prevailing wages; (2) Defendant falsely represented that their green cards required Plaintiffs to work for Defendant for a

specified period of time, and (3) based on the penalties Plaintiffs would have to pay for leaving employment.   Doc. No. 54, at 14–15.   Plaintiffs also argue that Defendant's misrepresentations to USCIS were the proximate cause of their payment of relocation expenses.   *Id.* at 16–17.   Plaintiffs further argue that they plausibly allege wage suppression as an additional harm to business or property. *Id.* at 17–18.

Upon review, the central issue raised by the parties' briefing is whether Plaintiffs adequately allege injury for purposes of RICO, to which inquiry the Rule 12(b)(6) standards, rather than Rule 9(b), apply.   Doc. No. 47, at 19–24; Doc. No. 54, at 14–18.   *See also, e.g.*, *Truthinadvertisingenforcers.com*, 2016 WL 7230955, at *5 (citing *Adell*, 785 F. Supp. 2d at 1237). [22]   Upon consideration of the parties'

---

[22] Defendant makes a brief argument that Plaintiffs fail to comply with Rule 9(b) and fail to plead the RICO claims with particularity, specifically by failing to "plead the who, what, when, or where of any misrepresentations that allegedly give rise to Plaintiffs' claims."   Doc. No. 47, at 19–20.   The undersigned disagrees that Plaintiffs have failed to plead the "who, what, when, or where," particularly because Plaintiffs allege that some of the misrepresentations were made to USCIS, and several were made during the pre-employment process with Plaintiffs, these misrepresentations to include that Plaintiffs were to be paid the prevailing wage and were not, and in fact Plaintiffs wages fell far below the wages of their American counterparts.   *See, e.g.*, *Carmen*, 2023 WL 5104066, at *10 (finding similar allegations sufficient to satisfy Rule 9(b)).   Moreover, given the recommendation above that the TVPA claims survive dismissal, and Plaintiffs' RICO claim is based, at least in part, upon same, the undersigned finds the RICO claim sufficiently pleaded to survive dismissal.   *See id.* at *11 ("As Health Carousel plausibly violated Plaintiffs' rights under the TVPA, Plaintiffs have adequately pled the predicate act of Trafficking.").

At oral argument, Defendant also argued that it is legally obligated to provide a copy of the employment contract to USCIS, so any misrepresentation claims under RICO

respective arguments, as well as the allegations of the second amended complaint, it appears to the undersigned that Plaintiffs plausibly state a RICO claim sufficient to survive dismissal.

Specifically, Plaintiffs allege that the purpose of the RICO enterprise[23] was "obtaining and supplying inexpensive foreign healthcare workers to United States healthcare providers through fraud and labor trafficking."   Doc. No. 44 ¶ 225. The second amended complaint alleges that Defendant knowingly made misrepresentations to USCIS with respect to Plaintiffs' employment/recruitment by misrepresenting that it pays prevailing wages, and that Defendant knowingly misrepresented to Plaintiffs that working for Defendant for the entire period was a condition of their green cards.   *Id.* ¶¶ 225–33.   The second amended complaint further alleges that Defendant's misrepresentations caused Plaintiffs to make them feel trapped in their jobs, jobs at which they earned wages substantially below the wages of their American-nurse counterparts.   *Id.* ¶¶ 225, 232 (incorporating allegations in paragraphs ¶¶ 136–46).   Plaintiffs allege injury to business or

---

in this regard are specious.   Doc. No. 71, at 101.   Defendant has cited no evidence or legal authority directly on point, and the undersigned agrees with Plaintiffs that discovery will be necessary on this issue for determination of whether, if true, it affects Plaintiffs' claims. *See id.* at 105–07.

[23] Neither in its briefing nor at oral argument does/did Defendant argue that Plaintiffs have failed to adequately allege a RICO enterprise.   *See* Doc. Nos. 47, 71. Accordingly, that element is not further addressed herein.

property in the form of "unpaid wages, reduced and suppressed wages, payments of expenses related to coming to the United States, and the payment of penalties to Defendant."   *Id.* ¶ 233.

The Southern District of Ohio's decision in *Carmen*, 2023 WL 5104066, at *10, is instructive on the Rule 12(b)(6) and RICO statutory standing issues.   There, the plaintiffs similarly alleged RICO predicates that were fraud-based and trafficking-based.   2023 WL 5104066, at *10.   The court found that the plaintiffs had plausibly alleged both based on allegations that: (1) the defendant misrepresented its intent to pay the plaintiffs the prevailing wage upon their arrival in this country; (2) that it made this representation both to the Plaintiffs and to immigration officials; (3) that according to the complaint, the defendant never intended to pay the plaintiffs the prevailing wage upon arrival in the United States; and (4) that the plaintiffs' pay in fact fell well below the wages their peers earned.   *Id.*   The court also found that the plaintiffs had adequately alleged statutory standing, in that they alleged a RICO injury at minimum, by alleging denial of the contractual right to a prevailing wage, and that causation was established for the same reason based upon allegations that the defendant "defrauded the Plaintiffs by lying about its intention to pay them the prevailing wage, defrauded the USCIS by lying about the same, and transported Plaintiffs into the country to have them work for less than the prevailing wage." *Id.* at *11–12.

The same analysis should apply here. Given the allegations regarding misrepresentations to Plaintiffs and USCIS regarding payment of prevailing wages and/or immigration consequences, as well as the allegations of wage suppression, Plaintiffs have adequately alleged statutory RICO standing. *See Carmen*, 2023 WL 5104066, at *13 ("[V]isa fraud on immigration officials, committed as part of a scheme to import and underpay immigrant laborers, strikes the Court as causally linked with the injury those laborers suffer when they immigrate and are underpaid."); *see also Adhikari v. Daoud & Partners*, 697 F. Supp. 2d 674, 691 (S.D. Tex. 2009) ("Plaintiffs in this case allege that, as a result of KBR's conduct, Plaintiffs were compelled to pay out-of-pocket fees to Defendants, suffered a reduction in promised wages, and were prevented from obtaining alternative employment. We find these allegations of financial loss sufficient to establish RICO standing. The Fifth Circuit has recognized that alleged victims of trafficking violations have RICO standing for claims of denied wages." (citing *Abraham v. Singh*, 480 F.3d 351 (5th Cir. 2007))).[24]

---

[24] Defendant points to *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702 (11th Cir. 2014) to argue that the suppressed wages claim fails for failure to identify specific market data in support. Doc. No. 47, at 22; Doc. No. 71, at 103. In *Simpson*, the court noted that depressed wages may validly state a RICO claim; however, the court found, in that case, plaintiffs failed to properly plead a claim of depressed wages because the complaint actually alleged an *increase* in the plaintiffs' wages, the plaintiffs failed to allege any comparators in the relevant market, the complaint wholly failed to allege or demonstrate a gap in wages between what the plaintiffs actually received and what they would have received absent the alleged RICO violation, and the plaintiffs instead relied on an abstract

market theory of wage suppression unsupported by any plausible market data to support their claims that the defendant's hiring of illegal workers resulted in depressed wages. 744 F.3d at 705, 707, 709–10.   Here, in contrast, Plaintiffs allege that their American-counterpart nurses performing the same job received much higher wages (in addition to other benefits such as paid time off and bonuses not also received by Plaintiffs), with Plaintiff Lewis specifically alleging that she made approximately $30 per hour in contrast to as much as $100 per hour for her American counterparts.   *See, e.g.*, Doc. No. 44 ¶¶ 46, 77, 84, 123–24.   Plaintiffs further allege they received increased wages from new employers upon leaving employment with Defendant.   *Id.* ¶ 146.   Although Defendant attempts to say this is not enough to survive a motion to dismiss, these allegations are not analogous to the facts alleged in *Simpson*, where it was "not a close case," there was a failure to allege *any* depression of wages and merely a pleading of abstraction and conclusory assertions, wholly unsupported by allegations of any comparators or any plausible market data to support the claims.   *See Simpson*, 744 F.3d at 709–10.   The undersigned therefore does not believe that *Simpson* mandates dismissal in this case, and it appears that the merits of Plaintiffs' claims of suppressed wages based on the relevant labor market is an issue to be resolved at a later point in the litigation.

   To the extent that Defendant argues that Plaintiffs' suppressed wages claim fails for failure to properly allege similarly situated comparators based on an "obvious alternative explanation," and relies on *Automotive Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins.*, 953 F.3d 707 (11th Cir. 2020), Doc. No. 47, at 24, that case did not involve a RICO claim. And *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010), *see* Doc. No. 47, at 24, involved RICO claims based on wire and mail fraud, and failure to properly plead conspiracy, which are not at issue here.   Accordingly, the undersigned does not find Defendant's reliance on these cases persuasive to support its argument for dismissal.

   Defendant also points to *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340 (11th Cir. 2016) to argue lack of causation, in that Plaintiffs would not have foregone immigration expenses had they been aware of the true nature of their visa *(i.e.,* absent Defendant's alleged misrepresentations about visa restrictions).   Doc. No. 47, at 21; Doc. No. 71, at 104.   In *Ray*, which concerned airline tickets and an attendant usage fee, the court found failure to plead causation because the plaintiffs failed to plausibly plead that they would not have purchased the airline tickets absent knowledge of the origin of the usage fee.   836 F.3d at 1350–51.   The circumstances are not the same here, and *Ray* is factually inapposite. Indeed, as Plaintiffs argue in response, they plead that Defendant's misrepresentations to UCSIS proximately caused the payment of relocation expenses, in that the visas would not have been approved had Defendant made accurate representations.   *See, e.g.*, Doc. No. 44 ¶¶ 138–41.

   Finally, insofar as Defendant's motion to dismiss argues that RICO statutory standing fails because Defendant has not yet sued to collect on the contract penalty, *see*

Accordingly, the undersigned will respectfully recommend that Defendant's motion to dismiss (Doc. No. 47) be denied as to the RICO claim (Count 9).

D.   <u>Unlawful Restraint of Trade</u>.

"Pursuant to section 542.18, Florida Statutes, '[e]very contract, combination, or conspiracy in restraint of trade or commerce in this state is unlawful.'   The Florida Legislature has indicated that its intent is for courts that are construing the Florida Antitrust Act to give 'due consideration and great weight . . . to the interpretations of the federal courts relating to comparable federal antitrust statutes.'"   *MYD Marine Distrib., Inc. v. Int'l Paint Ltd.*, 76 So. 3d 42, 46 (Fla. Dist. Ct. App. 2011) (citing Fla. Stat. §§ 542.15, 543.32).   "To state a claim for unlawful restraint of trade, the plaintiff must allege an agreement between two or more persons to restrain trade.   The plaintiff cannot rely on the bald assertion that the defendant agreed with other parties to restrain trade, but must identify the members to the agreement.   Likewise, '[i]ndependent action is not proscribed,' and no claim will lie where the plaintiff alleges that it is only the defendant who is restraining trade."   *Hill Dermaceuticals, Inc. v. Anthem, Inc.*, 228 F. Supp. 3d 1292, 1300 (M.D. Fla. 2017) (citations, quotation marks, and footnote omitted).

"[I]n antitrust actions, where the proof is largely in the hands of the alleged

---

Doc. No. 47, at 20–21, the undersigned finds this argument unavailing, as that is not the sole basis for the RICO claim.   *See* Doc. No. 44, at 48–51.

conspirators, summary dismissals prior to allowing the plaintiff ample opportunity for discovery should be granted . . . sparingly.  Nevertheless, even though a plaintiff may be unable to allege specific facts which would prove actual acts of agreement or conspiracy, the plaintiff must set forth facts from which an inference of unlawful agreement can be drawn."  *Ben Sheftall Distrib. Co. v. Mirta de Perales, Inc.*, 791 F. Supp. 1575, 1579 (S.D. Ga. 1992) (citations omitted).

Here, the second amended complaint alleges unlawful restraint of trade based on the provisions in the employment agreement imposing financial penalties upon workers who quit, which according to Plaintiffs, restricts competition because nurses cannot freely leave jobs and it suppresses wages throughout the market. Doc. No. 44 ¶¶ 235–45.

Defendant argues this claim is too conclusory, and Plaintiffs fail to allege harm to competition in general because they allege only that the contracts imposed an "economic penalty" on workers, and a financial disincentive that affects only an individual party to a contract does not constitute "restraint" on trade or commerce. Doc. No. 47, at 24.[25]  On the other hand, Plaintiffs contend that the threats of debt

---

[25] In their briefing, the parties also address restrictive covenants with regard to the restraint of trade claim.  Doc. No. 47, at 24–25; Doc. No. 54, at 18–20.  However, the second amended complaint does not allege restraint of trade with regard to the restrictive covenants, Doc. No. 44 ¶¶ 235–45, and Plaintiffs' counsel confirmed at oral argument that the restraint of trade claim is premised solely on the penalty provision in the employment contracts.  Doc. No. 71, at 95.  Accordingly, this Report addresses only whether the second amended complaint plausibly states a restraint of trade claim based upon same.

and unlawful immigration consequences trap nurses in their jobs and restrain trade, in that workers cannot move freely between jobs, which gives Defendant an unfair advantage over competitors.   Doc. No. 54, at 18–20.   And according to Plaintiffs, the "legitimate business interest" inquiry is factual, not legal.   *Id.* at 20 (citing *LT's Benjamin Recs., Inc. v. Machete Music*, No. 09-23770-CIV, 2010 WL 2573961, at *5 (S.D. Fla. June 24, 2010) (issue of facts regarding restraint of trade could not be decided on a motion to dismiss)).

As discussed above, the second amended complaint alleges only restraint of trade with regard to the financial penalties set forth in the employment agreements. *See* Doc. No. 44 ¶¶ 235–45.   Regarding the penalty, as Defendant argues, Plaintiffs do not allege an "agreement" to "restrain trade," and they allege only harm to parties to the contract (*i.e.*, "punishing nurses," *see* Doc. No. 44 ¶¶ 235–45) rather than a restraint on commerce generally.   *See generally Cap. Wealth Advisors, LLC v. Cap. Wealth Advisors, Inc.*, 335 So. 3d 164, 167 (Fla. Dist. Ct. App. 2021) ("[S]ection 542.18 governs restraints on 'trade' or 'commerce' itself — not the discreet effects that agreements have on the parties that enter into them.").   *Cf. Am. Credit Card Tel. Co. v. Nat'l Pay Tel. Corp.*, 504 So. 2d 486, 488 (Fla. Dist. Ct. App. 1987) ("Section 1 of the Sherman Act does not reach conduct that is wholly unilateral.").   Accordingly, Plaintiffs have not adequately alleged a restraint of trade claim, and the undersigned will respectfully recommend that Count 10 of the second amended

complaint be dismissed.    *See McFalls v. NCH Healthcare Sys., Inc.*, No. 2:23-cv-572-SPC-KCD, 2024 WL 111920, at *3-4 (M.D. Fla. Jan. 10, 2024) (granting motion to dismiss similar restraint of trade claim based solely on repayment of program fee as set forth in employment contract).[26]

## V.    RECOMMENDATION.

For the reasons discussed herein, it is respectfully **RECOMMENDED** that the Court:

1.    **GRANT in part and DENY in part** Defendant's Motion to Dismiss the Second Amended Complaint (Doc. No. 47).

---

[26] Plaintiffs' counsel candidly admitted at oral argument that he had no authority on point for the restraint of trade claim, and otherwise points the Court instead to proposed rulemaking from the Federal Trade Commission.   Doc. No. 71, at 96–97; *see also* Doc. No. 54, at 20 n.14.

As discussed above, after oral argument Plaintiffs also filed a Notice of Supplemental Authority regarding the *Fredericks* case from the Northern District of Texas, which Plaintiffs allege supports their restraint of trade claim, in that the penalty provision in the employment agreement between Plaintiffs and Defendant restrains trade.   Doc. No. 75.   The undersigned does not find Plaintiffs' reliance on *Fredericks* persuasive on this point, as *Fredericks* was addressing Texas law, under which "[i]f an agreement provides a severe economic penalty on a departing employee, courts use the noncompete reasonableness factors to assess whether the agreement is unlawful."   *Fredericks*, 2024 WL 1183075, at *5 (citing *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 388 (Tex. 1991)). Plaintiff has not demonstrated that the same is true under Florida law, and points to no authority demonstrating that, under Florida law, alleged harm caused solely to parties to an employment agreement is sufficient to support a restraint of trade claim.   *See Cap. Wealth Advisors, LLC*, 335 So. 3d at 167 ("[S]ection 542.18 governs restraints on 'trade' or 'commerce' itself—not the discreet effects that agreements have on the parties that enter into them.").

2.      **DISMISS without prejudice** the FLSA claims (Counts 5 & 6), FMWA claims (Counts 7 & 8), and unlawful restraint of trade claim (Count 10).

3.      **DENY** the Motion to Dismiss (Doc. No. 47) with respect to the TVPA claims (Counts 1 through 4) and the RICO claim (Count 9).

4.      **LIFT** the stay on discovery (*see* Doc. No. 73) and **ORDER** the parties to file briefing as to whether amendment to the current schedule of the case is necessary, *see* Doc. No. 58, as the Court deems appropriate.

## <u>NOTICE TO PARTIES</u>

A party has fourteen days from the date the Report and Recommendation is served to serve and file written objections to the Report and Recommendation's factual findings and legal conclusions.  Failure to serve written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.   11th Cir. R. 3-1.

Recommended in Orlando, Florida on April 10, 2024.

_____
LESLIE HOFFMAN PRICE
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge

Counsel of Record
Unrepresented Party
Courtroom Deputy