UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

LUCINDA BYRON and LATOYA
LEWIS,

      Plaintiffs,

v.                                  Case No: 6:23-cv-1645-JSS-LHP

AVANT HEALTHCARE
PROFESSIONALS, LLC,

      Defendant.
_____/

## ORDER

      Defendant Avant Healthcare Professionals, LLC moves to dismiss the second amended complaint (SAC) filed by Plaintiffs Lucinda Byron and Latoya Lewis for failure to state a claim. (Dkt. 47.) Plaintiffs largely oppose the motion. (Dkt. 54.) Magistrate Judge Leslie Hoffman-Price recommends that the motion be granted in part and denied in part. (Dkt. 77.) The parties partially object to the recommendation. (Dkts. 78 & 79; *see also* Dkts. 80 & 81.) Upon independent examination of the record, the court overrules the parties' partial objections, adopts Judge Hoffman-Price's recommendation, and grants Defendant's motion in part and denies it in part for the reasons outlined below.

## FACTS[1]

---

[1] The court accepts the well-pleaded factual allegations in the SAC as true and construes them in the light most favorable to Plaintiffs. *See Harry v. Marchant*, 291 F.3d 767, 769 (11th Cir. 2002) (en banc).

The court describes Defendant's general business practices and then turns to the specifics of Byron's and Lewis's employment with Defendant.

## A. Defendant's General Business Practices

Defendant recruits healthcare workers from outside the United States and brings them into the country to work for healthcare facilities.   (Dkt. 44 ¶ 14.) Defendant currently "employs hundreds of . . . workers," "has employed thousands of . . . workers over the years," and expects to employ greater numbers in light of high post-pandemic demand.  (*Id.* ¶ 20.)  The workers that Defendant recruits are "trained nurses, physical therapists, and occupational therapists."  (*Id.* ¶ 14.)  When Defendant recruits them, they "already have significant experience in nursing."  (*Id.* ¶ 45.)  Often, they have "worked for many years in hospitals all over the world."  (*Id.*)  Despite their years on the job, Defendant "frequently places [them] in positions that are well below their level of experience or outside their area of expertise."  (*Id.* ¶ 46.)  Defendant also provides the workers with "hourly pay that is much lower than the pay received by American nurses with comparable levels of experience."  (*Id.*)  Moreover, the workers "are generally ineligible for the bonuses and incentives that are paid to their colleagues at the hospitals where they work," (*id.* ¶ 47), and they may accrue "as little as four full days of [Paid Time Off (PTO)] per year," (*id.* ¶ 49).

The workers "live and work in the United States" on EB-3 visas, which "are available for skilled or professional workers . . . and are not tied to a specific employer."  (*Id.* ¶ 41.)  "Although EB-3 visa holders can change employers, the visa

requires sponsorship from the employer that the visa holder moves to the United States to work for." (*Id.* ¶ 42.)  Defendant is "generally the primary source of information on immigration to the United States" for its workers.  (*Id.* ¶ 44.)  "During the immigration process," Defendant tells the workers that "continuing to work with [Defendant] throughout the contract term is a requirement of the EB-3 visa." (*Id.* ¶ 42.)  When workers notify Defendant that "they intend to leave their jobs before the expiration of their commitment period," Defendant "routinely" responds that Defendant "will be forced to report their resignation to the United States Customs and Immigration Services." (*Id.* ¶ 43.)  Given Defendant's response, workers mistakenly "believe that their resignation [from Defendant] will have negative consequences for their immigration status." (*Id.* ¶¶ 43–44.)

Defendant charges fees to the healthcare facilities for the workers' labor.  (*Id.* ¶ 16.)  "[T]he longer [Defendant] can make [the] workers continue to work for it, the more it can profit from their labor." (*Id.*)  Accordingly, Defendant makes its workers "sign form contracts, each with substantially the same terms," and uses the contracts to keep the workers employed with Defendant.  (*Id.* ¶¶ 17–19.)  Defendant also threatens the workers with "serious harm," including financial, immigration, and other legal consequences, to ensure that they do not end their employment.  (*Id.* ¶¶ 17, 19.)  The form contract describes various events that would cause workers to owe Defendant an unspecified amount of damages including Defendant's lost profits.  (*See id.* ¶¶ 21, 26–28, 30.)  One of the events that triggers this damages provision is a

worker's resignation from Defendant before the "Initial Employment Period" or "Revised Initial Employment Period" ends. (*Id.* ¶ 21.)  When workers "submit notice of resignation early," Defendant "routinely" tells them via email that "early termination of employment is a serious decision" and asks them to "discuss that decision further by phone." (*Id.* ¶ 33.)  When workers call Defendant to discuss the decision, Defendant "routinely tells them that they owe tens of thousands of dollars, which must be paid within [thirty] days." (*Id.* ¶ 34.)

Under the form contract, the workers are not allowed to work "for anyone other than [Defendant] while they are employed by [Defendant]." (*Id.* ¶ 36.)  "The form contract also contains an [eighteen]-month covenant not to compete" absent the "prior written consent" of Defendant's Chief Executive Officer. (*Id.* ¶ 37.)  The eighteen-month period is reduced to six months after completion of the "Employment Period." (*Id.*)  Defendant applies the non-competition provision to "workers in all states except California." (*Id.*)  The provision "prohibits . . . workers from providing services to any of [Defendant]'s clients unless [Defendant] has assigned the worker to that client." (*Id.*)  In addition, during their employment with Defendant and for a year afterward, workers cannot "solicit[] or recruit[] [Defendant]'s employees for any other job or suggest[], advis[e], or encourag[e]" other workers to breach their contracts with Defendant. (*Id.* ¶ 39.)

## B. Byron's Employment with Defendant

Plaintiff Lucinda Byron first signed Defendant's form contract in January 2019,

but she did not come to the United States to work for Defendant until April 2022. (*Id.* ¶¶ 57, 67.) Around that time, on her first day of training, she signed the form contract again. (*Id.* ¶ 69.) Defendant required her to sign it "without reviewing it" and took it from her so she could not review it afterward. (*Id.*) Throughout her employment, Defendant assigned Byron to work for Monument Health, a hospital in Rapid City, South Dakota. (*Id.* ¶ 66.) She started working there in June 2022. (*Id.* ¶ 75.) Unfortunately, Byron experienced overlapping issues related to immigration, pay, PTO, and training during her employment with Defendant. (*See id.* ¶¶ 58–61, 64–65, 70–73, 76–86, 89–91, 94–99.) These "struggles . . . were draining." (*Id.* ¶ 91.) Accordingly, in January 2023, she notified Defendant of her intent to resign. (*Id.* ¶ 92.) Defendant discouraged Byron from resigning and threatened legal action when she did. (*See id.* ¶¶ 94–95, 105.)

Byron's issues with Defendant actually started as early as 2019, when she came to the United States to take a test so she could work as a licensed nurse in the United States. (*Id.* ¶ 59.) Defendant failed to inform her until after she took the nursing test that she would need to take another test—in English proficiency—to immigrate. (*Id.* ¶ 60.) "Byron found [it] frustrating" that she had to "pay out of pocket to travel back to the United States" to take the English test when she could have taken both tests at the same time if Defendant "had informed her of the [English] requirement earlier." (*Id.* ¶ 61.) Byron had other immigration issues. During the immigration process, an "immigration specialist" from Defendant misinformed Byron that "she would be

required to work for [Defendant] throughout the contract term as a condition of receiving a green card." (*Id.* ¶ 58.) Relatedly, after Byron resigned, Defendant "threatened to report her to" immigration officers. (*Id.* ¶ 94.)

A major issue throughout Byron's employment was Defendant's failure to help her minor daughter immigrate along with her. (*Id.* ¶¶ 64–65.) Defendant "did not properly submit [the] daughter's paperwork." (*Id.* ¶ 64.) After Byron contacted Defendant about this problem, Defendant said that it would "get back to" her, but it "never did." (*Id.* ¶ 65.) Consequently, the daughter did not move to the United States. (*Id.*) Byron sent money back home to support her daughter, which contributed to Byron's financial struggles. (*Id.* ¶ 82.) In addition, "Byron wanted to visit her daughter . . . in January 2023 because she had not seen her . . . for over a year," so Byron "worked long hours . . . to accrue more PTO." (*Id.* ¶ 86.) However, because Defendant disregarded Byron's PTO request, she had to "plan[] her trip to visit her daughter without knowing whether [her] PTO would be approved." (*Id.* ¶ 89.) Ultimately, Defendant only approved Byron's PTO request because she said that she was "so frustrated with . . . constant battles over pay and PTO that she planned to quit." (*Id.* ¶ 90.)

Byron allegedly experienced six main problems with her pay and PTO during her employment with Defendant. First, she "was supposed to receive incentive pay for working certain shifts," but Defendant "repeatedly failed to pay the proper incentive pay rate." (*Id.* ¶ 76.) Second, despite her years of prior nursing experience,

Byron was initially paid "only $27 an hour, which was less than the hospital paid new graduate nurses." (*Id.* ¶ 77.) After receiving a pay raise to $30 an hour, Byron still earned less than "the American nurses she worked with who had comparable experience" to her. (*Id.* ¶ 78.) Third, Defendant "consistently paid Byron less than it owed her." (*Id.* ¶ 79.) Fourth, although Defendant initially told Byron not to discuss pay with Monument Health, Defendant referred her to Monument Health when she had issues with her pay. (*Id.* ¶ 80.) Ultimately, Monument Health told Byron that Defendant "needed to resolve [the pay] issues." (*Id.* ¶ 81.) Fifth, Defendant's "payroll errors made it difficult [for Byron] to predict how much pay she would actually receive." (*Id.* ¶ 82.) Sixth, Byron accrued PTO at a "much slower" rate than did "the American nurses she worked with," and she "had to work at least 1,300 hours before she could take PTO at all." (*Id.* ¶ 84.)

In addition to immigration, pay, and PTO, Byron had issues with the training that Defendant required. In the very beginning of her employment with Defendant, before Byron started working at Monument Health, Defendant required her to undergo six weeks of training. (*See id.* ¶¶ 67–68, 71, 74–75.) During the training, Defendant paid Byron $10 an hour, informed her of its policies—including the policy "that [its] employees should never . . . talk about their salary with anyone except [Defendant]"—and administered "lessons in the basics of life in the United States." (*Id.* ¶¶ 70–72.) Byron got "frustrated" because she felt that the training "treated her like a child"; indeed, she got so frustrated that she "considered quitting." (*Id.* ¶ 73.) However, she did not quit because "she knew that she was required to work for

[Defendant] for 6,240 hours[] and worried that if she quit[,] she would face financial, legal, or immigration consequences." (*Id.*)  According to Byron, Defendant had said during training that workers "would be forced to pay a penalty if they tried to leave [Defendant] before their contract was up." (*See id.* ¶¶ 94, 96, 98–99, 102–03.)  This penalty—and the uncertainty of what it would be—weighed on Byron after she resigned early from Defendant.  (*Id.)*

After Byron resigned, Defendant "told her to rescind her resignation" so that Defendant would not call immigration officers on her, she would not pay Defendant "a financial penalty" and lose her PTO, and her insurance would not lapse.  (*Id.* ¶¶ 94–95.)  "When Byron asked what the financial penalty for resigning would be, [Defendant] told her that [it] could not tell her or even calculate the amount until her resignation was final, but . . . whatever the amount ended up being, she would only have [thirty] days to pay it."  (*Id.* ¶ 96.)  Byron then "asked for a copy of the most recent contract she signed," but Defendant "refused to provide" it.  (*Id.* ¶ 97.)  From talking to other nurses who had resigned from Defendant, Byron estimated that "the penalty was likely to be between $26,000 and $30,000."  (*Id.* ¶ 98.)  One of Byron's former colleagues at Monument Health, who had resigned from Defendant before she did, said that the penalty (for the colleague) was "more than $20,000" and that Defendant would retain the unused PTO.  (*Id.* ¶ 99.)  Byron confirmed her resignation after she ended her final shift.  (*Id.* ¶ 101.)  At that point, Byron's fears of immigration and financial consequences prompted her to retain legal counsel, who "informed [Defendant] that Byron was represented and that any communications should be sent

through counsel." (*Id.* ¶ 102.)  On July 18, 2023, Defendant sent Byron an email threatening to sue her for breach of contract.  (*Id.* ¶ 105.)  "Despite Byron's request to [Defendant] that all future communications be sent to her counsel," Defendant did not include Byron's counsel on the email.  (*Id.* ¶ 106.)  In the end, given Defendant's restrictive covenant, Byron "had to move to North Dakota to find a new job." (*Id.* ¶ 104.)

### C. Lewis's Employment with Defendant

Plaintiff Latoya Lewis's employment with Defendant was like Byron's in many respects.  Lewis first signed Defendant's form contract in September 2019 but did not arrive in the United States for work until October 2021.  (*Id.* ¶¶ 112, 115.)  After arriving, Lewis "was provided the contract again."  (*Id.* ¶ 116.)  In 2019, Lewis "did not fully understand the implications of" the contract's damages and non-competition provisions.  (*Id.* ¶ 113.)  When she reread the contract in 2021, she was "unsettled by some of" the provisions but felt that "it was too late to back out" at that point.  (*Id.* ¶ 116.)  Throughout her employment, Defendant assigned Lewis to work for Piedmont Rockdale Hospital in Conyers, Georgia.  (*Id.* ¶ 115.)  She started working there in November 2021.  (*Id.* ¶ 120.)  Unfortunately, Lewis faced various employment issues that prompted her to consider resigning early from Defendant.  (*Id.* ¶ 129.)  When threatened with "immigration consequences and financial penalties if she left" Defendant, Lewis "set a goal of trying to work for at least 3,000 hours to minimize the penalty she would face for leaving."  (*Id.* ¶¶ 129–31.)  "Despite these intentions,"

Lewis reached the point where she could no longer remain "trapped in a low-paying job that fell far short of her expectations," so she "retained counsel to negotiate her departure from [Defendant]." (*Id.* ¶¶ 132–33.)  Lewis resigned in March 2023.  (*Id.* ¶ 134.)  Defendant then "told Lewis that she would be receiving a bill from [Defendant] in the amount she purportedly owed via mail in approximately one month, . . . that she would have [thirty] days to pay that amount," and "that she could not work for any facilities that where [Defendant] placed nurses for a year and a half." (*Id.* ¶ 136.)  Lewis "was worried" that Defendant would try to collect its debt and sue her and that it would inform immigration officers that "she had illegally left her job." (*Id.* ¶ 137.)

Some of Lewis's alleged employment issues were very similar to Byron's and dealt with immigration, pay, PTO, and training.  As for immigration, "[b]ased on how [Defendant] explained the requirements of the green card that Lewis was applying for, Lewis believed that failing to meet the hours requirement set forth in [Defendant]'s contract would have a negative impact on her immigration status."  (*Id.* ¶ 114.) Concerning pay, "[d]espite working twice as hard as her American counterparts," Lewis earned "half of what they made, or potentially less."  (*Id.* ¶ 123.)  "Although Lewis made approximately $30 an hour, other nurses she worked with made as much as $100 an hour," and "[f]ull-time staff made up to $55."  (*Id.*)  In fact, Lewis's "salary was not enough to cover her cost of living in the United States."  (*Id.* ¶ 127.)  Lewis wanted to "work[] part-time for a dialysis unit in order to earn additional money," but the non-competition provision in her contract prevented her from "do[ing] this extra

work in her free time." (*Id.* ¶ 128). Lewis also did not receive the "Christmas bonus" that her colleagues received. (*Id.* ¶ 124.) As for PTO, Lewis accrued it as slowly as Byron did. (*Compare id.* ¶ 85, *with id.* ¶ 125.) By February 2023, "Lewis had accrued only six days of PTO" such that when her close aunt died—and Lewis "was denied compassionate leave"—Lewis "could only spend two days mourning with the rest of her family before she had to return to work." (*Id.* ¶ 126.) As for training, from mid-October to mid-November 2021, Lewis attended a training program that covered "lessons in the basics of life in the United States," among other topics. (*Id.* ¶ 117.) Like Byron, Lewis "was paid the minimum wage of approximately $10 per hour" during the training, and she was told that she "should never . . . talk about [her] salary with anyone except [Defendant]" and that she "would be forced to pay a penalty if [she] tried to leave [Defendant] before [her] contract was up." (*Id.* ¶¶ 118–19.)

Lewis also faced problems related to her working conditions. "When Lewis began working [at Piedmont Rockdale Hospital], she quickly found that the job was physically demanding and far below her skill level." (*Id.* ¶ 121.) "[I]nternational nurses were required to do more menial labor than American nurses, including housekeeping work like cleaning beds after patients had left them." (*Id.*) "Lewis had never had to do work like this before in her decade-and-a-half of nursing[] and found it to be demeaning." (*Id.*) "In addition, Lewis was assigned to a night shift, which was exhausting and difficult to sustain." (*Id.* ¶ 122.)

Although Lewis experienced these employment issues, she did not resign as soon as she wanted, for Defendant discouraged her from resigning just as it

discouraged Byron.  When Lewis first "approached [Defendant] to discuss leaving to find another job," Defendant told her that it "had paid a lot of money for her to come to the United States," and if she breached her contract, "she would face penalties," which she interpreted as financial and immigration consequences.  (*Id.* ¶ 129.) Defendant "declined to tell her how much [the financial] penalties would be." (*Id.*) The nurse who had referred Lewis to Defendant had left before her contract ended, and Lewis knew that Defendant "had collected money from" the nurse "as 'repayment' for its departure penalty." (*Id.* ¶ 130.)  Defendant kept the nurse's referral bonus, charged her through a monthly payment plan, and "claimed that the nurse still owed $12,000." (*Id.*)  "The nurse eventually had to take out a loan to pay [Defendant] back." (*Id.*)  What happened to this nurse contributed to Lewis's fears about what would happen to her if she resigned early.  (*See id.*)  After Lewis notified Defendant of her intent to resign, Defendant sent her an email that called "early termination of employment" "a serious decision" and asked to discuss the decision "further by phone." (*Id.* ¶ 135.)  On a subsequent phone call, Defendant told Lewis to comply with the damages and non-competition provisions in her contract.  (*Id.* ¶ 136.)

## PROCEDURAL HISTORY

In August 2023, Plaintiffs filed the initial complaint in this case, bringing seven counts against Defendant on behalf of themselves and a proposed class of similarly situated healthcare workers.  (Dkt. 1.)  Plaintiffs sued for violations of the Trafficking

Victims Protection Act (TVPA)[2] (Counts I through IV), the Fair Labor Standards Act (FLSA)[3] (Counts V and VI), and the Florida Antitrust Act (FAA)[4] (Count VII). (*Id.* at 28–37.) In their prayer for relief, Plaintiffs requested that the court grant them leave to amend their complaint to add claims under the Florida Minimum Wage Act (FMWA).[5] (*Id.* at 37.) Plaintiffs also sought declaratory and injunctive relief, money damages, interest, costs, and attorney fees. (*Id.*)

In October 2023, Defendant moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Dkt. 27.) As to the TVPA claims, Defendant argued that its "alleged immigration threats and contract terms did not cause Plaintiffs to work against their will" and that Plaintiffs inadequately alleged that they were threatened with "serious harm" or "abuse of legal process." (*Id.* at 14–23.) As to the FLSA claims, Defendant asserted that Plaintiffs lacked Article III and statutory standing to pursue the claims because according to the complaint, Plaintiffs received more than the federal minimum wage. (*Id.* at 5–10.) Defendant further argued that the "mere possibility that, in the future, a court might order repayment of breach-of-contract damages [wa]s not an illegal kickback or illegal condition on weekly wages" under the FLSA. (*Id.* at 10–13.) As to the FAA claim, Defendant maintained that Plaintiffs did not plausibly plead an unlawful restraint of trade because "a financial disincentive that only affect[ed] an individual party to [a] contract" did not amount to

---

[2] 18 U.S.C. §§ 1589(a)–(b), 1590(a), 1594(a).
[3] 29 U.S.C. §§ 206, 216(b).
[4] Fla. Stat. §§ 542.18, 542.23.
[5] Fla. Stat. § 448.110.

a restraint of trade and Plaintiffs' allegations were conclusory. (*Id.* at 23–24.)

Plaintiffs responded to Defendant's motion by amending their complaint. (Dkt. 35.) In the amended complaint, Plaintiffs reasserted their claims under the TVPA (Counts I through IV), the FLSA (Counts V and VI), and the FAA (Count X) and added claims under the FMWA (Counts VII and VIII) and the Racketeer Influenced and Corrupt Organizations Act (RICO)[6] (Count IX). (*Id.* at 38–52.) In addition to the FMWA and RICO claims, the amended complaint contained new allegations that Defendant made misrepresentations about Plaintiffs' visas to Plaintiffs and the United States government. (*Id.* at 28–33.) The amended complaint did not otherwise substantially differ from the initial complaint. (*Compare* Dkt. 1, *with* Dkt. 35.)

Because each count in the amended complaint incorporated by reference all allegations above the count, (*see, e.g.*, Dkt. 35 ¶ 243), the court sua sponte dismissed the amended complaint as a shotgun pleading, *see Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015), and allowed Plaintiffs to file a SAC, (*see* Dkt. 41). Aside from correcting the formal deficiency that resulted in the shotgun pleading, the SAC does not differ substantially from the amended complaint. (*Compare* Dkt. 35, *with* Dkt. 44.) Defendant now moves to dismiss the SAC with prejudice for failure to state a claim. (Dkt. 47.) Plaintiffs "agree to voluntary dismissal of their [FMWA] claims," (Dkt. 54 at 1 n.2), but otherwise oppose the motion, (*see id. passim*).

Judge Hoffman-Price held a hearing on the motion to dismiss, (*see* Dkt. 71),

---

[6] 18 U.S.C. § 1962.

stayed discovery pending resolution of the motion, (*see* Dkt. 73), and issued a Report

and Recommendation (R&R) on the motion pursuant to 28 U.S.C. § 636(b)(1), (*see*

Dkt. 77).   In the R&R, Judge Hoffman-Price recommends dismissing the FMWA,

FLSA, and FAA claims without prejudice and denying the motion to dismiss as to the

TVPA and RICO claims.   (*Id.* at 52–53.)   Judge Hoffman-Price recommends

dismissing the FMWA claims in light of Plaintiffs' response.  (*Id.* at 10; *see* Dkt. 54 at

1 n.2.)  As to the FLSA claims, Judge Hoffman-Price concludes that Plaintiffs lack

standing and that the claims are not ripe. (Dkt. 77 at 19–20, 25–27.) Judge Hoffman-

Price recommends dismissing the FAA claim because Plaintiffs allege restraint of trade

only "with regard to the financial penalties set forth in [their] employment

agreements" with Defendant and "allege only harm to parties to the

contract . . . rather than a restraint on commerce generally." (*Id.* at 51–52.) Judge

Hoffman-Price recommends denying the motion as to the TVPA claims because "the

TVPA inquiry is fact-specific" and the SAC's allegations concerning threatened

immigration consequences, suppressed wages, and the damages and non-competition

provisions in the form contract "sufficiently state[] TVPA claims." (*Id.* at 39–40.) As

to the RICO claim, Judge Hoffman-Price identifies "the central issue" as "whether

Plaintiffs adequately allege injury"; she concludes that they do based on their

allegations that Defendant's immigration-related misrepresentations caused Plaintiffs

to feel trapped in jobs that paid them "wages substantially below the wages of their

American-nurse counterparts." (*Id.* at 44–47.)

　　　The parties partially object to the R&R. (Dkts. 78 & 79.) Defendant asserts that

the RICO claim should be dismissed because Plaintiffs do not plausibly allege an injury sufficient to satisfy the statute and do not plead the RICO elements with particularity. (Dkt. 78.)  However, Defendant does not object to the denial of its motion to dismiss with respect to the TVPA claims.  (*Id.* at 1 n.1.)  Plaintiffs contend that their FLSA and FAA claims should not be dismissed.  (Dkt. 79.)  As to the FLSA claims, Plaintiffs maintain that they adequately allege concrete and particularized injury to satisfy the requirements of Article III standing.  (*Id.* at 1–5.)  As to the FAA claim, Plaintiffs argue that they plausibly allege that the damages provision in Defendant's form contract is an unreasonable restraint of trade.  (*Id.* at 6–9.)  Plaintiffs further assert that they plausibly allege harm to competition generally, rather than only harm to parties to the contract, for their FAA claim.  (*Id.* at 9–10.)  Plaintiffs do not mention their FMWA claims in their partial objection to the R&R.  (*See id. passim*.)

## APPLICABLE STANDARDS

After conducting a careful and complete review of the findings and recommendations, a district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72.  With respect to non-dispositive matters, the district judge "must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law."  Fed. R. Civ. P. 72(a); *see Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1327 (11th Cir. 2020).  For dispositive matters, the district judge must conduct a de novo review of any portion of the report

and recommendation to which a timely objection is made. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); *United States v. Farias-Gonzalez*, 556 F.3d 1181, 1184 n.1 (11th Cir. 2009) ("A district court makes a de novo determination of those portions of a magistrate's report to which objections are filed."). Even in the absence of a specific objection, the district judge reviews any legal conclusions de novo. *See Cooper-Houston v. S. Ry. Co.*, 37 F.3d 603, 604 (11th Cir. 1994); *Ashworth v. Glades Cnty. Bd. of Cnty. Comm'rs*, 379 F. Supp. 3d 1244, 1246 (M.D. Fla. 2019).[7]

In deciding a motion to dismiss for failure to state a claim, a court "accept[s] the allegations in the complaint as true and construe[s] them in the light most favorable to the plaintiff." *Henley v. Payne*, 945 F.3d 1320, 1326 (11th Cir. 2019). For a complaint to state a claim for relief, it "must contain . . . a short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[D]etailed factual allegations" are generally not required, but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint

---

[7] When a party fails to "object to a magistrate judge's findings or recommendations contained in" an R&R "in accordance with the provisions of 28 U.S.C. § 636(b)(1)," the party "waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions," provided that "the party was informed of the time period for objecting and the consequences on appeal for failing to object." 11th Cir. R. 3-1. Here, the R&R informed the parties of the time period for objecting and of the consequences for failing to object. (Dkt. 77 at 53.) Absent "a proper objection," a waived challenge is reviewable only "for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. Plain-error review "rarely applies in civil cases." *Ledford v. Peeples*, 657 F.3d 1222, 1258 (11th Cir. 2011). When plain-error review does apply, it "require[s] a greater showing of error than in criminal appeals." *Evans v. Ga. Reg'l Hosp.*, 850 F.3d 1248, 1257 (11th Cir. 2017), *abrogated on other grounds by Bostock v. Clayton County*, 590 U.S. 644 (2020).

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A claim sounding in fraud "must state with particularity the circumstances constituting [the] fraud." Fed. R. Civ. P. 9(b). To meet this particularity requirement, the claim must set forth "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the [p]laintiffs; and (4) what the defendant[] gained by the alleged fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997). In other words, the claim must provide "the who, what, when[,] where, and how" of the alleged fraudulent activities. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (quoting *Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1470 (N.D. Ga. 1997)).

## ANALYSIS

Defendant does not object to the denial of its motion to dismiss with respect to the TVPA claims. (Dkt. 78 at 1 n.1.) Accordingly, the court accepts Judge Hoffman-Price's recommendation not to dismiss those claims. (Dkt. 77 at 39–40, 53.) Similarly, because Plaintiffs "agree to voluntary dismissal of their [FMWA] claims," (Dkt. 54 at 1 n.2), the court accepts Judge Hoffman-Price's recommendation to dismiss those claims, (Dkt. 77 at 53). The court discusses the remaining FLSA, RICO, and FAA claims in turn.

## 1. The FLSA Claims

"The FLSA authorizes collective actions against employers accused of violating" its requirements. *Morgan v. Fam. Dollar Stores, Inc.*, 551 F.3d 1233, 1258 (11th Cir. 2008). Subject to exceptions that do not apply here, the FLSA sets a minimum wage requirement of $7.25 per hour. 29 U.S.C. § 206(a)(1)(C). "An employer has not satisfied th[is] minimum wage requirement unless the compensation is 'free and clear,' meaning the employee has not kicked back part of the compensation to the employer." *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 897 (9th Cir. 2013). Plaintiffs bring Counts V and VI under theories of illegal kickback and failure to pay wages free and clear, respectively. (Dkt. 44 ¶¶ 192–207.) As to Count V, Plaintiffs assert that when Defendant "recovers so-called 'damages' in its lawsuits or through payment of those sums, it receives a 'kick[]back' of wages that is impermissible under the FLSA." (*Id.* ¶ 8.) As to Count VI, Plaintiffs submit that Defendant failed to pay wages "free and clear" because Defendant's "policy of charging workers so-called 'damages' if they try to leave their jobs prevented their earned wages from being 'paid finally and unconditionally.'" (*Id.*)

Defendant contends that Plaintiffs lack statutory standing to pursue their FLSA claims because the claims "center on the speculative possibility that future events might cause [Plaintiffs] to be paid less than minimum wage months or years after they quit." (Dkt. 47 at 5 (emphasis omitted).) The speculative nature of the claims, Defendant argues, also means that the claims are not ripe. (*Id.* at 6–7.) Judge Hoffman-Price agrees with Defendant and concludes that Counts V and VI do not

- 19 -

plead "concrete injuries presenting a controversy ripe for review." (Dkt. 77 at 25.) In partially objecting to the R&R, Plaintiffs do not mention ripeness directly, (*see* Dkt. 79), but maintain that they plausibly allege concrete and particularized injuries for their FLSA claims, (*id.* at 1–5.) They contend, for example, that if "wage suppression . . . is sufficient for statutory standing purposes for Plaintiffs' RICO claim," it "should be sufficient . . . for Plaintiffs' FLSA claim[s]." (Dkt. 79 at 3.)

Ripeness is an issue of subject-matter jurisdiction and, as such, is always reviewed de novo. *See Dermer v. Miami-Dade County*, 599 F.3d 1217, 1220 (11th Cir. 2010); *Dupree v. Owens*, 92 F.4th 999, 1004–05 (11th Cir. 2024). "The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." *Digit. Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation omitted).

Plaintiffs allege that they earned $10 per hour while attending training and $27 or $30 per hour while performing nursing work. (Dkt. 44 ¶¶ 70, 77–78, 119, 123.) These numbers are greater than the $7.25 minimum wage. Thus, Plaintiffs state claims for violations of FLSA's minimum wage requirement only if the amount of wages that Plaintiffs pay back to Defendant is great enough to reduce Plaintiffs' wages to a level below the minimum wage. *See Gordon v. City of Oakland*, 627 F.3d 1092, 1095 (9th Cir. 2010) ("Because [the plaintiff] did not allege she was paid below the federal minimum wage for any given week, the only way [she] has stated a cognizable claim is if her

- 20 -

payment to the [defendant] . . . is a 'kick-back' payment . . . ." (footnote omitted)). Plaintiffs do not allege that Defendant actually collected any money damages from Plaintiffs, just that Defendant threatened to do so by enforcing the damages provision of its form contract. (*See* Dkt. 44 at 12–28.)  Because Plaintiffs' FLSA claims depend upon Defendant's enforcement of the damages provision against Plaintiffs, which involves "contingent future events that may not occur as anticipated, or indeed may not occur at all," the FLSA claims are not ripe.  *See Texas*, 523 U.S. at 300.

Wage suppression may suffice as an injury for a RICO claim.  *See Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 709 (11th Cir. 2014) ("[E]mployees c[an] plead [a] RICO injury by showing that [their] employer depressed [their] wages[.]" (citing *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1286–87 (11th Cir. 2006))).  However, wage suppression amounts to an injury under the FLSA only to the extent that employees' wages are depressed below the minimum wage.  *See Gordon*, 627 F.3d at 1095.  Because Plaintiffs' FLSA claims are not ripe, the court dismisses them without prejudice.  *See Petersen v. Overstreet*, 819 F. App'x 778, 780 (11th Cir. 2020) ("Because [the plaintiff]'s claims are unripe, the complaint must be dismissed without prejudice.").

## 2. The RICO Claim

When a defendant violates RICO by engaging in activities prohibited under 18 U.S.C. § 1962, plaintiffs who were "injured in [their] business or property by reason of" the defendant's RICO violations "may sue" the defendant to "recover threefold the damages [they] sustain[ed] and the cost of the suit," including reasonable attorney

fees.  18 U.S.C. § 1964(c).  "To recover, [the] civil plaintiff[s] must establish that [the] defendant (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts."  *Ray v. Spirit Airlines, Inc.*, 767 F.3d 1220, 1224 (11th Cir. 2014).  The RICO Act defines "racketeering activity" to encompass a host of crimes, including violations of 18 U.S.C. §§ 1343, 1351, 1546, 1590, and 1592.  18 U.S.C. § 1961(1).  Violations of sections 1343, 1351, and 1546 sound in fraud; violations of sections 1590 and 1592 do not.  *See Magnifico v. Villanueva*, 783 F. Supp. 2d 1217, 1227–28 & n.9 (S.D. Fla. 2011).  RICO claims based on violations that sound in fraud need to be pleaded with particularity, but RICO claims based on violations that do not sound in fraud do not.  *See id.*

Defendant maintains that Plaintiffs do not plausibly plead an injury in their business or property that occurred by reason of the alleged statutory violations.  (Dkt. 47 at 20–24; Dkt. 78 at 2–9.)  In addition, Defendant asserts that because Plaintiffs' RICO claim sounds in fraud, it must be pleaded with particularity, and Plaintiffs do not describe Defendant's alleged misrepresentations in sufficient detail to satisfy this particularity requirement.  (Dkt. 47 at 19–20; Dkt. 78 at 9.)  Judge Hoffman-Price disagrees with Defendant on both points.  (Dkt. 77 at 44 n.22, 47 & n.24.)

Plaintiffs allege that Defendant "directly engaged in . . . racketeering activity" when it made "material misrepresentations" to the United States government and to Plaintiffs about Plaintiffs' employment and "maintain[ed] policies designed to force [Plaintiffs] to continue working" for Defendant.  (Dkt. 44 ¶ 155.)  Specifically, Plaintiffs plead that Defendant misrepresented to the United States government that

Defendant "intended to pay [Plaintiffs] the prevailing wage" and misrepresented to Plaintiffs that they could not obtain their green cards unless they worked for Defendant "through the entirety of [their] contract period[s]." (*Id.* ¶¶ 139–45.) These misrepresentations, Plaintiffs claim, made them "feel trapped in their jobs" with Defendant and allowed Defendant to "suppress[] their wages substantially below what they would have earned at similarly situated employers." (*Id.* ¶¶ 145–46.) Plaintiffs further allege that they "experienced injury to [their] business or property in the form of unpaid wages, reduced and suppressed wages, payments of expenses related to coming to the United States, and the payment of penalties to Defendant as a consequence of Defendant's racketeering activity." (*Id.* ¶ 233.)

To support their allegations of wage suppression, Plaintiffs allege that they earned "increased wages after they departed from [Defendant] and began working for new employers that did not use misrepresentations and coercion to keep them trapped in their jobs." (*Id.* ¶ 146.) Although Plaintiffs do not provide specifics about their new employment situations, (*see id. passim*), they describe the differences between their wages and the wages of the other nurses at the hospitals where they worked during their employment with Defendant, (*id.* ¶¶ 77–78, 123). Byron alleges that she was initially paid "only $27 an hour, which was less than the hospital paid new graduate nurses," and even after her salary increased to $30 per hour, it "was still lower than the American nurses she worked with who had comparable experience." (*Id.* ¶¶ 77–78.) Lewis specifies that while she "made approximately $30 an hour," "other nurses she worked with made as much as $100 an hour" and "[f]ull-time staff made up to

$55." (*Id.* ¶ 123.)

Plaintiffs' allegations plausibly state a RICO injury because they support that Plaintiffs' wages were suppressed by reason of Defendant's misrepresentations. *See Simpson*, 744 F.3d at 709. "[P]leading a civil RICO claim requires that [P]laintiffs plead facts sufficient to give rise to a reasonable inference that the claimed racketeering activity . . . was the but-for and proximate cause of [P]laintiffs' injuries." *Ray*, 836 F.3d at 1349 (emphasis omitted). "The connection between the racketeering activity and the injury can be neither remote, purely contingent, nor indirect." *Id.* Here, the connection between Defendant's misrepresentations and Plaintiffs' suppressed wages is direct. Taken together, Plaintiffs' allegations support that even though Defendant did not pay Plaintiffs the prevailing wage it told the government it would pay, Plaintiffs felt like they had no choice but to work for Defendant for their entire contract periods if they wanted to obtain their green cards. "[T]he alleged violation[s] led directly to [Plaintiffs'] injuries." *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006); *see also Healthcare Facility Mgmt. LLC v. Malabanan*, No. 1:23-cv-236, 2024 U.S. Dist. LEXIS 19649, at *29–30 (S.D. Ohio Feb. 5, 2024) ("conclud[ing] that [an immigrating nurse] sufficiently pled facts that would establish a pattern of racketeering" against the nurse's former employer when the former employer "misrepresent[ed] on its immigration forms that it pa[id] [its nurses] the 'prevailing wage'"), *report and recommendation accepted and adopted by* 2024 U.S. Dist. LEXIS 49295, at *19 (S.D. Ohio Mar. 20, 2024). Because Plaintiffs sufficiently plead injuries in their business or property that occurred by reason of Defendant's violations, the court will not dismiss

- 24 -

the RICO claim.

Defendant's particularity argument fares no better.  Plaintiffs allege that "Defendant engages in multiple repeated violations of" section 1590, which "constitute[] a pattern of racketeering activity" "[o]n [their] own" or "in conjunction with" violations of sections 1351, 1546, and 1592.  (Dkt. 44 ¶¶ 225–26.)  Plaintiffs further allege that Defendant engages in "repeated" violations of sections 1343 and 1546, which "[t]ogether or on their own, . . . constitute a pattern of racketeering activity." (*Id.* ¶¶ 227–30.)  Because Plaintiffs base the alleged pattern of racketeering activity in part on multiple violations of section 1590 and on a combination of violations of sections 1590 and 1592—which do not sound in fraud—Plaintiffs need not satisfy the fraud-related particularity requirement to state a RICO claim on these bases.  *See Magnifico*, 783 F. Supp. 2d at 1228 n.9.  Accordingly, the court will not dismiss Count IX for failure to plead with particularity.

### 3. The FAA Claim

The FAA generally makes "unlawful" "[e]very contract, combination, or conspiracy in restraint of trade or commerce in [Florida]."  Fla. Stat. § 542.18.  However, the FAA does not prohibit "a restrictive covenant" that is "reasonable in time, area, and line of business," "is set forth in a writing signed by the person against whom [the] enforcement [of the restrictive covenant] is sought," and "is reasonably necessary to protect [a] legitimate business interest."  Fla. Stat. § 542.335(1)(a)–(c).  The term "restrictive covenant" encompasses "all contractual restrictions such as non[-]competition/non[-]solicitation agreements, confidentiality agreements,

exclusive dealing agreements, and all other contractual restraints of trade." *Hilb Rogal & Hobbs of Fla., Inc. v. Grimmel*, 48 So. 3d 957, 959 (Fla. Dist. Ct. App. 2010). That said, not every contractual provision that "imposes a 'substantial financial disincentive' . . . constitutes a 'restraint of trade or commerce'" under the FAA. *Cap. Wealth Advisors, LLC v. Cap. Wealth Advisors, Inc.*, 335 So. 3d 164, 166 (Fla. Dist. Ct. App. 2021).[8] "[A]n antitrust plaintiff must show harm to competition in general, rather than merely damage to an individual competitor." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1069 (11th Cir. 2004).[9]

Plaintiffs allege that the damages provision specifically—"the financial penalty for departing workers"—is an unreasonable restriction on competition, in violation of the FAA; they do not allege that any other provision in Defendant's form contract, such as the non-competition provision, violates the FAA. (*See* Dkt. 44 ¶¶ 234–45; *see also* Dkt. 71 at 95–96 (confirmation by Plaintiffs' counsel that the FAA claim is premised on the damages provision, not the non-competition provision).) Defendant asserts that "Plaintiffs' conclusory [FAA] allegations" fail because "a financial disincentive that only affects an individual party to the contract is not a restraint on trade or commerce." (Dkt. 47 at 24 (internal quotation marks omitted).) Judge Hoffman-Price agrees with Defendant and concludes that Plaintiffs do not adequately

---

[8] "A federal court applying state law is bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise." *Silverberg v. Paine, Webber, Jackson & Curtis, Inc.*, 710 F.2d 678, 690 (11th Cir. 1983).

[9] Although *Spanish Broadcasting* addressed the Sherman Act, it applies to this analysis because the FAA is "analyzed under the same rules and case[]law" as the Sherman Act. *Andrx Pharms., Inc. v. Elan Corp., PLC*, 421 F.3d 1227, 1233 n.5 (11th Cir. 2005).

allege an FAA claim because they "allege only harm to parties to the contract . . . rather than a restraint on commerce generally." (Dkt. 77 at 51.) In partially objecting to the R&R, Plaintiffs contend that the damages provision "operates just like a standard restrictive covenant insofar as it impedes workers from going to work elsewhere." (Dkt. 79 at 7.) Plaintiffs further maintain that the court should presume harm to competition from their allegations that the damages "provision amounts to a restrictive covenant that is unreasonable under [section] 554.335." (*Id.* at 9.) Even absent such a presumption, Plaintiffs argue, they plausibly plead harm to competition "by alleging harm to competing employers impeded from hiring skilled nurses and harm to healthcare consumers deprived of a competitive market for healthcare workers." (*Id.* at 9–10.) [10]

The court agrees with Defendant and Judge Hoffman-Price. "[S]ection 542.18 governs restraints on 'trade' or 'commerce' itself—not the discreet effects that agreements have on the parties that enter into them." *Cap. Wealth*, 335 So. 3d at 167. Plaintiffs' FAA claim relies on the discreet effects that the damages provision has on Plaintiffs as parties to Defendant's form contract. (*See* Dkt. 44 ¶ 241 (claiming that the "severe economic penalty [that] Defendant imposes on departing employees . . . injures [them] by subjecting them to substantial debts").) The damages

---

[10] Plaintiffs do not support their presumption argument with legal authority. (*See* Dkt. 79 at 6–10.) Absent legal authority, the court will not employ the presumption Plaintiffs advance. *See Carrizosa v. Chiquita Brands Int'l, Inc.*, 965 F.3d 1238, 1248 n.6 (11th Cir. 2020) (concluding that a "district court was free to give [an] affidavit little weight" when the affidavit called for a presumption for which it "gave no meaningful support"); *cf. United States v. Markovich*, 95 F.4th 1367, 1379 (11th Cir. 2024) (holding that a defendant forfeited his position when he "cite[d] no legal authority to support it").

provision imposes a substantial financial disincentive on workers who, like Plaintiffs, terminate their employment with Defendant before the initial employment period ends. (*Id.* ¶ 21.) But as stated above, not every contractual provision that "imposes a 'substantial financial disincentive' . . . constitutes a 'restraint of trade or commerce'" under the FAA. *Cap. Wealth*, 335 So. 3d at 166. Plaintiffs do not plausibly plead an FAA claim because they do not adequately allege harm to competition generally. *See Spanish Broad.*, 376 F.3d at 1069. Accordingly, the court will dismiss the FAA claim.

Defendant seeks dismissal with prejudice because the SAC represents Plaintiffs' "third bite at the apple." (Dkt. 71 at 11.) *See Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (listing the "repeated failure to cure deficiencies by amendments previously allowed" as a ground to dismiss a claim with prejudice). However, because the court has not previously ruled on the merits of Plaintiffs' claims, dismissal will be without prejudice. *See Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, 7 F.4th 989, 1000 (11th Cir. 2021) ("[D]istrict courts should generally exercise their discretion in favor of allowing amendments to reach the merits of a dispute.").

## CONCLUSION

After undertaking an independent de novo examination of the case file and carefully considering not only Judge Hoffman-Price's R&R but also the parties' objections and responses concerning the R&R, the court agrees with the R&R. Accordingly:

1. The parties' partial objections to the R&R (Dkts. 78 & 79) are

**OVERRULED**.

2. The R&R (Dkt. 77) is **ADOPTED**.

3. Defendant's motion to dismiss the SAC (Dkt. 47) is **GRANTED in part and DENIED in part.**

4. The motion is **granted** as to the FLSA, FMWA, and FAA claims (Counts V through VIII and X), which are **DISMISSED without prejudice**.

5. The motion is **denied** as to the TVPA and RICO claims (Counts I through IV and IX).

6. The stay on discovery, (*see* Dkt. 73), is **LIFTED**.

7. On or before August 23, 2024, the parties shall file briefing as to whether amendment to the current schedule of the case, (*see* Dkt. 58), is necessary.

**ORDERED** in Orlando, Florida, on August 9, 2024.

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record